UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JENNIFER M. MEDLEY | * | CIVIL ACTION |
| | * | NO. 09-4570 |
| | * | |
| versus | * | SECTION J |
| | * | JUDGE BARBIER |
| | * | |
| STATE OF LOUISIANA, | * | DIVISION 3 |
| DEPARTMENT OF JUSTICE | * | MAGISTRATE KNOWLES |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT

The facts in this race/gender/retaliation case show that Jennifer Medley (Medley), an African-American female, went to work for the Louisiana Department of Justice (DOJ) as an Assistant Attorney General (AAG) in July 2007 (*infra*, p.2). In the first year of her employment, Medley began noticing that disparities in pay correlated to gender and race. She confirmed her suspicions with official salary figures and raised these issues with her immediate supervisor (*infra,* p.3). This got her nowhere. When James D. "Buddy" Caldwell became Attorney General in January 2008, Medley attempted to avoid further difficulties with her chain of command by voicing her concerns directly to him through his announced "open door" policy (*infra*, pp.3-4). From that point in time, Jennifer Medley's working environment became so hostile that she resigned from her job as Assistant Attorney General on the advice of her treating physicians on September 4, 2009 (*infra*, p.11).

In what follows, Jennifer Medley shows that the concerns she voiced about race and gender bias in matters of pay were and are real and that she voiced those concerns in good faith.

She further shows that, in cruel irony, her civil rights cases were pulled from her and her professional life made intolerable as a result of her protected activity in attempting to pursue federally protected rights.  Medley shows that she can prove her discrimination in pay (*infra*, pp. 28-31) and retaliation cases (*infra* pp. 9-17); consequently, she shows that the Attorney General's Motion for Summary Judgment should be denied in all respects.

## FACTS

### *Jennifer Medley's Employment*

Jennifer Medley was born and raised in New Orleans and graduated from Southern University Law Center in May 2002.  She was sworn in on October 19, 2002.  For nearly two years, Medley worked with a group of noted New Orleans lawyers in the areas of toxic torts, personal injury, and products liability.  In January 2004, Medley saw an opportunity to work for the State of Louisiana, Department of Justice; like other members of her family, she was attracted to the opportunity to serve the public.  She saw a career at the Louisiana Department of Justice offering a stable career path with excellent benefits and retirement opportunities.[1]  On July 7, 2004 Medley became employed by Defendant State of Louisiana, Department of Justice at the Office of the Attorney General in New Orleans (AG).[2]

Almost immediately, Medley began working civil rights cases in addition to those involving general liability and road hazard.  Civil rights litigation interested her more than the other fields of law she had practiced.  At that time, and even now, the number of minorities

---

[1] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶1.

[2] *See* Plaintiff's *verified* Complaint, ¶3 (Rec. Doc. 1).

practicing in this area on behalf of the State in federal court can be counted on one hand.[3]
Medley has had significant and sustained success as a trial attorney, has never lost a civil rights
case, and has earned the respect of her colleagues, judges, and attorneys she has opposed in
court.  She had a great and productive working relationship with her client, the Office of Risk
Management, her adjusters (particularly the civil rights adjuster, Lynda Colomb) and various
agency personnel whom she represented.[4]

When Medley interviewed for her job, her last annual salary was $40,000.00; she had
requested a starting salary with the AG's office of $45,000.00.[5]  Mr. Babin responded that he
would see what he could do.  The AG claimed only to have the budget to offer $40,000.00, and
Ms. Medley accepted the offer of employment.   Medley did not know at the time that the lowest
paid attorneys in the New Orleans office were Carmella Parker, Pauline Feist, and herself, all
three black female attorneys.[6]  White attorneys, both male and female were subsequently brought
in at higher salaries or were quickly given raises, in addition to the annual raise received by all
attorneys.  Despite her demonstrated competence, Medley received no significant raises.[7]

---

[3] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶1.

[4] *See* Plaintiff's *verified* Complaint, ¶3 (Rec. Doc. 1); *see also* Exhibit 1, Sworn Declaration of
Jennifer Medley, ¶5 and Exhibit 2, Affidavit of Carmella Parker, ¶8:  "Jennifer Medley, to my knowledge,
enjoyed working on…[Civil Rights] cases and was quite successful and did not have any unfavorable
results from the state."

[5] *See* Plaintiff's *verified* Complaint, ¶6 (Rec. Doc. 1).

[6] *See* Exhibit 2, Affidavit of Carmella Parker, ¶9

[7] *See* Plaintiff's *verified* Complaint, ¶6 (Rec. Doc. 1).

### *Medley Initially Protests Using Her Chain of Command*

Medley began raising questions and complaining publicly of unfair pay differentials between males and females, whites and blacks in early 2008.[8]  Medley first attempted to resolve these issues through her chain of command.[9]  Jennifer Medley and another African-American attorney in the New Orleans office, Carmella Parker, Esq., discussed race and gender as it related to DOJ salaries with Office Chief Paul Deal, Esq. and Assistant Office Chief Stephen Babin, Esq.  Mr. Babin and Mr. Deal repeatedly indicated that it was not up to them to give salary increases and that they had nothing to do with increases in pay.

However, given the concerns that Parker and Medley voiced, Deal told them that he would meet with Attorney General Charles Foti about the issue when they met for their Saturday morning working breakfast.[10]  After the breakfast, Deal informed Medley and Parker that Attorney General Foti wanted to know "who in the office was complaining"; Deal further asked if it was all right to tell him but that he could not predict what the outcome would be after divulging such information.  Deal said that the outcome could include being terminated.  After this explanation Medley was worried, and thought that she would be fired.  Parker told Deal that it was alright to reveal her name, even if the consequences were termination.[11]

Medley eventually sent a memorandum through her chain of command, which directed the attention of Mr. Rob Harroun, Director of the Litigation Division, to pay disparities based in

---

[8] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶3.

[9] *See* Plaintiff's *verified* Complaint, ¶7 (Rec. Doc. 1).

[10] *See* Exhibit 2, Affidavit of Carmella Parker, ¶4

[11] *See* Exhibit 2, Affidavit of Carmella Parker, ¶5

race and gender.[12]  Medley requested salary increases on several bases:  first, for cost of living; second, to offset preexisting gender and race pay disparities, and third, in return for her excellent performance.[13]  Medley also tried to discuss these issues with the administration many times via email and by telephone with Mr. Harroun; her repeated protests fell on deaf ears.

At no time relevant to this lawsuit did the Department of Justice have a method of tracking success or failure in the work of the attorneys it employed.  The Louisiana Department of Justice was and is, at all times relevant, invested in an entirely subjective personnel evaluation scheme in which the chief deciders were and are, almost without exception, older white males.[14]

Among the attorneys whose salary underscored the gender and race pay disparities is Mr. Matthew Derbes, a white male, who graduated on the same date as Medley in May 2002.  Derbes was admitted to the Bar on the same day in October 2002 as Medley, was hired by the AG's office on October 20, 2006, but was given pay increases in addition to the annual pay increases received by all attorneys, the first from $50,000.08 on July 1, 2007 to the last at $72,080.06 on April 7, 2008; these four pay increases, which amounted to $22,079.98 came in a period of only

---

[12] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶3; *see also*, Exhibit 3, Memorandum to Rob Harroun.

