UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JENNIFER M. MEDLEY | * | CIVIL ACTION |
| | * | NO. 09-4570 |
| versus | * | SECTION J |
| | * | JUDGE BARBIER |
| STATE OF LOUISIANA, | * | DIVISION 3 |
| DEPARTMENT OF JUSTICE | * | MAGISTRATE KNOWLES |

## DECLARATION OF JENNIFER M. MEDLEY

Pursuant to the provisions of 28 U.S.C. § 1746, I, Jennifer M. Medley, verify under penalty of perjury that I have personal knowledge of the following, and the following is true and correct to my personal knowledge and belief.

1. I graduated from Southern University's Law Center May of 2002. I took the Louisiana bar exam in July of 2002, passed and was sworn in by the Louisiana Supreme Court on October 19, 2002. From October 19, 2002 until my date of hire with the Louisiana Department of Justice, I practiced law in the areas of toxic torts, personal injury and products liability under the same set of lawyers at their different offices. I have always been very involved in my community. In January of 2004, I was presented with the opportunity to work at the Louisiana Department of Justice, in the New Orleans satellite office. It was a more stable career path than that which I was on. I also had the opportunity to get into the State's retirement system. Upon my hiring, I was introduced to the civil rights area of law. It was mostly federal practice and a rarity for any minority female attorney to practice this area of law. I enjoyed the practice and its complexities, it was challenging and decided that I wanted to continue practicing in this area. It was an area that I knew I could develop a niche for myself. As a lawyer, it is beneficial to have

a niche in such a competitive market. I also realized that there are very few minorities in federal practice.

2. During my employment with the Attorney General's office, I had the opportunity to observe the hiring and compensation practices in place. The Attorney General has complete discretion with regard to hiring and compensation. Neither market rates nor job performance are not taken into account since performance evaluations are not done. Furthermore, the Attorney General's office had no procedure in place to rate performance or behavior.

3. My requests for raises started in January 2008, when I noticed that black females consistently earned less in the office than white attorneys with similar skills and qualifications. I wrote several memoranda to Mr. Rob Harroun notifying him of apparent race and gender pay disparities, while requesting an increase in pay.

4. I requested a meeting to discuss my concerns of disparate pay with Attorney General Caldwell many times through Linda Southhall and John Sinquefield to no avail.

5. I requested the increases in pay for several different reasons. The cost of living in the New Orleans area skyrocketed after Hurricane Katrina. I knew that others who were less qualified for anything had asked for and received increases, in addition to the annual increase that all state employees got. I consistently performed my job well, received praise from our clients and did not have any complaints. Particularly given the fact that performance evaluations were not routinely conducted. But, I had never lost a civil rights case while working at the AG's office. In fact and just to name a few, Stephen Babin, Assistant Office Chief, and Lynda Colomb, former State Risk Claims Adjuster for civil rights litigation, who both wrote very favorable letters of recommendation.

6. While my requests for salary increases based on the above reasons were ignored for supposed budget limitations, Raquelle Babeaux-Phillips, a white female admittedly with three more years of experience, requested and received a salary increase, in addition to the annual increase given to all state employees. Additionally, John Sudderth, a white male, requested and received a salary increase outside of the one annually given across the board.

7. Once I began to request these raises, my then office chief, Paul Deal, began to act in an increasingly hostile manner toward me. On April 28, 2008, Paul Deal and I had an argument over an email. About a week before this, I sent an email around the office asking a legal question. Attorneys in our office did this all of the time. In fact, about two weeks prior, Kathi Logan sent a similar email asking if anyone in the office had ever done a minor's settlement. Everyone responded in an effort to assist Ms. Logan. This time, Paul's response to me was to "look it up myself." He sent his response to me to all of the attorneys in the office. He came into my office to discuss it with me and he said that he didn't remember Kathi's email and that I was crazy. I told him that the only difference between Kathi and I was that she was white and I was black. When he came into my office, he was very loud and did not close my door. Others in the area at that time heard this.

8. According to the records publicly available through the Louisiana Department of State Civil Service, I discovered that Phyllis Glazer received a raise in or around February 2008. This raise had her at a higher rate of pay than me. At the time of her hire, I had been an Assistant Attorney General for approximately a year and a half and had been a practicing attorney for three years. At the time of her hire, she had just gotten out of law school and had no experience as an attorney. She started at the same rate of pay as I had been earning at the time of her hire. For

several months before Phyllis Glazer received her raise, I had been requesting a raise but was told that the Louisiana Department of Justice did not have any money. The only difference between Phyllis Glazer and I, is that she is white and I am black.

