NEOMIE G. SAVOY
9/23/2010

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JENNIFER MEDLEY   *   CIVIL ACTION
                  *   NO. 09-4570
VERSUS            *   CJB - DEK
                  *
LOUISIANA STATE   *   JUDGE CARL BARBIER
DEPARTMENT OF     *
JUSTICE           *   MAGISTRATE JUDGE
                  *   DANIEL E. KNOWLES,
                  *   III
*   *   *   *   *  *  *


        Deposition of NEOMIE G. SAVOY,
9088 Shirley Dyer Road, Gonzales,
Louisiana 70737, taken in the law
offices of Shows, Cali, Berthelot &
Walsh, LLP, located at 628 St. Louis
Street, Baton Rouge, Louisiana 70802,
commencing at 10:18 a.m., on Thursday,
the 23rd day of September, 2010.


APPEARANCES:

    LAW OFFICE OF DALE EDWARD WILLIAMS
    (By:  Dale Edward Williams, Esquire)
    212 Park Place
    Covington, Louisiana  70433
       (Attorneys for the Plaintiff)

NEOMIE G. SAVOY
9/23/2010

Page 2

```
 1   APPEARANCES (continued):

 2

     SHOWS, CALL BERTHELOT & WALSH,
 3   L.L.P.
     (By:  Amy L. McInnis, Esquire
 4            - and -
         Lindsay L. Lollar, Esquire)
 5   628 St. Louis Street
     Baton Rouge, Louisiana  70802
 6     (Attorneys for the Defendant,
        Douglas Marine Service, Inc.)
 7

 8

 9   ALSO PRESENT:

10

     Rob Harroun
11
     Jennifer Medley
12

13

     REPORTED BY:
14

15   KATHY SHAW-GALLAGHER, CCR, RPR
     Certified Court Reporter
16   (No. 049519)
     Curren-Landrieu, L.L.C.
17   749 Aurora Avenue
     Suite 4
18   Metairie, Louisiana  70005
     (504) 833-3330 (800) 487-3376
19

20

21

22

23

24

25
```

NEOMIE G. SAVOY
9/23/2010

1        E X A M I N A T I O N   I N D E X

2

3                                          PAGE

4
    EXAMINATION BY MR. WILLIAMS                    5
5

6

7            *       *       *       *       *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NEOMIE G. SAVOY
9/23/2010

1          S T I P U L A T I O N

2      It is stipulated and agreed by

3    and among counsel for the parties

4    hereto that the deposition of the

5    aforementioned witness is hereby being

6    taken under the Federal Rules of Civil

7    Procedure, for all purposes, in

8    accordance with law;

9      That the formalities of reading,

10   signing, filing, sealing, and

11   certification are specifically waived;

12     That all objections, save those

13   as to the form of the question and the

14   responsiveness of the answer, are

15   hereby reserved until such time as this

16   deposition, or any part thereof, may be

17   used or sought to be used in evidence.

18         *     *     *     *     *

19     KATHY SHAW-GALLAGHER, certified

20   Court Reporter, State of Louisiana,

21   officiated in administering the oath to

22   the witness.

23

24

25

NEOMIE G. SAVOY
9/23/2010

1            NEOMIE G. SAVOY,

2    after having been duly sworn by the

3    above-mentioned Certified Court

4    Reporter, was examined and testified as

5    follows:

6    EXAMINATION BY MR. WILLIAMS:

7         Q.   Morning, Ms. Savoy.

8         A.   Good morning.

9         Q.   My name is Dale Williams,

10   and I'm here on behalf of my client,

11   Jennifer Medley, to ask you some

12   questions about -- some you may or may

13   not know about this case, this

14   proceeding in the federal court.

15            I understand that you are

16   employed by the Department of Justice

17   in the State of Louisiana; is that

18   correct?

19        A.   Yes, sir.

20        Q.   And you work for the

21   attorney general; is that right?

22        A.   Yes.

23        Q.   Could you fill me in on your

24   background of the association you've

25   had with the attorney general and the

NEOMIE G. SAVOY
9/23/2010

Page 6

1    Department of Justice, how long you've

2    been working with them, that sort of

3    thing, kind of speed it along?

4         A.   I've been with the

5    Department of Justice for 36 years.

6    I've been in human resources about 26

7    of those 36 years and I was in payroll

8    for the other ten.  I was human

9    resource analyst, and then when I came

10   back -- I retired for five months, and

11   when I came back in January of '08, I

12   was human resource manager.

13        Q.   You are an H.R. analyst; is

14   that correct?

15        A.   Yes, sir.

16        Q.   And that was up to January

17   of '08?

18        A.   That was August 24th of '07.

19        Q.   Okay.

20        A.   And then, from that time to

21   January 15th, I was retired.

22        Q.   Now, you had put in, what,

23   25 years or so as of '07?

24        A.   That's counting these three

25   years also, so 23 or 22 and then these

NEOMIE G. SAVOY
9/23/2010

1    three are 25.