[13] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶4; *see also*, Exhibit 4, Letter of Recommendation by Stephen Babin dated June 20, 2008, Letter of Recommendation by Lynda Colomb, the Civil Rights Adjuster, dated July 18, 2008, Letter by Steve Babin to YLD Scholarship Program dated June 7, 2007, and Letter by Judge Cornelius Regan to Cong DiMattia dated June 20, 2008.  Despite these letters of recommendation extolling Medley's professional competence and demeanor, the AG's office now asserts that it somehow doubted Medley's ability to perform her job.  *See* Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 96-1), p.16.

[14] *See* Exhibit 5, Deposition of Neomie Savoy taken September 23, 2010, p.38 (ll.6-21); *see also* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.36 (ll.14-15, 21-25), p.37 (ll.1-10).

eight months and were made in addition to the annual increases that all AG employees received.[15]

Medley's repeated requests for salary increases based on specific accomplishments and specified needs were to no avail:  Medley was told, repeatedly, that salary increases outside of those given annually to all attorneys, were not within the AG's budget.  This was the only reason Medley was ever given.  Despite this announced budgetary concern, Ms. Raquelle Babineaux-Phillips, a white female in the New Orleans office, and Mr. John Sudderth, a white male in the New Orleans office, requested and were given salary increases outside of those given annually.[16]

### Next, Medley Knocks at the Attorney General's "Open Door"

Not wishing to cause further friction with her superiors, Jennifer Medley next attempted to use Mr. Buddy Caldwell's announced "Open Door Policy" to bring her information and her concerns directly to his attention.  Medley soon found out that not a single Assistant Attorney General was ever permitted to meet with the AG personally on a pay issue but, instead, was told to meet with intermediaries such as John Sinquefield and Rob Harroun.[17]  For four months, neither the Attorney General personally nor his staff made any response to Medley's repeated requests for a meeting; instead Mr. Harroun finally stated by letter that he would complete a comprehensive study of salaries by the end of September 2008.  To date, no such study has been produced, nor has the Attorney General ever offer to meet with Medley personally or by deputy.

---

[15] *See* Exhibit 7, Recommendations for Salary Change for Matthew B. Derbes.

[16] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶5.

[17] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.45 (ll.5-16).

The AG has never, at any time, suggested any resolution of the pay issue, nor has he even responded to it.[18]

Medley then began her own research of the Louisiana Department of Civil Service records about the apparent pay differential.[19]  When Medley looked into the actual pay situation at the Louisiana Department of Justice, using civil service pay data, she was shocked to discover the extent to which it was stratified according to race and gender.  Salaries for attorneys working for the Louisiana Department of Justice, as revealed by records kept in the ordinary course of business, show the following:[20]

| December 31, 2006 | White Males | $65,428.00 |
| | Black Males | $57,432.55 |
| | White Females | $57,997.53 |
| | Black Females | $49,670.51 |
| | | |
| August 14, 2009 | White Males | $69,264.05 |
| | Black Males | $65,849.77 |
| | White Females | $63,293.36 |
| | Black Females | $57,091.13 |
| | | |
| January 31, 2010 | White Males | $72,157.44 |
| | Black Males | $64,485.00 |
| | White Females | $64,073.10 |
| | Black Females | $56,248.03 |

---

[18] *See* Plaintiff's *verified* Complaint, ¶7 (Rec. Doc. 1).

[19] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶8.

[20] *See* Exhibit 8, *in globo* Employee Reports from State Civil Service for December 2006, August 2009, and January 2010; *see also* Exhibit 9, *in globo* Spreadsheet of Louisiana AAGs for the respective years and Exhibit 1, Sworn Declaration of Jennifer Medley, ¶8.  The spreadsheet is simply a compilation of the salaries listed in the Civil Service Employee Reports sorted by race and gender.

Jennifer Medley discovered that these pay discrepancies, running along the lines of race and gender, went back at least as far as the Richard Ieyoub administration.[21]  Indeed, women *and* minorities had continuously, if intermittently, complained ever since then.[22]

Medley discovered that a White female employee, Phyllis Glazer, who graduated law school three years after Medley and was hired by the AG a year and a half after Medley had received a raise and was already earning more than Medley.  The AG received a letter from Medley's attorney placing him on notice of Medley's claims of discrimination and disparate treatment; this letter was copied to and received by Paul Deal on August 5, 2008.  Paul Deal showed the letter to Glazer who confronted Medley about it.  Deal also confronted Medley, asking her why she was so upset over a differential of only "a couple of thousand dollars." Deal's actions only increased the created discord between Medley and Glazer.[23]

When internal attempts to obtain salary increases through her immediate supervisor were unsuccessful, Medley retained an attorney and requested a personal meeting with the Attorney General for the specific purpose of voicing her concerns.[24]

***Medley's Immediate Supervisor, Paul Deal, Retaliates***

The reaction from Medley's white, male supervisors was swift and retaliatory.  In April 2008, Medley requested information from other attorneys in her office concerning a specific

---

[21] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.8 (ll.12-25), p.9 (ll.1-10).  Richard Ieyoub was the AG in office before Charles Foti, the current AG's predecessor.

[22] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.15 (ll.18-22).

[23] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶9.

[24] *See* Plaintiff's *verified* Complaint, ¶7 (Rec. Doc. 1).

legal question.  This was a practice quite common to the office and was encouraged.[25]  Her superior, Paul Deal, replied to Medley, copying all the attorneys she had asked, that she should "look it up" herself.  Deal later walked into Medley's office to chew her out, publically, about the email she had written requesting legal information.  The conversation that ensued was loud and done in Medley's office with the door open:  the other attorneys in the office could clearly hear Paul Deal, (White, male) tell Jennifer Medley, (a younger African-American female attorney), that she was "crazy."[26]  Medley's reaction was shock, anger and humiliation.

Later in that month of April 2008, Medley made a routine request for information from other attorneys in her office concerning a specific legal point.  This was a practice quite common to the office and was encouraged.[27]  Her superior, Paul Deal, Esq. replied on this occasion to Medley, copying all the attorneys she had asked, that she should "look it up" herself.[28]  Deal later went to Medley to criticize her, publically, about the email she had written requesting legal information.

Later, Paul Deal, Medley's made a comment which he had never made before in Medley's hearing, that "all black females want more money for less work."[29]  This comment was pointedly directed at Medley following her complaints about the discriminatory pay differentials between whites and blacks and males and females in the office.[30]

---

[25] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶6.

[26] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶7.

[27] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶6.

[28] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶7.

[29] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶10.

[30] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶10.

***Medley's EEOC Charge***

In November 2008, the Attorney General received notice of Medley's EEOC Charge of Discrimination.[31]  At that time Mr. Deal generated a mass email asking AG employees to put in a request for personal printers before scheduled budget cuts went into effect.  The only two individuals who failed to receive printers were Medley and Sharry Scott, a white female, both had been very vocal about the discriminatory pay disparities between male and female attorneys working for the Louisiana Department of Justic[32]  Deal later claimed that he did not recall Medley requesting the printer and that they had been distributed based on seniority.  However, a secretary (Angela Sapia) and an attorney (Don Paul Landry), hired after the printers were ordered, received printers.  Both Medley and Sharry Scott are senior to the secretary and to the new hire.[33]

Medley and Scott worked at least half a city block away from the nearest common printer at the Attorney General's office in New Orleans.  Their computers were networked so that either of the two attorneys could have shared a printer with the other, and with one computer between them, both could have avoided repeated and time wasting trips to the common office printer.[34]

---

[31] *See* Defendant's Statement of Uncontested Facts (Rec. Doc. 96-10), ¶15; *see also* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶11.