9. In the Spring of 2008, I met with an attorney who sent a letter to the AG requesting a meeting to discuss my concerns. The letter written by my attorney was received in the AG's Baton Rouge office on August 5, 2008. Paul Deal was copied on the letter and he received it in our office on the same day. When Paul Deal got the letter, he showed it to Phyllis Glazer, which led to her confronting me angrily about it in my office. In addition, Paul told me in his office that he didn't understand why I was upset about it, "it was only a couple of thousand dollars." This created even more tension between Phyllis and me. Because of Mr. Deal's actions, now everyone in our office knew of my situation. It was embarrassing.

10. On September 11, 2008, as I was in the hallway, Paul Deal said that "all black females want more money for less work," which was very obviously directed at me.

11. The EEOC letter was received by the AG in November of 2008. The next month Paul Deal sent an email asking which Assistant AGs wanted a personal printer for their office. The DOJ knew that the budget cuts were coming, so this was the time to put any orders in. I responded that I needed one. I had been using my personal printer and told him that I could finally bring mine home. The printers were delivered in February of 2009. The two people who did not get one were me and Sharry Scott. When I asked him why I didn't get a printer, he said that he didn't remember that I asked for one and that they were given by seniority. This was not

4

true, as Angela Sapia (a secretary) and Don Paul Landry (an attorney who was not even hired at the time the order was placed) each received one. Sharry Scott and I were vocal in the office about the pay disparities. Both of us were senior to them.

12. Around the same time, I met with Senator Karen Carter Peterson to see if she might be able to assist me in finding other employment. I expressed to her that I had become unhappy with my employment with LA DOJ because of the disparity in pay and their attitudes towards even addressing the issue. I also expressed my disappointment in the Attorney General, that he had totally ignored my many attempts to discuss the matter with him. General Caldwell said that he had an open door policy.

13. From November of 2008 until Paul Deal's termination in May of 2009, he would pass by my office every day, multiple times daily to see if I was there. This was unusual, and others in the office noticed and voiced their concerns to me, as Paul was seldom in the office at 8:30 or there after 4:00pm. Suddenly, he was there all day. He watched everything that I did. He did not do this to any other employees with the exception of Pauline Feist, another African American attorney. He went as far as sticking his head in my office each time.

14. Since I began making complaints, I was denied assignments to civil rights cases even though I requested them repeatedly. I was told that none were coming in. To my knowledge, civil rights cases continued to come in. I enjoyed federal practice and civil rights filings are the main way that the state gets in federal court. This was the only way that I could perfect my craft in regards to federal practice.

15. Months before my departure from the office, Michael Menasco was hired at a salary that was approximately $4,000.00 more than my salary at that time. Michael Menasco is a white male. We finished law school together in the same year.

16. Around the same time, Tanya Irvin was hired, a black female but started at the same pay as myself. Irvin passed the Louisiana bar on October 19, 2002. Menasco passed the bar later in April of 2003.

17. Months after my departure, and now approximately two years after my complaints, the DOJ has increased Irvin's salary (black female) to match Menasco's salary (white male) to the exact penny. No one else in the office got any type of increase.

18. My last day of work was on September 4, 2009. I could not take the stress and morale effects that had been caused by the situation. It was taking a toll on my mental and physical health. I understood from my treating physician that my mental health was at risk everyday that I worked at the Attorney General's office. I was running the risk of having a mental breakdown and losing my ability to practice law. Had this not happened, I could have been a career employee with the AG's office. I thoroughly enjoyed the work and knew I was doing a great job for the citizens of Louisiana. I took a lot of pride in the work I have done and the work that I do.

19. The following exhibits are true and correct copies of the documents generated and kept in the ordinary course of business:

    a. Memorandum to Rob Harroun

b.   Letter of Recommendation by Stephen Babin dated June 20, 2008, Letter of Recommendation by Lynda Colomb, the Civil Rights Adjuster, dated July 18, 2008, Letter by Steve Babin to YLD Scholarship Program dated June 7, 2007, and Letter by Judge Cornelius Regan dated June 20, 2008

c.   Recommendations for Salary Change for Matthew B. Derbes

d.   *in globo* Employee Reports from State Civil Service for December 2006, August 2009, and January 2010

e.   *in globo* Spreadsheet of Louisiana AAGs for December 2006, August 2009, and January 2010

f.   Video of Exchange between Senator Peterson and the Attorney General

g.   Louisiana Department of State Civil Service Annual Pay Plan Report

h.   Louisiana Department of Justice Policy and Procedure Manual, Performance Appraisal, effective August 7, 2000

i.   Office of Risk Management Contract Evaluations

Signed in Metairie, Louisiana, this 5th day of October 2010.

_____
JENNIFER M. MEDLEY