2         Q.   I see.  So in '07, you would

3    have been at 22 years?

4         A.   Right.  Well, 22 plus the

5    ten that I was in payroll, so -- You

6    follow me?

7         Q.   Well, I guess, totally you

8    would have had --

9         A.   Oh, I have 36 years now.

10        Q.   -- over 30 years?

11        A.   Yes, sir.

12        Q.   That's really remarkable.

13             So in '07, were you eligible

14   to retire essentially at 100 percent of

15   your pay?

16        A.   Seventy-five percent.

17        Q.   Is that kind of a cap for

18   the retirement system?

19        A.   That's 30 years at any age,

20   you can retire.

21        Q.   I see.  And after that, do

22   you continue to accrue entitlement

23   toward your retirement?

24        A.   When I came back, I

25   suspended my benefits and now I am

NEOMIE G. SAVOY
9/23/2010

1    accruing and earning retirement again.

2    I mean, I'm putting into the system

3    again.

4         Q.   I see.  I just really don't

5    know what the rules are, and I was

6    wondering past 30 years, do you

7    continue to accrue benefits on the

8    retirement system?

9         A.   You can, yes, sir.  You can

10   work up to 40 years and at 40 years,

11   you get 100 percent.

12        Q.   I see.  Well, I was just

13   wondering what brought you out of

14   retirement in January '08.  Did you

15   know the present attorney general prior

16   to January of '08?

17        A.   Only in passing.  He had

18   been at some JP conferences I had

19   worked at and everything, but, no, sir,

20   not really, not --

21        Q.   Well, Ms. Savoy, would you

22   tell me what an H.R. analyst does?  I

23   mean, we were just on the verge of

24   talking about that when we got into

25   your retirement.

NEOMIE G. SAVOY
9/23/2010

Page 9

1        A.    We prepare all the paperwork

2   to hire and then once an employee is

3   fired, we prepare the paperwork for

4   that.  We make any changes to their

5   taxes, retirement, whatever.  Whatever

6   personnel matters or changes that need

7   to be made, we enter them in the

8   system.

9        Q.    The analyst part of that job

10  title, where does that come from, if

11  you know?

12        A.    Civil Service has an H.R.

13  analyst and we use their numbering

14  system through the Civil Service.

15  We're unclassified.  We do not have to

16  go by Civil Service's rules, but we do

17  use their class codes.

18        Q.    So an analyst would -- among

19  other things, would classify employees;

20  is that right?

21        A.    We would use -- Whatever

22  their title is, we'd use that class for

23  them, yes, sir.

24        Q.    I believe you said that you

25  were in the -- you worked in the

NEOMIE G. SAVOY
9/23/2010

Page 10

```
 1   capacity of an H.R. analyst for some

 2   lengthy period of time prior to

 3   August 24th, 2007; is that right?

 4        A.   Yes, sir.

 5        Q.   Can you tell me

 6   approximately again how long you were

 7   in that position?

 8        A.   From November of '84, give

 9   or take, till 2007.

10        Q.   In the Department of

11   Justice, how many H.R. analysts were

12   there during that period of time?

13        A.   One.

14        Q.   And that would have been

15   you; is that right?

16        A.   Yes, sir.

17        Q.   As part of your job, did you

18   ever have the responsibility of

19   analyzing salary structure?

20        A.   That was the manager's job.

21        Q.   And that's the H.R. manager?

22        A.   Yes, sir.

23        Q.   Did you work with the H.R.

24   manager?

25        A.   Yes, sir.
```

NEOMIE G. SAVOY
9/23/2010

Page 11

1          Q.    Were you physically

2    co-located in close proximity --

3          A.    Yes, sir.

4          Q.    -- to the H.R. manager?

5                And during this period of

6    time, where was your office located?

7          A.    Well, we were at Woodale

8    Boulevard at some part of that time and

9    then we moved to the State Capitol.  I

10   was located on the 24th floor of the

11   Capitol.

12         Q.    When did that change happen?

13         A.    Oh, gosh.  I honestly don't

14   remember the date or the year.

15         Q.    It's been awhile?

16         A.    Oh, yes, sir.

17         Q.    What was your -- What duties

18   or functions did you perform for the

19   H.R. manager?

20         A.    I entered everything into

21   the ISES system.  I prepared the

22   documentation that she would give me

23   directions on, prepare that.  And I

24   handled employees' questions and, you

25   know, filled out the paperwork that

NEOMIE G. SAVOY
9/23/2010

Page 12

1   employees wanted to change their taxes,

2   credit unions, whatever.

3        Q.   Did you work with the H.R.

4   manager frequently and on a daily

5   basis?

6        A.   Yes, sir.

7        Q.   Can you recall anyone else

8   working with the H.R. manager more

9   closely than you did during that period

10  of time?

11       A.   We have payroll analysts and

12  we have a secretary in that section and

13  we had an accountant.  They all worked

14  with her.

15       Q.   And who was the H.R. manager

16  that you worked with up to August of

17  '07?