[32] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶11.

[33] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶11.

[34] *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.44 (ll.1-12).

***Senator Karen Carter Peterson's Questions and Legislative Request
is Treated as a Political Attack by the Attorney General***

During a conversation with Senator Peterson wholly unrelated to her state employment, Medley expressed her concerns about the above-mentioned disparities in pay. Medley recounted the results of her research into gender/race-based pay disparities and voiced her displeasure at not having had the opportunity to present her grievances to the Attorney General under his announced "Open Door" policy.

In preparation for the 2009 regular session, as was customary, the Joint Legislative Committee on the Budget held its hearing on April 1, 2009. During this hearing, the Department of Justice presented its annual budget. Senator Peterson asked Attorney General Caldwell directly about his diversity policies, why his attorneys would feel "scared" to talk with him about these particular concerns, and requested information on pay, gender, and race from his office.[35]

When he returned from the hearing, the Attorney General reportedly tasked his assistant Mr. Rob Harroun with performing a salary survey of the assistant attorneys general in the Baton Rouge and New Orleans litigation divisions.[36] This "Survey" has never been produced in discovery, despite a hearing to obtain it and despite contradictory testimony about its very existence and the hypothetical content of the survey, if it does indeed exist in some form.[37] Ms. Neomie Savoy, the human resources analyst, testified that she had never been instructed to

---

[35] *See* Exhibit 10, Video of Exchange between Senator Peterson and the Attorney General. This confrontation is preserved as part of the Committee records of that date and will be manually filed pursuant to local rules.

[36] *See* Exhibit 11, Deposition of Robert Harroun taken April 16, 2010, p.13 (ll.6-15).

[37] *See* Exhibit 11, Deposition of Robert Harroun taken April 16, 2010, p.13 (ll.3-7). Apparently, the survey was begun but budget constraints halted its production, although it is purported to exist in some unfinished form. *Id.*

perform any analysis of the compensation for AAGs in terms of gender and race, even in response to Senator Peterson's request.[38]

From November 2008 until early May 2009, when Deal was terminated by the Attorney General, Deal began passing Medley's office several times a day, every day.  Deal even went so far as to stick his head in Medley's office each time he passed by.  Only Medley and Sharry Scott, were subjected to this hyper scrutiny.[39]  After Deal's unplanned departure, which came a month after the AG learned of his "estrogen alley" comment, Deal's good friend and second-in-command Steve Babin became office chief.[40]

### The Attorney General Ignores Senator Peterson's Request for Salary Information

After Senator Peterson's inquiry in April 1, 2009, Mr. Babin had a short conversation with the AG.[41]  In this conversation, Mr. Babin and the AG talked only about Paul Deal's "estrogen alley" comment, which had arisen in the course of Senator Peterson's inquiry, and had no discussion about the complained about pay practices within the department, even though those complaints had originated in the AG's New Orleans office.[42]

Following the testimony to Senator Peterson, the Attorney General made no further effort to respond to Medley's requests for a meeting; instead Mr. Robert Harroun, Director for the

---

[38] *See* Exhibit 5, Deposition of Neomie Savoy taken September 23, 2010, p.16 (ll.5-14), p.21 (ll.12-16).

[39] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶13; *see also* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.38 (ll.21-25), p.39 (ll.1-3).

[40] *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.35 (ll.7-10).

[41] *See* Exhibit 14, Deposition of Stephen Babin taken September 24, 2010, p.38 (ll.8-10).

[42] *See* Exhibit 14, Deposition of Stephen Babin taken September 24, 2010, p.37 (ll.16-21), p.38 (ll.13-16).

Litigation Division for the DOJ, stated by letter that he would complete a comprehensive study of salaries by the end of September 2008.  To date, no such study has been produced.  The AG has never, at any time, suggested any resolution of the pay issue.[43]

### *The Attorney General Orders His Investigator to Get Something on Jennifer Medley*

Mr. Caldwell never honored Senator Peterson's request concerning the salary survey; he did, however, task his special assistant/investigator, a young woman whose salary the AG had doubled to $102,000, to snoop through Jennifer Medley's work emails and bring to his attention things that Medley might have been doing wrong, or things which Medley might be criticized for. [44]  In her deposition, Investigator Carter admitted that she had never been asked to do any such thing before to any attorney working for the State.[45]

### *The Decision to Pull Medley's Civil Rights Cases was Subjective, Undocumented, and Made by a Supervisor Uniquely Unqualified to Make Such a Call*

Steve Babin, using the excuse that Medley's performance in Civil Rights cases was inadequate, went along with the decision to deny Medley any further Civil Rights work.[46]  The decision to shut Medley off from the steady flow of incoming civil rights cases is even more

---

[43] *See* Plaintiff's *verified* Complaint, ¶7 (Rec. Doc. 1).

[44] *See* Exhibit 15, Deposition of Ms. Sha Carter taken April 16, 2010, p.10 (ll.16-21).  Sha Carter had worked with the AG since 1997 and was hired at double her previous salary.  *Id.* at pp.8 (ll.23-25), p.9 (l.1), p.19 (ll.17-22).   An investigator earning $100,000 per year is "unheard of."  *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.42 (ll.22-25), p.43 (ll.1-18).

[45] *See* Exhibit 15, Deposition of Ms. Sha Carter taken April 16, 2010, p.16 (ll.11-19).

[46] It is unclear exactly who made the decision to deny Medley the Civil Rights.  *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.26 (ll.11-25), p.27 (ll.9-24).  The litigation background of Patricia Wilton, the Civil Rights Director, was comprised of workers' compensation litigation.  *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.48 (ll.15-25), p.49 (ll.2-4), p.50 (ll.18-25), p.51 (ll.1-7).  It appears that Patricia Wilton received this position at least partly due to her personal, intimate relationship with David Sanders, her predecessor as the civil rights section chief.  *Id.* at p.49 (ll.11-17), p. 50 (ll.16-25), p.51 (ll.1-7).

difficult to understand in light of a tragic and unexpected accident which befell Lance Guest, Esq., who ordinarily handled many employment and civil rights matters for the New Orleans office.[47]  Mr. Guest was at least temporarily paralyzed and out of the office for months beginning February, 2009.  Jennifer Medley was willing and available to help step in and help; she was never even asked.  Medley had been requesting to get her civil rights cases back a year before she was constructively discharged.[48]  The decision not to return Medley's civil rights cases was an ongoing one which came at the recommendation of Paul Deal after he had already ignored her request for a printer and begun subjecting her to heightened scrutiny, actions that Medley complained about to Mr. Babin:[49]

| | | |
|---|---|---|
| **Page 26** | **11** | **Q.     Did Ms. Medley ever tell you** |
| | **12** | **that she was having problems with** |
| | **13** | **Mr. Paul Deal?** |
| | **14** | **A.     She might have come in once** |
| | **15** | **or twice and complained about Paul,** |
| | **16** | **yeah.** |
| | **17** | **Q.     Do you remember what she was** |
| | **18** | **complaining about?** |
| | **19** | **A.     I'm trying to - - As you're** |
| | **20** | **asking this question, I'm trying to** |
| | **21** | **think. It seems to me one of the** |
| | **22** | **problems was about a printer.  He had** |
| | **23** | **gotten some printers and he didn't give** |
| | **24** | **her one, so she was upset about that.** |
| | **25** | **There might have been one or two other** |
| **Page 27** | **1** | **things.** |

---

[47] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶14.  The AG claims that Medley could not handle civil rights cases, but Medley enjoyed the work, performed it well, and never lost a single civil rights case.  *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.30 (ll.3-6, 16-19), p.39 (ll.4-24).