18       A.   Well, it started out with

19  Ralph Hall, back in the late -- I mean,

20  the early '80s.  And then from Ralph

21  Hall, it went to Jack Jolissaint.  And

22  then from Jack Jolissaint, it was -- We

23  had no H.R. manager at that time.

24  There were two analysts at that time

25  and that was -- Katie Kirkpatrick was

NEOMIE G. SAVOY
9/23/2010

Page 13

1   my associate and then it went to Judy

2   Stout.

3        Q.   And this period without an

4   H.R. manager, the interregnum, I guess

5   you'd call it, the period of time

6   without a king, I guess, if you want to

7   call it that -- this period without an

8   H.R. manager, how long did that last?

9        A.   Probably about four years

10  and that was -- we reported to

11  Mr. Anderson, who was over H.R. at the

12  time.

13       Q.   Okay.  And can you tell me

14  what years those four years included?

15       A.   It was -- It might have been

16  more than four years.  It was up to the

17  middle of General Foti's last campaign.

18  So that ended in '08, so probably up to

19  '06, four to six years previous to

20  that.

21       Q.   Okay.  And Mr. Anderson, he

22  was the manager or --

23       A.   No, sir.  He was an

24  assistant to the attorney general and

25  H.R. reported to him.

NEOMIE G. SAVOY
9/23/2010

Page 14

1        Q.   And during all this time,
2   did you customarily have much direct
3   contact with the attorney general
4   himself?
5        A.   No, sir.
6        Q.   During all this time, did
7   anyone other than the attorney general
8   have authorization or the authority to
9   decide salary levels for the attorneys
10  working for the Department of Justice?
11       A.   That was worked upon by
12  the -- your budget people and then that
13  was -- the package was sent to the
14  general and then from there, he would
15  approve it.
16       Q.   And who were the budget
17  people who would have provided input to
18  the attorney general?
19       A.   Oh, let's see.  There was
20  Cindy Reese.  There was Mike Larisey.
21  There was --
22       Q.   I guess I should qualify the
23  time I'm speaking about.  Let's talk
24  about the period of time that you -- at
25  this point, the period of time from

NEOMIE G. SAVOY
9/23/2010

Page 15

1   when you returned in '08.

2        A.   Okay.  When I returned in

3   '08, that was Melissa Gannauch.

4        Q.   How do you spell that last

5   name?

6        A.   G-A-N-N-A-U-C-H.

7        Q.   Okay.  Thank you.

8        A.   And Odessa Lawson.

9        Q.   What are --

10        A.   And, I'm sorry, Ashley Peak,

11   and Michael Larisey.

12        Q.   And were these individuals

13   attorneys themselves?

14        A.   No, sir.  All of those were

15   under the budget and accountability

16   section.

17        Q.   To your knowledge, did any

18   of these individuals rate the

19   performance of the attorneys working

20   for the attorney general; that is to

21   say, rate them in terms of their

22   effectiveness as attorneys?

23        A.   No, sir.

24        Q.   Who, if anyone, did perform

25   that function for the attorney general?

NEOMIE G. SAVOY
9/23/2010

Page 16

1        A.   I'm not sure.

2        Q.   During the time you were an

3   H.R. manager, did you ever -- Well,

4   strike that.

5            What I meant to say was

6   during the time you were an H.R.

7   analyst, did you ever analyze the

8   compensation for attorneys working for

9   the attorney general in terms of race

10  and gender?

11       A.   No, sir.

12       Q.   Are you aware of anyone who

13  did?

14       A.   No, sir.

15       Q.   If that had gone on, that is

16  to say, if someone had conducted a

17  study of the compensation rates of

18  attorneys working for the Louisiana

19  attorney general and they were to have

20  analyzed it on the basis of gender,

21  ethnicity, do you believe that you

22  would have become aware of that in the

23  course of your duties?

24       A.   No, sir.  They gave me the

25  final result.

NEOMIE G. SAVOY
9/23/2010

Page 17

 1        Q.   And were there any final

 2   results like we spoke of?

 3        A.   That would have been the

 4   raises.  They would have given me

 5   the -- what to bring them up to.

 6   That's all I would have.

 7        Q.   Did you ever receive

 8   instructions to bring people up to a

 9   particular level based upon gender or

10   ethnicity?

11        A.   No, sir.

12        Q.   I want to show you a

13   document that's been made a part of a

14   pleading in this case.  It seems to be

15   an affidavit.  And my problem with this

16   is I don't see a signature on it, at

17   least in my copy, and I was wondering

18   if you could identify that for me?

19        MS. McINNIS:

20             I think this is an

21        incomplete document actually.

22        MR. WILLIAMS:

23             Yeah, it might be.  I just

24        don't know.

25        MS. McINNIS:

NEOMIE G. SAVOY
9/23/2010

1              Just for the record, the

2        affidavit that Mr. Williams has

3        handed to the deponent, it looks

4        like there's page numbers on it

5        and of that one document, we've

6        received pages one and two of

7        four; is that correct?