[48] *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.16 (ll.24-25), p.17 (ll.1-6, 18-25), p.18 (ll.1-4).

[49] *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.26 (ll.11-25), p.27 (ll.9-24).

```
 2     Q.      Did she ever say that Paul
 3     kept looking into her cubicle, into her
 4     work space checking on her more than
 5     other people?
 6     A.      You know, I can't – She
 7     might have.  I don't remember that, but
 8     she might have.
 9     Q.      Did you ever have any
10     discussions with Mr. Deal about
11     Ms. Medley?
12     A.      Yes, we talked about
13     Jennifer.
14     Q.      What do you remember about
15     those discussions?
16     A.      We talked about her
17     performance as far as civil rights
18     cases were going, and I remember
19     discussing with him that she and Mike
20     had come in my office and we decided to
21     take the cases.  And he was the office
22     chief at the time, so I told him that's
23     what we felt like we should do and he
24     agreed.
```

***Both Medley and Parker are Driven to Resign within Weeks of Each Other***

The retaliation she experienced following her complaints took its toll on Medley's mental and physical health, placed undue stress on her, and negatively affected her office morale.[50] At approximately the same time, the Attorney General involuntarily transferred Carmella Parker out of the New Orleans office to Baton Rouge and increased her commute by several hours each day.[51] At last, on the advice of her treating physician, Jennifer Medley reluctantly resigned her

---

[50] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶18.

[51] *See* Exhibit 2, Affidavit of Carmella Parker, ¶18.

15

position of Assistant Attorney General with the Louisiana Department of Justice.[52]  Medley's last

day of work for the Attorney General was September 4, 2009.

### Epilogue:  "The Attorneys General Do Things the Way They Want To"

The Attorney General's authority to terminate at will any attorney working for him stops

at the point where the attorney's protected activity begins.   But without any policies and

procedures in place in the Department of Justice, there is nothing (and no one) to remind him of

that fact.  That is what this case is really about.

Ms. Renee Free, the Director of Administrative Services, speaking of the Attorney

General of the State of Louisiana, stated:  "[E]ach Attorney General does things they way they

want to."[53]  When Richard Ieyoub came to office, pay was based on a salary schedule given each

individual attorney's seniority in the office.[54]   This scheme was completely abandoned by

Charles Foti's administration.[55]  Mrs. Gayle Truly, a respected former Secretary of Labor and a

long-time senior official at the Department of Justice, now retired, described the AG's office as

"patronage":[56]

> **Page 36**      **21**      **Q.      This patronage system or good old boy**
> **22      system, as you might choose to call it, did that**
> **23      system of friends and preferential treatment run**

---

[52] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶18.

[53] *See* Exhibit 16, Deposition of Renee Fontenot Free taken April 16, 2010, p.20 (ll.15-16).

[54] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.10 (ll.9-15), p.12 (ll.13-15).  It was at this time that the AG's office adopted the Civil Service policies and procedures and created an employee manual.  *See* Exhibit 17, Louisiana Department of Justice Policy and Procedure Manual, Performance Appraisal, effective August 7, 2000.

[55] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.13 (ll.18-24).

[56] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.36 (ll.14-15, 21-25), p.37 (ll.1-10).

|          | 24 | along gender and racial lines in what you observed? |
|----------|----|------------------------------------------------------|
|          | 25 | A.      Well, I think because all the Attorney       |
| Page 37  | 1  | Generals were male and all the Attorney Generals     |
|          | 2  | were white, that's who their friends were.  I mean,  |
|          | 3  | you know, that's who they knew unless they knew      |
|          | 4  | somebody's daughter, you know.  Yeah.  It's          |
|          | 5  | patronage.  Most of the people, and I'm not going to |
|          | 6  | say all of them, but most of the people know someone |
|          | 7  | that works at the Attorney General's office and, you |
|          | 8  | know.  I can't say that, you know, blanket because   |
|          | 9  | that's, there are people that don't know anybody     |
|          | 10 | that they have hired.                                |

Mr. Babin described hiring at the AG's office in a similar way:[57]

|          | 21 | Q.      What is the hiring practice?              |
|----------|----|---------------------------------------------------|
| Page 12  | 22 | What can you tell us about the hiring             |
|          | 23 | practice in the New Orleans office that           |
|          | 24 | you're familiar with?                             |
|          | 25 | A.      You have X amount of spots                |
| Page 13  | 1  | that are available for attorneys in the           |
|          | 2  | New Orleans office.  We keep some                 |
|          | 3  | [resumes] on file.  If there is an                |
|          | 4  | opening, then we look through the                 |
|          | 5  | [resumes].  One of the attorneys in the           |
|          | 6  | office might know somebody.  Somebody             |
|          | 7  | from Baton Rouge might know somebody.             |
|          | 8  | And they'll call up and say, "Hey, this           |
|          | 9  | person might be a good fit."  And then            |
|          | 10 | we'll go through an interviewing                  |
|          | 11 | process.  First of all, there's an                |
|          | 12 | application.  There is a background               |
|          | 13 | check that you have to go through and             |
|          | 14 | then there's an interview process.  And           |
|          | 15 | basically that's it.                              |
|          | 17 | Q.      Are these jobs required to               |
|          | 18 | be advertised.                                    |
|          | 19 | A.      No.                                       |

---

[57] *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.12 (ll.21-25), p.13(ll.1-19).

***The Absence of Policy:  A Recipe for the Informal Perpetuation
of Racial and Gender Injustice***

At the time she was hired, Jennifer Medley was provided with a copy of AG's Policy and Procedure Manual.[58]  According to what is printed, the policy and procedure manual remains in force to this day, employees sign for receipt of it, and they are expected to follow the policies and procedures in that manual.[59]

The manual expressly (but it turns out, falsely) provides that "all full time employees will receive an Annual Performance Appraisal, which is an evaluation of the individual's work performance."  The first evaluation was to be completed shortly before the end of Jennifer Medley's six-month probationary period.  Annual performance appraisals were to be performed thereafter.  However, when Medley requested her first evaluation to make sure that she was doing her job properly, her request was denied.[60]  But Medley had been evaluated by someone who counted:  the client.  The Attorney General represents the Office of Risk Management, which is the executive agency charged with defending the state from legal claims.  The adjusters who work in the Office of Risk Management direct attorneys who are paid by the Attorney General.  The adjusters with ORM maintain direct contact with the AAG's and get constant updates and feedback on every single case that is assigned.  As they should, the AAG's task is to protect the taxpayers of the State of Louisiana.

---

[58] *See* Plaintiff's *verified* Complaint, ¶4 (Rec. Doc. 1); *see also* Exhibit 17, Louisiana Department of Justice Policy and Procedure Manual, Performance Appraisal, effective August 7, 2000.

[59] *See* Exhibit 5, Deposition of Neomie Savoy taken September 23, 2010, p.32 (ll.5-13).

[60] *See* Plaintiff's *verified* Complaint, ¶4 (Rec. Doc. 1).