8        MR. WILLIAMS:

9              That's what I came with this

10       morning and I'll just leave it at

11       that.

12       MS. McINNIS:

13             That's okay.  We just want

14       to make it clear for anyone who's

15       reading this back.

16       MR. WILLIAMS:

17             Sure.

18       THE WITNESS:

19             I don't see my signature,

20       but I'm assuming this is correct.

21  EXAMINATION BY MR. WILLIAMS:

22       Q.   Do you remember having a

23  discussion about the contents of that

24  affidavit with anybody?

25       A.   I read over it and signed

NEOMIE G. SAVOY
9/23/2010

Page 19

1    mine after I verified all the

2    information.

3        Q.    You didn't type it up

4    yourself, did you?

5        A.    No, sir, I didn't.

6        Q.    May I see it, please?

7        A.    Yes, sir.

8            (Witness tenders document to

9    counsel.)

10       Q.    Did you ever become aware of

11   an EEOC complaint filed by Ms. Jennifer

12   Medley?

13       A.    Yes, sir, I received the

14   documentation.

15       Q.    Did you play any part in

16   responding to --

17       A.    I prepared the requests that

18   were asked.

19       Q.    And what requests are you

20   speaking of?

21       A.    A list of all DOJ attorneys

22   and their information -- their salary

23   information.

24       Q.    Were they particular

25   individuals or whole classes of

NEOMIE G. SAVOY
9/23/2010

Page 20

1    individuals?

2         A.    Whole DOJ, all attorneys.

3         Q.    And who did you provide that

4    information to?

5         A.    Mr. Rob Harroun and Bridget

6    Denicola and David Sanders.

7         Q.    Was this information

8    provided to the EEOC?

9         A.    I didn't answer any of their

10   questions.  I provided it to them and

11   then they went forth with it.

12        Q.    And, again, would you tell

13   me with some specificity what

14   information you provided to Mr. Harroun

15   and the other two individuals?

16        A.    The list of all attorneys in

17   DOJ, their salary history, I want to

18   say their Bar admit date, but I don't

19   remember anything else.

20        Q.    Was there any information on

21   that pertaining to their ethnicity?

22        A.    I'm not sure.

23        Q.    How long ago was that?  Do

24   you remember?

25        A.    Oh, gosh.  No, sir, I don't.

NEOMIE G. SAVOY
9/23/2010

Page 21

1    It was quite some time.

2         Q.   Do you remember being asked

3    to investigate pay scales, pay rates

4    for individuals employed by the

5    Department of Justice --

6         A.   No, sir.

7         Q.   I'm not --

8         A.   Oh, I'm sorry.

9         Q.   -- as a result of an inquiry

10   from Senator Carter Peterson?

11        A.   No, sir.

12        Q.   Had you ever -- Did you ever

13   hear of an inquiry being made by

14   Senator Peterson into the pay practices

15   of the attorney general?

16        A.   No, sir.

17        Q.   Do you know who Senator

18   Carter Peterson is?

19        A.   No, sir.

20        Q.   A point in time focusing in

21   2008 -- Were you working for the

22   attorney general's office in 2008?

23        A.   Yes, sir.

24        Q.   What month of that year did

25   you begin?

NEOMIE G. SAVOY
9/23/2010

Page 22

 1        A.    January 15th.

 2        Q.    You would have been there on

 3   April 15th, I take it?

 4        A.    Yes, sir.

 5        Q.    I mean, you didn't take any

 6   extended vacation?

 7        A.    No, sir.

 8        Q.    About in the year 2008, do

 9   you remember discussions concerning

10   massive budget cuts to the attorney

11   general's office?

12        A.    No, sir.

13        Q.    When pay increases were

14   given, were they generally given across

15   the board, or were they generally given

16   to specific attorneys?

17        A.    They were basically across

18   the board.

19        Q.    When you say "across the

20   board," if you had $10,000 a month to

21   be distributed to, say, ten attorneys,

22   just to keep it simple, would it be

23   that each attorney got a thousand

24   dollars, or would it be that each

25   attorney got the same percentage raise

NEOMIE G. SAVOY
9/23/2010

Page 23

1    to equal $10,000?

2         A.   It would have been a

3    percentage probably.

4         Q.   So if it was a 5 percent

5    raise, it would have been applied to

6    everybody?

7         A.   Yes, sir.

8         Q.   Did you ever have any

9    inquiries concerning the pay of an

10   assistant attorney general by the name

11   of Carmella Parker?

12        A.   No, sir.

13        Q.   Does that name ring a bell

14   with you?

15        A.   Yes, sir.

16        Q.   What do you associate with

17   that name, if anything?

18        A.   She worked in litigation.

19   She was in the New Orleans office and

20   after Katrina, she moved to Lafayette

21   and then she moved to Baton Rouge.

22        Q.   Did it ever come to your

23   attention that she filed an EEOC

24   complaint against the attorney general?

25        A.   Yes, sir.  I received that

NEOMIE G. SAVOY
9/23/2010

Page 24

1    paperwork.