Medley was uniformly praised by the adjusters she has worked for in the Office of Risk Management.[61]  She made sure that her supervisors knew this when she requested consideration for a raise.[62]  Medley had never been formally evaluated by the AG despite the fact that she was employed continuously for a period of five years and despite the written policy mandating performance appraisals, which would have ensured an objective basis for evaluating each employee's performance.[63]  No attorneys in the New Orleans office of the AG have ever received an Annual Performance Appraisal done by DOJ.[64]  In fact, Ms. Free, whose responsibility it is to administer the policies and procedures, recognized that it is the "policy, but not the practice" to perform annual performance reviews, and Ms. Savoy admitted that performance evaluations had not been performed "since Richard Ieyoub's time."[65]  Instead, merit determinations are made arbitrarily and entirely subjectively by office and section chiefs.[66]  But, it is the Office of Risk Management that conducts evaluations of the litigation attorneys case by

---

[61] *See* Exhibit 18, Office of Risk Management Contract Evaluations.  Each one of these evaluations ranks Medley's performance at satisfactory or above.

[62] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶5.

[63] *See* Plaintiff's *verified* Complaint, ¶4 (Rec. Doc. 1); *see also* Exhibit 17, Louisiana Department of Justice Policy and Procedure Manual, Performance Appraisal, effective August 7, 2000.

[64] *See* Plaintiff's *verified* Complaint, ¶4 (Rec. Doc. 1).  Ms. Sharry Scott testified that while the Office of Risk Management conducts evaluations of the attorneys' work, she has never once seen any of these evaluations. *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.45 (ll.16-22).

[65] *See* Exhibit 16, Deposition of Renee Fontenot Free taken April 16, 2010, p.20 (l.13); *see also* Exhibit 5, Deposition of Neomie Savoy taken September 23, 2010,p.31 (ll.15-16).

[66] *See* Exhibit 11, Deposition of Robert Harroun taken April 16, 2010, p.28 (ll.6-9); *see also* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.10 (ll.15-25), p.11 (ll.1-2).

case and, more than any other supervisory employee, had the best "handle on who was a good attorney and who maybe wasn't as good."[67]

The Attorney General operates with unfettered discretion in regard to hiring and compensation; pay levels have no necessary connection with job performance, since performance evaluations of assistant attorneys general are never performed.[68]  In fact, a recent Civil Service survey, released in 2010, found that pay in the Attorney General's office is, on average, 18-29% lower than market factors would dictate, which tends to show that market factors also do not bear on attorney compensation.[69]

It is undisputed that the Attorney General seldom, if ever, personally observes or reviews the individual work of the lawyers who work for him. Mr. Rob Harroun testified that does not know if the Attorney General even reviews proposed individual salary levels, or what input he would have.[70]  Mr. Stephen Babin, the assistant office chief, testified that, while he has no direct say in pay raises, he will at times receive a phone call from a *deputy director* in the AG's office in Baton Rouge to discuss giving a specific attorney a pay raise.[71]

Making complaints of any kind can be a fearful thing for an attorney who works solely at the pleasure of the Attorney General:[72]

---

[67] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.38 (ll.21-24).

[68] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶2.

[69] *See* Exhibit 13, Louisiana Department of State Civil Service Annual Pay Plan Report, p.10.

[70] *See* Exhibit 11, Deposition of Robert Harroun taken April 16, 2010, p.15 (ll.21-23).

[71] *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.10 (ll.13-25), p.11 (ll.1-16).

[72] *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.35 (ll.12-22), p.36 (ll.8-15), p.60 (ll.2-5).

| | | |
|---|---|---|
| **Page 35** | **12** | **Q.      In your opinion and in your** |
| | **13** | **own particular circumstances, did you** |
| | **14** | **feel comfortable about bringing forward** |
| | **15** | **complaints through the chain of command** |
| | **16** | **at the Department of Justice?  In other** |
| | **17** | **words, did you fear that there could be** |
| | **18** | **repercussions?** |
| | **19** | **A.      I fear there could be** |
| | **20** | **repercussions from this deposition,** |
| | **21** | **yes, sir.  Any time you make a** |
| | **22** | **complaint, it's uncomfortable.** |
| | ... | |
| **Page 36** | **8** | **A.      Well, I've made several** |
| | **9** | **complaints to Steve [Babin] obviously.** |
| | **10** | **I think I'm going on my sixth year at** |
| | **11** | **the attorney general's office.  Pretty** |
| | **12** | **much stopped complaining because it** |
| | **13** | **doesn't really do any good.  It seems** |
| | **14** | **that whatever you want, the opposite is** |
| | **15** | **going to occur.  And it's frustrating.** |
| | ... | |
| **Page 60** | **2** | **…But, yes, I,** |
| | **3** | **frankly, think nothing good can come** |
| | **4** | **from this for me and my career at the** |
| | **5** | **attorney general's office.** |

*Mrs. Gayle Truly, Former Secretary of Labor:*

Mrs. Gayle Truly, who, as part of her long and distinguished service to the State, worked for years as a senior official at the Louisiana Department of Justice, is now retired.  She noted in her deposition that the atmosphere at the AG's office was not conducive to making criticisms and described the reaction given to those who vocalized criticisms of the AG's procedures and administration:[73]

| | | |
|---|---|---|
| **Page 25** | **9** | **Q.      What was the attitude that you observed in** |
| | **10** | **the department of Justice when people came up with** |
| | **11** | **criticisms of the way things were being done?** |

[73] *See* Exhibit  Deposition of Gayle Truly taken September 24, 2010, p.25 (ll.9-24), p.44 (ll.20-23).

        **12**    **A.**    **I don't think, I don't think you**
        **13**    **criticized.  I don't think you went to meetings**
        **14**    **upstairs and said anything.  I can remember some**
        **15**    **people trying to make some suggestion and it was**
        **16**    **just, you know, they were being - - they would be**
        **17**    **ridiculed.  I just, I think criticism was not**
        **18**    **something you did.**
        **19**    **Q.**    **Is vindictive too strong a word for the**
        **20**    **attitude that you experienced in the Department of**
        **21**    **Justice?**
        **22**    **A.**    **I think it was petty.  I don't know how**
        **23**    **vindictive, but it was petty.  There was some**
        **24**    **meanness to it.**
                     **…**
**Page 44**    **20**    **…You worried about**
        **21**    **your job all the time.  And you don't want anybody**
        **22**    **to hear that you complained.  You don't want anybody**
        **23**    **to know that you're, you know, talking about it.**

The AG's office was openly defensive about individuals, particularly legislators, coming into the office and criticizing the administration:[74]

**Page 27**    **11**    **A.**    **Well, they didn't like Karen Peterson.**
        **12**    **They didn't like a representative talking about - -**
        **13**    **and that probably happens at all departments.  They**
        **14**    **don't like for a representative to say something**
        **15**    **about their Department and that they're not doing,**
        **16**    **you know, doing what is correct.  So it's just a**
        **17**    **reaction they had.**

### LAW

#### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue as to *any* material fact.  See Federal Rule of Civil Procedure 56(c); see also, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A factual issue is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In determining whether there is a

---

[74] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.27 (ll.11-17).

genuine issue as to any material fact, all justifiable inferences will be made in the non-moving party's favor, and it is well-established that courts do "not weigh the evidence or evaluate the credibility of witnesses…" at the summary judgment stage. *Id.* A "dispute about a material fact is 'genuine'…if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In a summary judgment, inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451, 456, 112 S.Ct. 2072, 2077 (1992). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Therefore, summary judgment is appropriate only if the non-movant fails to establish facts supporting an essential element of his *prima facie* claim. *Celotex Corp.,* 477 U.S. at 322-23.