2        Q.   Did you respond in any way

3    to that paperwork in the case of

4    Ms. Parker?

5        A.   No, sir.  I respond to Rob

6    Harroun, Bridget Denicola, and David

7    Sanders.

8        Q.   Did they ask you to do

9    anything or retrieve anything, any

10   particular information with respect to

11   Ms. Carmella Parker?

12       A.   Yes, sir.

13       Q.   What kind of information did

14   you retrieve in that case?

15       A.   They searched her personnel

16   file and asked me to make copies of

17   certain things and I did.

18       Q.   Do you remember at this

19   point what documents -- what kind of

20   documents you were retrieving?

21       MS. McINNIS:

22           I'm going to make an

23       objection.  That's the subject of

24       ongoing litigation right now

25       and --

NEOMIE G. SAVOY
9/23/2010

Page 25

```
 1        MR. WILLIAMS:

 2            I think it's absolutely

 3        relevant for that reason.  I

 4        think it's exactly why I'm here

 5        today and I expect an answer,

 6        ma'am, with all due respect.

 7        MS. McINNIS:

 8            Dale, I really do think that

 9        that's -- that Ms. Denicola and

10        Mr. Sanders are operating on

11        behalf of the attorney general as

12        counsel to the general and at

13        that point, that's

14        attorney/client privilege and

15        what they've asked her to provide

16        to them is, in fact, subject to

17        attorney/client privilege.

18        MR. WILLIAMS:

19            Well --

20        MS. McINNIS:

21            She has already stated that

22        she's pulled Ms. Parker's

23        personnel records and I think

24        that's sufficient.

25        MR. WILLIAMS:
```

NEOMIE G. SAVOY
9/23/2010

Page 26

 1          Well, I don't believe it's

 2      still in litigation for one

 3      thing, and if that's not true --

 4      MS. McINNIS:

 5          I suggest that you

 6      double-check that.

 7      MR. WILLIAMS:

 8          I thought it had been

 9      compromised and settled.  That's

10      not the case?

11      MS. McINNIS:

12          I would suggest that you

13      double-check your facts.

14      MR. WILLIAMS:

15          Well, ma'am, I'm going to

16      suggest that you need to answer

17      that.  We will not terminate the

18      deposition at this point.  This

19      case is all about information and

20      it is about steps that the

21      attorney general took or did not

22      take in response to complaints of

23      gender discrimination and race

24      discrimination.  We have the

25      burden of proving willful conduct

NEOMIE G. SAVOY
9/23/2010

```
 1        and how are we going to prove it

 2        unless we can get information

 3        concerning what was in the mind

 4        of the attorney general?

 5        MS. McINNIS:

 6              If you want to know what was

 7        in the mind of the attorney

 8        general, Dale, I would suggest

 9        that you take the general's

10        deposition.  However, Ms. Savoy

11        is not going to divulge any

12        information that is subject to a

13        privilege in ongoing litigation

14        at this time.

15        MR. WILLIAMS:

16              Well, there's no privilege

17        been established.  There's one

18        been asserted, but we can put

19        that behind us for the time

20        being.

21   EXAMINATION BY MR. WILLIAMS:

22        Q.   Are you familiar with the

23   name Jennifer Medley?

24        A.   Yes, sir.

25        Q.   Have you ever been asked to
```

NEOMIE G. SAVOY
9/23/2010

Page 28

```
1   retrieve certain documents from
2   Ms. Medley's personnel file?
3        A.   Yes, sir.
4        Q.   Was that also in response to
5   a request from Mr. Rob Harroun?
6        A.   Yes, sir.
7        Q.   And I'll pose the same
8   question to you about that.
9        MR. WILLIAMS:
10            And am I to assume I'm going
11            to be met with the same
12            objection?
13        MS. McINNIS:
14            You can ask the question.
15        Go ahead.  You can ask.
16   EXAMINATION BY MR. WILLIAMS:
17        Q.   I'm going to ask you what
18   documents you retrieved, as best you
19   can remember, for Ms. Jennifer Medley?
20        A.   All of her salary
21   information from the time of employment
22   up until that period of time, whatever
23   that time was.
24        Q.   Any other information other
25   than salary information?
```

NEOMIE G. SAVOY
9/23/2010

Page 29

1        A.   Her application probably,

2   but that would have been the extent of

3   it.

4        Q.   In the course of responding

5   to this request for information, did

6   you have occasion personally to review

7   Ms. Medley's personnel file?

8        A.   I only made copies and

9   provided them the information that they

10  went through the file and asked me to

11  make copies of.

12       Q.   So you didn't go through the

13  file, they did?

14       A.   Yes, sir.

15       Q.   Was anyone in the

16  presence -- Was anybody other than --

17  Well, I'm sorry.

18            Who went through

19  Ms. Medley's personnel file to your

20  knowledge?

21       A.   Bridget Denicola.

22       Q.   Anyone else?

23       A.   No, sir.

24       Q.   And where was Ms. Denicola

25  when she went through Ms. Medley

NEOMIE G. SAVOY
9/23/2010

Page 30

1    personnel file?