**B.   PRETEXT POST-*REEVES***

In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097 (2000), the Supreme Court discussed the place of pretext in proving intentional discrimination. It quoted, with explicit approval, language from *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993), which stated that:

> **The fact finder's disbelief of the reason's put forward by the defendant (*particularly if disbelief is accompanied by a suspicion of mendacity*) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.**
> *St. Mary's Honor Center,* at p. 511. **[*Emphasis supplied*.]**

The *Reeves* Court, again citing *St. Mary's Honor Center, supra,* went on to discuss in detail the question of when proof of pretext was probative of intentional discrimination. The Court's discussion is reproduced below.

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.   See *id.,* at 517, 113 S.Ct. 2742 ("[Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination").   *In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.   Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."   Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); see also *Wilson v. United States,* 162 U.S. 613, 620- 621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896);  2 J. Wigmore, *Evidence* § 278(2), p. 133 (J. Chadbourn rev. ed. 1979).   Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.   *Cf. Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[When all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration").   Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.   Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was discriminatory.   For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. See *Aka v. Washington Hospital Center,* 156 F.3d, at 1291-1292; see also *Fisher v. Vassar College,* 114 F.3d, at 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent").   To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not "treat discrimination differently from

> **other ultimate questions of fact."** *St. Mary's Honor Center, supra,* **at 524, 113 S.Ct. 2742 (quoting** *Aikens,* **460 U.S., at 716, 103 S.Ct. 1478).**
>
> **Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law. For purposes of this case, we need not--and could not--resolve all of the circumstances in which such factors would entitle an employer to judgment as a matter of law. It suffices to say that, because a** *prima facie* **case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination.**
> *Reeves v. Sanderson Plumbing Products, Inc., supra.* <u>*Emphasis supplied.*</u>

Pretext, post-*Reeves,* is found when the employer's proffered explanation is not worthy of belief. *Reeves, supra,* at 143. No additional evidence of discriminatory intent is required if a plaintiff's *prima facie* case raises a genuine issue of material fact regarding the employer's proffered reasons. *Reeves, supra,* at 143 (rejected earlier cases that required added proof of pretext).

### C.  MEDLEY'S PRIMA FACIE CASE

At trial, Jennifer Medley will show 1) that she was discriminated against on the basis of her gender and race in pay, 2) that she was engaged in protected acts both as a protester in her own case and as a participant in Senator Peterson's investigation, and 3) that she resigned as a result of a hostile workplace, thereby meeting the criteria for constructive discharge.

### 1)  <u>Gender and Race Discrimination in Pay</u>

Medley must show at trial that she was discriminated against because of her race and gender in pay; she does not even have to show that race and gender discrimination were the only

reasons she was given unequal pay.[75]    Salaries for attorneys working for the Louisiana

Department of Justice, as revealed by records kept in the ordinary course of business, show the

following:[76]

| December 31, 2006 | White Males | $65,428.00 |
| | Black Males | $57,432.55 |
| | White Females | $57,997.53 |
| | Black Females | $49,670.51 |
| | | |
| August 14, 2009 | White Males | $69,264.05 |
| | Black Males | $65,849.77 |
| | White Females | $63,293.36 |
| | Black Females | $57,091.13 |
| | | |
| January 31, 2010 | White Males | $72,157.44 |
| | Black Males | $64,485.00 |
| | White Females | $64,073.10 |
| | Black Females | $56,248.03 |

i.    *Anthony Winters and Tanya Irvin*

Tanya Irvin was not an employee of the AG at the time that Medley filed her EEOC

charge, but Medley and Irvin were barred by the Louisiana Supreme Court on the same date.

Mr. Michael Menasco (white male) graduated law school on the same date as Medley, but was

barred on April 11, 2003.  Irvin and Menasco were hired by the AG around the same time in

2009.  Irvin's initial pay rate was $50,000.86; Menasco's was $54,000.18.  At the time of Irvin

and Menasco were hired, Medley was earning $50,000.86.  Medley and Irvin, two black females

with equal time, qualifications, and more experience as the white male, were earning $4,000.00

---

[75] See Exhibit 19, Fifth Circuit Pattern Jury Instructions, 11.5.1.

[76] *See* Exhibit 8, *in globo* Employee Reports from State Civil Service for December 2006, August 2009, and January 2010; *see also* Exhibit 9, *in globo* Spreadsheet of Louisiana AAGs for the respective years and Exhibit 1, Sworn Declaration of Jennifer Medley, ¶8.  The spreadsheet is simply a compilation of the salaries listed in the Civil Service Employee Reports sorted by race and gender.

less than their white male counterpart (Menasco).  Additionally, approximately six (6) months after Medley was no longer employed with the AG, Irvin's pay was increased to $54,000.18 ostensibly to match Menasco's.  This can only be seen as a remedial measure made in response to Medley's EEOC charge and this suit.  When Irvin got this increase, it was not an annual across the board increase.  No one else in the New Orleans office got an increase.

Anthony Winters is a black male.  Winters was barred by the Louisiana Supreme Court in April 2005, long after Medley and Irvin, yet was hired at a higher rate of pay.

### ii.    *Phyllis Glazer*

Glazer (white female) asked for and received an increase in addition to the annual increases, as said earlier.  Whatever the pretense was for giving Glazer a raise, the AG does not address the fact that Medley was repeatedly told that there were no funds in the budget for any raises.  Given the Plaintiff's time, experience, and performance evaluations conducted by the Office of Risk Management, there exists no rationale for Glazer's rate of pay other than race discrimination.

### iii.   *Phillips and Sudderth*

John Sudderth and Kelly Badeaux-Phillips both asked for and received increases in addition to their annual across the board raise.

Mr. Sudderth received his raise, in addition to the annual increases, after being disciplined for ethical shortcomings in connection with his work.  Ms. Sharry Scott, an Assistant Attorney General still employed by the AG, testified that Sudderth was disciplined for being involved in a situation which involved self dealing, conflict of interest, and misappropriation of another attorney's work file, yet he subsequently received individual pay increases when more

deserving African American females were denied such raises.[77]   Ms. Scott's complaints on that

occasion led to a tense meeting between Steve Babin, Paul Deal, John Sudderth, Ms. Scott, and

another female attorney.[78]   After this meeting, in which all members became outwardly upset,

Paul Deal (White male) brought Ms. Scott into his office and told her that Mr. Sudderth (also

White male) would be disciplined discretely, that neither he nor Scott would file a complaint

against Sudderth, and that no one would be contacting Baton Rouge to report what had transpired

in the office, nor was the Louisiana Attorney Disciplinary Board contacted.[79]   Yet, Mr. Sudderth

asked for and received this additional increase.

2)   <u>Medley's Protected Activities/Enlargement of Pleadings under FRCP 15</u>

The retaliation Jenifer Medley experienced grew out of her participation and protests of

the wage situation at the DOJ.[80]   As the facts suggest, the EEOC charge of discrimination

triggered the retaliatory acts which compelled Medley to resign.   The facts pertaining to the

DOJ's retaliatory conduct were plainly revealed to Defendant in Plaintiff's deposition taken on

April 15, 2010 and again in explicit responses to discovery on July 21, 2010.   [81]   The Court has

---

[77] *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.24 (ll.4-11, 23-25). Apparently, Mr. Sudderth took information out of Ms. Scott's office and used the information to file a lien on behalf of his sister, who was a witness in a case Ms. Scott was handling for the AG's office.