2          A.    In my office.

3          Q.    Were you in the office when

4    Ms. Denicola went through the file?

5          A.    Yes, sir, I was.

6          Q.    Did you observe her going

7    through the personnel files?

8          A.    Yes.

9          Q.    Did Ms. Denicola remove or

10   add anything to Ms. Medley's personnel

11   file?

12         A.    No, sir.

13         Q.    Did she give you documents

14   from it to be copied?

15         A.    She placed stickies on it

16   for the pages that she wanted copied.

17         Q.    Customarily, what is placed

18   in a personnel file such as the one

19   Jennifer Medley had?  What was the

20   purpose of that file?

21         A.    To give a history of her

22   employment with the office, her -- In

23   her confidential jacket was her

24   federal, state taxes, retirement,

25   insurance, anything like that.

NEOMIE G. SAVOY
9/23/2010

Page 31

1    Verifications of employment.

2         Q.   Would that have been the

3    place to put any personnel evaluations?

4         A.   No, sir.

5         Q.   Where would that have gone

6    if it would have gone anywhere?

7         A.   We have a separate file for

8    any evaluations.

9         Q.   On the topic of evaluations,

10   has the attorney general's office, to

11   your knowledge as someone who works in

12   human resources, ever regularly

13   evaluated the attorneys that work for

14   the State of Louisiana?

15        A.   We have not had evaluations

16   since Richard Iyoub's time.

17        Q.   And when did Mr. Iyoub

18   step --

19        A.   '92 to 2004, because --

20   Four?  Yeah, 2004.

21        Q.   Do you provide input for the

22   policy and procedure manual?

23        A.   No, sir.

24        Q.   Who does that?

25        A.   Our policy and procedures

NEOMIE G. SAVOY
9/23/2010

Page 32

1    manual hasn't been changed since

2    Richard Iyoub's time.  And at that

3    time, I was not a manager, so I

4    wouldn't have had any input.

5         Q.   Do employees of the

6    Department of Justice still sign that

7    policy and procedure manual when they

8    become employed?

9         A.   Yes, sir.

10        Q.   Are they expected to follow

11   the policies and procedures in that

12   manual?

13        A.   Yes, sir.

14        Q.   Did you remember ever or do

15   you remember ever seeing a memorandum

16   or other --

17            (Whereupon Ms. Medley enters

18        the proceedings.)

19   MR. WILLIAMS:

20            Excuse me.  Can we take

21        five-minute break?

22            (Whereupon a recess was

23        taken.)

24   EXAMINATION BY MR. WILLIAMS:

25        Q.   Ms. Savoy, before a brief

NEOMIE G. SAVOY
9/23/2010

Page 33

1    break, you were just telling me about a

2    confidential jacket, records jacket for

3    evaluations.  What was that you were

4    referring to?

5         A.   The confidential jacket is

6    in the H.R. file and it has the

7    federal, the state, the retirement,

8    insurance, etc., document records that

9    are private.

10        Q.   What about evaluations?

11        A.   Evaluations are in a

12   separate folder for evaluations and

13   disciplinary actions are in a separate

14   folder.

15        Q.   So that's two separate

16   folders?

17        A.   Yes, sir, not located with

18   the file.

19        Q.   And is there any mention of

20   these folders made in the policy and

21   procedures manual that you're aware of?

22        A.   No, sir.

23        Q.   What is the physical

24   location for the disciplinary file?

25        A.   In a file cabinet separated

Page 34

1    from all the other documentation.

2          Q.   Was that on the 24th floor

3    of the Capitol Building?

4          A.   At that time, yes, sir.

5          Q.   And where is it now?

6          A.   It's on the seventh floor at

7    the Livingston Building.

8          Q.   And that is in the custody

9    and control of the --

10         A.   Of human resources.

11         Q.   Of human resources?

12         A.   Yes, sir.

13         Q.   And I'll ask you the same

14   question about the evaluation folder?

15         A.   In my custody or the human

16   resource section.

17         Q.   On the seventh floor of

18   the --

19         A.   Livingston Building.

20         Q.   Livingston?

21         A.   Yes, sir.

22         Q.   Where is the Livingston

23   Building?

24         A.   1885 North Third Street.

25         Q.   Is that one of those new

NEOMIE G. SAVOY
9/23/2010

Page 35

 1   office buildings?

 2        A.   Yes, sir, where the old Lady

 3   of the Lake used to be.

 4        Q.   Did Ms. Jennifer Medley ever

 5   request to see either her evaluation

 6   folder or her disciplinary folder?

 7        A.   No, sir.

 8        Q.   Have you ever spoken with

 9   Ms. Jennifer Medley?

10        A.   Yes, sir.

11        Q.   What occasion or occasions

12   was that?

13        A.   If she had anything to be

14   changed, she'd speak to us or right

15   after she left, she requested her

16   personnel file.