[78] *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.26 (ll.16-21).

[79] *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.27 (ll.7-23).

[80] See *Sanchez v. Standard Brands, Inc*., 431 F.2d 455 (5th Cir. 1970) and its progeny.

[81] **Interrogatory No. 3:**

Identify specific instances of gender and/or racial discriminatory practices, including but not limited to disparate pay, by the Louisiana Department of Justice. For each, please provide names of all individuals involved; all relevant dates; all specific actions, whether by the Louisiana Department of Justice, or by any of its employees

and/or representatives; any and all witnesses to any of the discriminatory acts; and any and all evidence or documentation of the alleged discriminatory acts.

**Response:**

Please see Plaintiff's Second Amended Complaint, which was filed in the record.

Medley was hired in as an attorney at $40,000 her first year, while white attorneys, both male and female, were subsequently brought in at higher salaries or were quickly given raises.

Medley began raising questions and complaining, quite publicly, of the unfair pay differential between males and females and whites and blacks in January 2008. In April 2008, Medley requested information from other attorneys in her office concerning a legal question, a practice quite common to the office. Her superior, Paul Deal, replied to Medley, copying all the attorneys she had asked, that she should "look it up" herself. Deal later went to Medley to speak with her about the email. The conversation that ensued was loud and done in Medley's office with the door open, allowing other employees to hear Deal tell Medley she was "crazy."

*Medley then met with an attorney about the apparent pay differential. She discovered that a white female employee, Phyllis Glazer, who graduated law school three years after Medley and was hired by the AG a year and a half after Medley had received a raise and was earning more than Medley. The AG received a letter from Medley's attorney placing him on notice of Medley's claims; this letter was copied to and received by Paul Deal on August 5, 2008. Paul Deal showed the letter to Glazer who confronted Medley about it. Deal also confronted Medley, asking her why she was so upset over a differential of only "a couple of thousand dollars." Deal's actions created discord between Medley and Glazer.*

*On September 11, 2008, Deal made the comment, while passing Medley in the hallway, that "all black females want more money for less work." This comment was blatantly directed at Medley following her complaints about the discriminatory pay differentials between whites and blacks and males and females in the office.*

*In November 2008, the AG received notice of Medley's EEOC Charge of Discrimination. The very next month, Deal generated a mass email asking AG employees to put in a request for personal printers before the budget cuts went into effect. The only two individuals who failed to receive printers were Medley and Sharry Scott, both very vocal about the discriminatory pay disparities. When questioned, Deal responded that he did not recall Medley requesting the printer and that they were distributed based on seniority. However, a secretary and an attorney, hired after the printers were ordered, received printers. Both Medley and Sharry Scott are each senior to the secretary and new hire.*

earlier rejected Plaintiff's motion to amend, (Rec., Doc 43) under FRCP 16.  Evidence which has

since come to light has set the conditions precedent for pleadings in this matter to be enlarged

pursuant to FRCP 15(b) and 15(c).[82]  The facts of this case, as recited above, show conclusively

that an enlargement of the pleadings to include retaliation relates back to the same transaction or

occurrence as Medley's discrimination claim under Rule 15(c).   In the Fifth Circuit, an

amendment may relate back notwithstanding that the proffered amendment offers a new legal

theory.  *Johnson v. Crown Enterprises, Inc.,* 398 F.3d 339, 342 (5th Cir. 2005) (focus is not on

---

*From November 2008 until early May 2009, when Deal left the employ of the AG, Deal began passing Medley's office every day, several times a day. Medley was subject to this enhanced scrutiny continuously for six months. Deal even went so far as to stick his head in Medley's office each time he passed by. Only Medley and one other employee, also vocal about the AG's discriminatory practices, were subjected to this scrutiny.*

*Medley's last day of work for the AG was on September 4, 2009. <u>Working for the AG after her complaints of the discriminatory pay differentials was difficult for Medley. In addition to the retaliatory actions described above, Medley was denied the assignment of any civil rights cases after her complaints despite her requests for the assignments and the steady flow of incoming civil rights cases. Furthermore, a contemporary of Medley's who graduated with her from law school was hired earning nearly $4,000 more than Medley just months before her departure. The retaliation she experienced following her complaints took its toll on Medley's mental and physical health, placed undue stress on her, and negatively affected her office morale.</u>*

*<u>The actions taken by the LDJ and those for whom it is responsible were done in retaliation of Medley's complaints of discriminatory wage differentials and violated Title VII of the Civil Rights Act proscribing retaliation for complaining of race discrimination. As such, the LDJ is liable unto for the damages set forth herein below.</u>*

***<u>Medley has brought her complaints of retaliation to the EEOC and received a right to sue on February 27, 2010.</u>***
**<u>Supplied</u>**.

[82] *See* Exhibit 20, Table of Deposition Testimony Supporting Retaliation.  No objection was ever made by Defendant when testimony pertaining to retaliation was elicited or given.

caption of count, but underlying facts).  The Court at this juncture should exercise its discretion under Rule 15(b) to enlarge the pleadings to include evidence in the record of retaliation and to make whatever orders necessary to ensure fairness to both parties.

Medley has shown that she actively engaged in vocal protests and the legislative inquiry into the AG's pay disparities for minorities.  When she first discovered the pay discrepancies through her research of Civil Service records, Medley attempted to resolve this matter through official channels.[83]  Jennifer Medley and another African-American attorney in the New Orleans office, Carmella Parker, Esq. discussed race and gender as it related to DOJ salaries with Paul Deal Esq., the Office Manager and his assistant Stephen Babin, Esq.  Mr. Babin and Mr. Deal indicated that it was not up to them to give salary increases.[84]  Medley eventually sent a memorandum through her chain of command, which directed the attention of Mr. Rob Harroun to pay disparities based in race and gender.[85]

When informal attempts to obtain salary increases through her immediate supervisor were unsuccessful, Medley retained an attorney and requested a personal meeting with the Attorney General for the specific purpose of voicing her concerns.[86]  Despite the Attorney General's announced "Open Door Policy," not a single Assistant Attorney General ever met with the AG personally on a pay issue but, instead, was told to meet with intermediaries like John

---

[83] *See* Plaintiff's *verified* Complaint, ¶7 (Rec. Doc. 1).

[84] *See* Exhibit 2, Affidavit of Carmella Parker, ¶4.

[85] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶3; *see also*, Exhibit 3, Memorandum to Rob Harroun.

[86] *See* Plaintiff's *verified* Complaint, ¶7 (Rec. Doc. 1).

Sinquefield and Rob Harroun.[87]   Around the same time that Medley met with an attorney, Medley communicated her complaints in pay disparities to State Senator Karen Carter Peterson in the course of an unrelated personal conversation.[88]  In a Senate Committee hearing conducted in April 2009, Senator Peterson confronted Mr. Buddy Caldwell face to face and demanded that he conduct a salary survey of his entire litigation division.[89]

      3)      <u>Hostile Work Environment</u>

For Defendant to be liable for the hostile work environment Medley endured, the conduct must be sufficiently severe or pervasive to alter the terms or conditions of Plaintiff's employment and create a hostile or abusive work environment.  To determine whether the conduct in this case rises to a level that alters the terms or conditions of Plaintiff's employment, the fact finder should consider all the circumstances, including:  the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with Plaintiff's work performance.[90]

Medley began raising questions and complaining publicly of unfair pay differentials between males and females, whites and blacks in early 2008.[91]  In April 2008, Medley requested information from other attorneys in her office concerning a specific legal question.  This was a practice quite common to the office and was encouraged.[92]  Her superior, Paul Deal, replied to

---

[87] *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.45 (ll.5-16).