17        Q.   When she requested her

18   personnel file, did you take it that

19   she also requested her disciplinary and

20   evaluation file?

21        A.   No, sir.

22        Q.   Are disciplinary and

23   evaluation records part of the

24   personnel file?

25        A.   No, sir, they're separate.

NEOMIE G. SAVOY
9/23/2010

Page 36

```
 1        Q.   Well, I know they're kept
 2   separate, but would you regard it as a
 3   personnel record?
 4        A.   No, sir.
 5        Q.   What does it deal with if it
 6   doesn't deal with personnel matters?
 7        A.   It deals with their ability
 8   and their job performance, but --
 9        Q.   That relates to someone
10   working for the attorney general, does
11   it not?
12        A.   Yes, sir.
13        Q.   Isn't it true that
14   Ms. Jennifer Medley requested these
15   records from you in person on April 1st
16   of 2009 in the Baton Rouge office?
17        A.   I don't remember in person.
18        Q.   Are these records currently
19   in existence?
20        A.   If any documentation is
21   there, yes, sir.
22        Q.   Have you ever yourself seen
23   the contents of her disciplinary folder
24   or her evaluations folder?
25        A.   There's only a folder if we
```

NEOMIE G. SAVOY
9/23/2010

Page 37

1   had the documentation.  I cannot verify

2   or not.

3        Q.   Well, my question is have

4   you ever seen the contents of those

5   folders?

6        A.   No, sir.

7        Q.   Is there any policy that

8   you're aware of that would prohibit

9   Ms. Medley from viewing the content of

10  those folders?

11       A.   No, sir.

12       Q.   Do you remember ever putting

13  anything in -- or would it have been

14  your job to maintain those disciplinary

15  and evaluation folders?

16       A.   Anyone in H.R.

17       Q.   Could have done that?

18       A.   Yes, sir.

19       Q.   Whose job was it typically

20  to do that?  Was it usually one person?

21       A.   The H.R. analyst.

22            No.  Whatever H.R. analyst

23  received the documentation.

24       Q.   When you were H.R. manager,

25  how many H.R. analysts were there?

NEOMIE G. SAVOY
9/23/2010

Page 38

1        A.   I am manager now and there

2   are two H.R. analysts.

3        Q.   Do you personally remember

4   putting anything into those two folders

5   or taking anything out of them?

6        A.   Since 2008, there have been

7   no evaluations or discipline actions

8   processed.

9        Q.   With respect to anybody?

10        A.   To anyone.

11        Q.   Are you aware of any reason

12   behind it?

13        A.   We don't do job performances

14   anymore.  We haven't done that since

15   Iyoub.

16        Q.   How about disciplinary

17   actions?  The attorney general doesn't

18   discipline any of the attorneys that

19   are working for him?

20        A.   I have no documentation that

21   I know of.

22        Q.   In the event that an

23   attorney is disciplined by the attorney

24   general, would you have any record of

25   that at all?

NEOMIE G. SAVOY
9/23/2010

Page 39

1        A.    Only if the document were

2    forthcoming.

3        Q.    Since you've come back as

4    H.R. manager, has any such document

5    been forthcoming?

6        A.    No, sir.

7        Q.    Has your office ever

8    conducted any training in civil rights

9    law for members of the Department of

10   Justice?

11       A.    If we did, it would have

12   been under a CLE and I'm not involved

13   in training.

14       Q.    I'm referring more

15   specifically to the Title 7 of the

16   Civil Rights Act, 1963, the Equal Pay

17   Act, or, in fact, the Americans With

18   Disabilities Act, or any act dealing

19   with the rights of employed

20   individuals.  Does the attorney

21   general's office conduct any sort of

22   training whatsoever that you're aware

23   of in these areas?

24       A.    No, sir.

25       Q.    Are you aware that the

NEOMIE G. SAVOY
9/23/2010

Page 40

1   Office of Risk Management conducts
2   evaluations of attorney performance in
3   cases that they manage?
4        A.   No, sir.
5        Q.   Do you have anything to do
6   with those evaluations?
7        A.   No, sir.
8        Q.   Has Ms. Shea Carter -- Is
9   that a person known to you?
10       A.   Yes.
11       Q.   Has she ever been in your
12  office?
13       A.   Yes, sir.
14       Q.   Has she ever looked at
15  personnel records in your office?
16       A.   Yes, sir.
17       Q.   Has she ever looked at
18  Ms. Jennifer Medley's personnel
19  records?
20       A.   I don't remember.
21       Q.   When someone comes in to
22  look at personnel records, do they have
23  to sign something indicating that they
24  had access to those documents?
25       A.   No, sir, but they look at

NEOMIE G. SAVOY
9/23/2010

Page 41

 1    them in my presence.

 2         Q.   Do you remember when

 3    Ms. Shae Carter last looked at

 4    Ms. Jennifer Medley's records?

 5         MS. McINNIS:

 6              I'm going to object.  I

 7         think that the deponent said that

 8         she was not sure.