[88] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶12.

[89] *See* Exhibit 11, Deposition of Robert Harroun taken April 16, 2010, p.13 (ll.6-15).

[90] See Exhibit 19, Fifth Circuit Pattern Jury Instructions, 11.5.2.

[91] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶3.

[92] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶6.

Medley, copying all the attorneys she had asked, that she should "look it up" herself. Deal later went to Medley to chew her out, publically, about the email she had written requesting legal information. The conversation that ensued was loud and done in Medley's office with the door open: the other attorneys in the office could clearly hear Paul Deal, (White, male) tell Jennifer Medley, (a younger African-American female attorney), that she was "crazy."[93]

In November 2008, the Attorney General received notice of Medley's EEOC Charge of Discrimination.[94] In addition, Medley and Scott worked at least half a city block away from the nearest common printer at the Attorney General's office in New Orleans. Their computers were networked so that either of the female attorneys could have shared a printer with the other, and both could have avoided repeated and time wasting trips to the common office printer.[95]

From November 2008 until early May 2009, when Deal suddenly left the employ of the Attorney General, Deal began passing Medley's office several times a day, every day.[96] Deal even went so far as to stick his head in Medley's office each time he passed by. Only Medley and one other employee, also vocal about the AG's discriminatory practices, were subjected to this hyper scrutiny.[97] After Deal's departure, Deal's good friend and second-in-command Steve Babin became office chief.[98]

---

[93] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶7.

[94] *See* Defendant's Statement of Uncontested Facts (Rec. Doc. 96-10), ¶15; *see also* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶11.

[95] *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.44 (ll.1-12).

[96] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶13; *see also* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.38 (ll.21-25), p.39 (ll.1-3).

[97] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶13.

[98] *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.35 (ll.7-10).

Mr. Caldwell never honored Senator Peterson's request concerning the salary survey; he did, however, task his special assistant/investigator, a young woman whose salary the AG had doubled to $102,000.00, to snoop through Jenifer Medley's work emails and bring to his attention things that Medley might have been doing wrong, or things which Medley might be criticized for. [99]   In her deposition, Investigator Carter admitted that she had never been asked to do any such thing before to any attorney working for the State.[100]

Medley reached the limits of her endurance in the summer of 2009.  Steve Babin, using the excuse that Medley's performance in Civil Rights cases was inadequate, went along with the decision to deny Medley any further Civil Rights work.[101]   Working for the AG after her complaints of the discriminatory pay differentials was difficult for Medley.  In addition to the retaliatory actions described above, Medley was denied the assignment of any civil rights cases after her complaints despite her requests for the assignments and the steady flow of incoming civil rights cases.[102]   Mr. Babin recalled taking these civil rights cases from Medley without any

---

[99] *See* Exhibit 15, Deposition of Ms. Sha Carter taken April 16, 2010, p.10 (ll.16-21).  Sha Carter had worked with the AG since 1997, and, when the AG came into office, she was hired at double her previous salary.  *Id.* at pp.8 (ll.23-25)-9 (l.1), p.19 (ll.17-22).  An investigator receiving pay in excess of $100,000 per year is unheard of in the AG's office.  *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.42 (ll.22-25), p.43 (ll.1-18).

[100] *See* Exhibit 15, Deposition of Ms. Sha Carter taken April 16, 2010, p.16 (ll.11-19).

[101] It is unclear exactly who made the decision to deny Medley the Civil Rights.  *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.26 (ll.11-25), p.27 (ll.9-24).  The litigation background of Patricia Wilton, the Civil Rights Director, was comprised of workers' compensation litigation.  *See* Exhibit 6, Deposition of Gayle Truly taken September 24, 2010, p.48 (ll.15-25), p.49 (ll.2-4), p.50 (ll.18-25), p.51 (ll.1-7).  It appears that Patricia Wilton received this position at least partly due to her personal, intimate relationship with David Sanders, her predecessor as the civil rights section chief.  *Id.* at p.49 (ll.11-17), p. 50 (ll.16-25), p.51 (ll.1-7).

[102] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶14.  Medley enjoyed the Civil Rights work, performed it well, and never lost a single civil rights case.  *See* Exhibit 12, Deposition of Sharry Scott taken September 23, 2010, p.30 (ll.3-6, 16-19), p.39 (ll.4-24).

type of written documentation accompanying such an action and also recalled that Medley requested assignments to civil rights cases even a year before she was constructively discharged.[103]

    4)    <u>Constructive Discharge</u>

To establish constructive discharge, a plaintiff must demonstrate that "'working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" *Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir. 2001) (quoting *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)). "Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Id.* (citation omitted). In evaluating a claim of constructive discharge, a court may consider factors such as:

> **(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status]…**

*Id.* citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000).

The retaliation she experienced following her complaints took its toll on Medley's mental and physical health, placed undue stress on her, and negatively affected her office morale.[104] At approximately the same time, the Attorney General involuntarily transferred Carmella Parker to Baton Rouge, adding several hours to the commute from her home. Parker, like Medley, was African American and had participated and protested gender and race pay issues.[105] At last, on

---

[103] *See* Exhibit 14, Deposition of Stephen Babin taken September 23, 2010, p.16 (ll.24-25), p.17 (ll.1-6, 18-25), p.18 (ll.1-4).

[104] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶18.

[105] *See* Exhibit 2, Affidavit of Carmella Parker, ¶18.

the advice of her treating physician, Jennifer Medley reluctantly resigned her position of Assistant Attorney General with the Louisiana Department of Justice.[106] Medley's last day of work for the Attorney General was September 4, 2009.  The other protesting African American female attorney in the New Orleans office, Carmella Parker resigned and was constructively discharged by the Attorney General on October 22, 2009.[107]

## CONCLUSION

Medley has rebutted each and every "undisputed" material fact proffered by Defendant. The abundant evidence produced by Medley on retaliation is unrefuted on this record, and Medley's pay data at the very least reveals material questions of fact which, when viewed in the light most favorable to the non-moving party, *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451, 456, 112 S.Ct. 2072, 2077 (1992), is sufficient to survive summary judgment.

Therefore, Defendant State of Louisiana, Department of Justice's Motion for Summary Judgment should be denied in all respects at this time and the pleadings enlarged to encompass evidence in the record relevant to retaliation.

Respectfully submitted,
LAW OFFICE OF DALE EDWARD WILLIAMS

/s/Dale E. Williams
Dale E. Williams, Bar #18709
212 Park Place
Covington, Louisiana 70433
Telephone: (985) 898-6368
Facsimile:  (985) 892-2640
mailto:dale@daleslaw.com

---

[106] *See* Exhibit 1, Sworn Declaration of Jennifer Medley, ¶18.

[107] See Exhibit 2, Affidavit of Carmella Parker, ¶19.

36

James M. Williams, Bar #26141
Gauthier, Houghtaling, & Williams, L.L.P
3500 N. Hullen Street
Metairie, Louisiana 70002
Telephone: (504) 456-8600

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/Dale E. Williams