 9         MR. WILLIAMS:

10              I'm not sure --

11         MS. McINNIS:

12              Can you read back her

13         response, please, the question

14         and the response?

15              (Whereupon the requested

16         material was read back by the

17         court reporter.)

18    EXAMINATION BY MR. WILLIAMS:

19         Q.   I just want to ask further

20    whether you remember the last time she

21    would have looked at them?

22         A.   No, sir.

23         Q.   Have you ever had a

24    discussion with Ms. Shea Carter about

25    Ms. Medley?

NEOMIE G. SAVOY
9/23/2010

Page 42

```
 1        A.   No, sir.

 2        Q.   Did she ever send you an

 3   e-mail about Ms. Medley?

 4        A.   No, sir.

 5        Q.   Other than viewing

 6   Ms. Medley's personnel file, did she

 7   ever request any information about

 8   Ms. Medley in any --

 9        MS. McINNIS:

10             I'm going to object again,

11        Dale.  You're presuming that

12        Ms. Shea Carter did view records

13        when Ms. Savoy stated twice now

14        on the record that she is unsure

15        Ms. Carter ever looked at

16        Ms. Medley's personnel records.

17        Go ahead.

18   EXAMINATION BY MR. WILLIAMS:

19        Q.   I thought you said she did.

20   Did she or didn't she?

21        MS. McINNIS:

22             No.  I think our court

23        reporter has read the question

24        back and she said --

25        THE WITNESS:
```

NEOMIE G. SAVOY
9/23/2010

Page 43

1             I said I wasn't sure.

2        MS. McINNIS:

3             -- she was unsure.

4        MR. WILLIAMS:

5             You weren't sure.  Well, let

6        me just rephrase the question so

7        we can get a more definite

8        answer.

9    EXAMINATION BY MR. WILLIAMS:

10        Q.   To your knowledge, did

11   Ms. Shea Carter ever view Ms. Jennifer

12   Medley's personnel record?

13        A.   No, sir.

14        Q.   So your answer is no, she

15   didn't?

16        MS. McINNIS:

17             No.  Her answer is no, she's

18        unsure whether Ms. Carter -- I'm

19        sorry.  Go ahead.

20        THE WITNESS:

21             I'm not sure if she's looked

22        at the file or not.

23   EXAMINATION BY MR. WILLIAMS:

24        Q.   How often has Ms. Shea

25   Carter come in to view personnel

NEOMIE G. SAVOY
9/23/2010

Page 44

1   records of attorneys working for the

2   attorney general?

3           A.   I'm not sure.

4           Q.   More than once?

5           A.   I'm not sure.  I mean --

6           Q.   I think your answer is that

7   she has at some point?

8       MS. McINNIS:

9               No.  I think she just

10          provided her answer.

11              Give him your answer again.

12      THE WITNESS:

13              I'm not sure.

14  EXAMINATION BY MR. WILLIAMS:

15          Q.   If she ever came in, is that

16  your answer?

17          A.   I'm not sure if she's ever

18  asked for an attorney's file.

19          Q.   Are you equally sure that

20  she has never reviewed records of

21  attorneys working for the attorney

22  general?

23          A.   I'm not sure.  There are

24  other people that have access to the

25  files.  I'm not sure.

NEOMIE G. SAVOY
9/23/2010

Page 45

1        Q.    Who other than yourself,

2   would have access to the files?

3        A.    Everyone in my human

4   resource section has access to the

5   files along with our director of admin

6   services.

7        Q.    Are there job descriptions

8   that go along with the attorneys

9   working for the State of Louisiana?

10       A.    No, sir.

11       Q.    Have there ever been to your

12   knowledge?

13       A.    No, sir.

14   MR. WILLIAMS:

15            I think that's all the

16       questions I have this morning.

17       Thank you very much for being

18       here.

19   MS. McINNIS:

20            That's it.  We have no

21       questions.

22            (Whereupon the deposition

23       was concluded at 11:07 a.m.)

24       *      *      *      *      *

25

NEOMIE G. SAVOY
9/23/2010

1              REPORTER'S CERTIFICATE

2          I, Kathy Shaw-Gallagher CCR,

3    RPR, Certified Court Reporter, in and

4    for the State of Louisiana, as the

5    officer before whom this testimony was

6    taken, do hereby certify that NEOMIE G.

7    SAVOY, after having been duly sworn by

8    me upon authority of R.S. 37:2554, did

9    testify as hereinabove set forth in the

10   foregoing 45 pages; that this testimony

11   was reported by me in stenotype

12   reporting method, was prepared and

13   transcribed by me or under my personal

14   direction and supervision, and is a

15   true and correct transcript to the best

16   of my ability and understanding; that I

17   am not related to counsel or to the

18   parties herein, nor am I otherwise

19   interested in the outcome of this

20   matter.

21

          _____
22        KATHY SHAW-GALLAGHER, CCR, RPR
          Certified Court Reporter
23        Curren-Landrieu, L.L.C.
          749 Aurora Avenue
24        Suite 4
          Metairie, Louisiana  70005
25