1            UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    JENNIFER M. MEDLEY            CIVIL ACTION
                                   NO. 09-4570
5         VERSUS                   SECTION J
                                   JUDGE BARBIER
6    STATE OF LOUISIANA,           DIVISION 3
     DEPARTMENT OF JUSTICE         MAGISTRATE KNOWLES

7

8

9

10

11

12

13

14

15          The deposition of GAYLE TRULY, taken in the

16   above-entitled cause, before Jan DiCicco, a

17   Certified Court Reporter, given at the offices of

18   the Louisiana Association for Justice, 442 Europe

19   Street, Baton Rouge, Louisiana, 70802, on the 24th

20   day of September, 2010.

21

22                                    ORIGINAL

23

24

25

```
 1   APPEARANCES:              .

 2   REPRESENTING JENNIFER M. MEDLEY:

 3           LAW OFFICES OF DALE EDWARDS WILLIAMS
             BY:  DALE E. WILLIAMS, ESQ.
 4           212 Park Place
             Covington, Louisiana  70433
 5
     REPRESENTING STATE OF LOUISIANA, DEPARTMENT OF
 6   JUSTICE:

 7           SHOWS, CALI, BERTHELOT & WALSH, LLP
             BY:  AMY McINNIS, ESQ.
 8           AND  LINDSAY L. LOLLAR, ESQ.
             628 St. Louis Street
 9           Baton Rouge, Louisiana  70802

10                       AND

11           CLAYTON & FRUGE
             BY:  RICHARD WARD, III, ESQ.
12           706 N. Alexander Avenue
             Port Allen, Louisiana  70767
13
     ALSO PRESENT:
14
             ROBERT E. HARROUN, III
15           JENNIFER M. MEDLEY

16   REPORTED BY:

17           JAN DICICCO
             CERTIFIED COURT REPORTER
18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2

 3   APPEARANCES................................  2

 4   INDEX......................................  3

 5   STIPULATION................................  4

 6   REPORTER'S CERTIFICATE..................... 68

 7   WITNESS'S CERTIFICATE..................... 69

 8

 9   EXAMINATION

10   BY MR. WILLIAMS............................  5

11   BY MS. McINNIS............................ 52

12   BY MR. WILLIAMS........................... 64

13

14   EXHIBITS                          (NONE)

15

16

17

18

19

20

21

22

23

24

25
```

1                    STIPULATION

2              It is stipulated and agreed by and between

3    counsel for the parties hereto that this deposition

4    is hereby being taken pursuant to the Federal Rules

5    of Civil Procedure, for all purposes, in accordance

6    with law;

7              That the formalities, including those of

8    sealing, certification and filing, are specifically

9    waived;

10             That the formality of signing is

11   specifically not waived;

12             That all objections, save those as to the

13   form of the question and the responsiveness of the

14   answer, are hereby reserved until such time as this

15   deposition or any part thereof, may be used or

16   sought to be used in evidence.

17

18             JAN DICICCO, Certified Court Reporter,

19   officiated in administering the oath to the witness.

20

21                    GAYLE TRULY

22   16405 Antietam Avenue, Baton Rouge, Louisiana,

23   70817, after having been first duly sworn by the

24   court reporter, did testify as follows:

25

1    BY MR. WILLIAMS:

2        Q.    Good afternoon, Miss Truly.  My name is

3    Dale Williams, and I'd like to begin by asking you

4    if you've ever been employed by the Department of

5    Justice.

6        A.    Yes.

7        Q.    Could you tell me in what capacity you were

8    employed by them?

9        A.    Well, when I was first employed, I was

10   employed as the chief administrative officer for

11   litigation, and then my title changed over several

12   generals, Attorney Generals.

13       Q.    When did you first become employed by the

14   Department?

15       A.    2000.

16       Q.    And chief administration officer, where

17   were you working?

18       A.    I was working over at the bank building, in

19   litigation.

20       Q.    So that was in Baton Rouge?

21       A.    Yeah.  At Chase Bank building.  That's been

22   changed too many times.  I guess Chase still owns

23   it.

24       Q.    That's the big building?

25       A.    Uh-huh.

1     Q.    What were your duties at that point?

2     A.    Well, at that point, I was in charge of

3     administration, time and attendance, I was over the

4     clerical.  I worked with the attorneys, but I

5     wasn't, I didn't, you know, I wasn't the

6     administrator over the attorneys.  Elaine Patin did

7     that.  My function was mostly over the clerical and,

8     you know, secretaries, so forth.

9     Q.    About how many attorneys were employed by

10    the Attorney General in 2000?

11    A.    I don't remember.  A hundred.  Yeah.  I

12    would think so.  Close to a hundred maybe.

13    Q.    Did part of your job include knowing about

14    people getting hired, people getting fired?

15    A.    Yes.

16    Q.    People getting promoted?

17    A.    Yes, at that time, yes.  My duties changed

18    over the years.  I mean, by the time I left, most of

19    my duties had been taken away from me, so I really

20    didn't know a lot that was going on at the end, just

21    before I retired.

22    Q.    When you first started, how many women and

23    minorities were in senior positions from what you

24    saw in Baton Rouge?

25    A.    When I first started?

1    Q.    Yes, ma'am.

2    A.    Well, there was Elaine Patin.  Not too

3    many.  Sonia Mallett came in.  Now, in

4    administration, where Richard Ieyoub was, there were

5    several, like Connie Koury.  You're talking about

6    litigation?

7    Q.    Yeah.  I'm talking about litigation.  I'm

8    talking about specifically attorneys.

9    A.    Yeah.

10    Q.    The ones that would go out there and

11    litigate cases?

12    A.    There weren't many.  I know Connie Koury

13    was working really hard to get more women involved

14    and get more women in, blacks and women.  She was

15    trying very hard.

16    Q.    Now, when you first came in, and this was

17    about the year 2000?

18    A.    Uh-huh.

19    Q.    How many women were in leadership positions

20    in the litigation section that you were involved

21    with?  Were there any?

22    A.    Well, Elaine Patin was.  She was a deputy.

23    I'm trying to think if there was a director outside

24    of Elaine.  Sonia Mallett came over there and she

25    was put in a position, assistant deputy director or

1    some such position.

2        Q.   Now, if we go out to where the district

3    offices were --

4        A.   That's what I'm trying to remember and

5    think.

6        Q.   Did you have any district office chiefs in

7    the year 2000 who were female?

8        A.   I think there was one, but I think it was

9    in Lake Charles at that time.

10       Q.   But everyone else was male?

11       A.   I think so.

12       Q.   When you first started, how many attorneys

13   were there who were outside the category of white

14   male attorneys?

15       A.   Oh, there was one black attorney over at

16   civil rights.  When I first started.  Black attorney

17   over at civil rights.  There may have been one in

18   Alec.  I'm not sure.  I really can't remember.  But

19   there were not a lot.  Let's put it that way.  There

20   were very few.  And I know that was something that

21   they were trying to work on, the Ieyoub

22   administration.  Because there had been some

23   complaints.

24       Q.   Who was complaining?

25       A.   Well, I think it was some representatives

1    were complaining at that time.  I had, you know,
2    heard that --
3         Q.    This goes back to when Mr. Ieyoub was --
4         A.    Yes.
5         Q.    -- Attorney General?
6         A.    You talking about when I first started?
7         Q.    Yes, ma'am.
8         A.    Some representatives were complaining about
9    there being a lack of minorities and women in the
10   whole office.
11        Q.    Okay.  And that came to your attention how?
12        A.    Well, during the time I was there.
13        Q.    Did it come to your personal attention or
14   did you just become aware of it?
15        A.    I was just told that there was a, there
16   were some complaints.
17        Q.    Did that require you to do anything in
18   particular, prepare reports --
19        A.    No.
20        Q.    -- take action?
21        A.    No.  I didn't do the reports.  Reports were
22   done over at the Capitol.
23        Q.    What, if anything, was done in response to
24   those complaints?
25        A.    I think there was something done.  I think

1    they hired Johnny Anderson and Connie Koury.  And

2    then Connie and Johnny Anderson tried to get more

3    minorities and women involved at that time.

4         Q.   What did you have to do with the setting of

5    salaries, if anything?

6         A.   When I first got there, I had a lot to do

7    with setting salaries.

8         Q.   Tell me how that worked, ma'am.

9         A.   Well, Richard Ieyoub -- there was a lot of

10   dissension because they set salaries, they had a

11   structure.  If you had been at the Department for so

12   many years and you were a senior attorney, you got

13   between, you know, two different kind of salaries.

14   It was a salary schedule.  And it went on how many,

15   you know, on your seniority.

16        Q.   Okay.

17        A.   But the problem was, that they didn't get

18   an increase every year.  They would put it into the

19   budget and the legislature would take it out.  There

20   was a lot of dissension about that.  The attorneys

21   were upset about that.

22        Q.   Who set up the based on seniority?

23        A.   People in general.  Ieyoub's

24   administration.  It wasn't me, because it was

25   already there when I came in.

1    Q.   So it had already existed in the year 2000
2    when you came in?
3    A.   Yes.  There was a scheme.
4    Q.   Do you have any idea how far back the
5    scheme went?
6    A.   No, I don't.
7    Q.   There wasn't anybody's fingerprints on it.
8    You couldn't say that's so and so's scheme for --
9    A.   No.  No.  I don't know if Guste had one,
10   too.  I wasn't there.  I just know when I was over
11   there, that I went over to see Johnny Anderson one
12   day, he pulled out the scheme, and they were giving
13   salaries because the legislature had left the money
14   in the budget that particular year.
15   Q.   What was Mr. Anderson doing at that
16   particular point?
17   A.   He was over, I would say he was over
18   personnel for the whole Department.
19   Q.   And what was the issue confronting him when
20   you went over and saw --
21   A.   To set salaries.  To give increases to
22   people.
23   Q.   And whose decision was it as far as you
24   were able to observe as to which lawyer got what
25   increase?

1    A.   Well, actually, that came down.  Ron

2  Thompson and I think Cliff Bingham, who were, Cliff

3  was the director.  Ron Thompson was the assistant.

4  I think they sat down and worked out who -- but they

5  had a structure that they could look at and say what

6  people were going to get at that time.

7    Q.   These two people you just mentioned, they

8  were white males?

9    A.   Yes.

10    Q.   And according to this scheme, in my mind, I

11  have, if you have been an attorney from, what,

12  fifteen to twenty years --

13    A.   It was a scheme that was only your

14  seniority at the Department.  Not since you've been

15  an attorney.

16    Q.   It's how long you had been in the

17  Department?

18    A.   Yeah.  And to me, that was, they were

19  wanting to keep people in the Department, so they

20  did that.  I don't know for sure, but I just thought

21  maybe that was why they didn't use outside

22  experience.

23    Q.   So you would be brought in, you would be

24  paid according to how long you had been in the

25  Department of Justice?

1    A.    Yeah.   You had a beginning salary, and they
2    set the beginning salary.   Like if you had been an
3    attorney maybe ten years, they would bring you in
4    probably with the ten years of experience, but then
5    it went on with how many you were, how long you had
6    been in the Department.
7        Q.    I see.   Okay.
8        A.    And that was with Richard Ieyoub.   Like I
9    said, it did change.
10       Q.    And was your awareness, did you remain
11   informed on how pay was set?
12       A.    No.
13       Q.    When did you get out of the loop, so to
14   speak?
15       A.    Well, probably under Foti's administration,
16   and totally under Caldwell's.   Attorney General
17   Caldwell.
18       Q.    How did Attorney General Foti handle the
19   same problem, of pay?
20       A.    I think he just threw out the scheme.   I
21   didn't, you know -- but he did give raises almost
22   every year, unlike Richard, who didn't give raises
23   every year, but had a structure.   I think General
24   Foti gave raises, but he didn't have a structure.
25       Q.    Well, were they across the board raises?

1  A. Some of them.

2  Q. And the ones that weren't across the board

3 raises, they were specific raises?

4  A. Right, right.

5  Q. Did you ever discern a pattern out of these

6 specifically targeted raises?

7  A. Well, I was kind of out of the loop at that

8 time.  When General Foti came in, I kind of was out

9 of the loop.  So it was hard for me.  I really can't

10 answer that.  But I know that some people got more

11 than others.  And I know, I know this was a sense of

12 dissension within the Department because civil

13 service said -- our agency was the only one that

14 came over all the time and asked to see the list of,

15 you know, you can get the list from civil service

16 for ten dollars or whatever.

17   And they were always going over there

18 asking for the list.  So everybody knew what

19 everybody was getting.  And, of course, General Foti

20 said if he found out if you knew what everybody was

21 getting, you were going to be fired.  So everybody

22 was very tense about it.  They still went over there

23 and got the list.

24  Q. Do you know what objections Attorney

25 General Foti had with people knowing what each other

15

1  made?

2    A.  No.  I think it's kind of his personality.

3  He had been a sheriff and, you know.  I just think

4  that may have been his personality.

5    Q.  Okay.  Well, what kind of complaints did

6  you hear about pay when you were in the

7  administration?

8         MS. McINNIS:

9            Objection.  She didn't say she heard

10  any complaints about --

11         MR. WILLIAMS:

12            I thought she did actually.

13         THE WITNESS:

14            I did.  I heard complaints.

15  BY MR. WILLIAMS:

16    Q.  I just wanted to know, maybe if you could

17  characterize them for me a little bit.

18    A.  Well, some of the women were upset that

19  they weren't getting as much as some of the men and,

20  of course, some of the minorities were upset that

21  they were not, they didn't think they were getting

22  pay.  There was one director, I know, she was made

23  director and she didn't get a raise for a long time

24  and she was promised when she came from New Orleans

25  that she would get a pay raise.

1    Q.   Now, this was a director in the City of New

2    Orleans?

3    A.   No.  She was an attorney, and she came over

4    and became a director.

5    Q.   In Baton Rouge?

6    A.   Yes.

7    Q.   From New Orleans?

8    A.   Yes.  And she did not get her pay raise for

9    a long time.  And she was a black woman.

10   Q.   Do you happen to recall her name?

11   A.   Michelle.  I can't recall Michelle's last

12   name.

13   Q.   Okay.  This was, just to make it clear for

14   the record, right now you're speaking about the

15   years that Attorney General Foti --

16   A.   Right, right.  We're off of Richard.  On to

17   General Foti.

18   Q.   All right.  I imagine every complaint was

19   slightly different, and I don't want to paper over

20   that, but if there are some things in common about

21   these complaints, for instance, let's talk about the

22   women first.  What did you hear most frequently from

23   women?

24   A.   Not a lot.  Just that, you know, they

25   didn't -- whether it was justified or not, they

1   didn't feel like they were getting a fair shake a

2   lot of times with salaries.

3       Q.   What was General Foti's approach toward

4   complaints such as these?  Did he actually listen to

5   them or --

6       A.   I don't think anybody complained to him.  I

7   really don't.  I mean, when you sat down at a

8   meeting, people didn't say much, because there was a

9   lot of intimidation, I felt.  Because they were -- I

10  think a lot of people were very scared that he would

11  fly off the handle and maybe terminate them.

12      Q.   Now, I take it, and I've been using this as

13  an assumption.  Maybe I better get this out on the

14  table.  There's no kind of civil service protection

15  of any sort given to attorneys working for the

16  Attorney General, is that right?

17      A.   There is no civil service protection for

18  anybody that works at the Attorney General's office,

19  to the low he is clerk to the highest appointee.

20  Nothing.  There is no structure.  The policies were

21  set, there were some policies set under Richard

22  Ieyoub.  After that, everyone said, we're going to

23  write a new policy and procedure manual.  We never

24  saw it.  It just, there was just no structure.

25      Q.   Well, without structure, did that make

1   people feel in terms of complaining about perceived

2   shortcomings or inconsistencies, did that make

3   people more or less reluctant to come forward?

4       A.   No, they were less reluctant, because

5   everybody is at will.

6       Q.   So they were more reluctant and less

7   willing?

8       A.   Less willing to come forward because

9   they're an at will employee.  When an at will

10  employee is terminated, you don't have to tell them

11  why.  Just say, you're terminated.  Pick up your

12  things and leave.  You're using taxpayers' money to

13  pay these people, but they don't have any recourse.

14  Under the policies and procedures manual, it says

15  you can appeal to a higher level, but --

16      Q.   That didn't happen?

17      A.   I don't think that ever happened.  I may

18  not have known about it, but.

19      Q.   In the case of minorities, was there a

20  theme that emerged in that area?

21      A.   Well, I think it was kind of like, there

22  are no minorities at the, you know, on the top

23  floor.  You know.  There were no minorities on the

24  top floor.  And if they were appointed in a high

25  position, most of them were at the Capitol.  People

1    kind of said things about it.

2        Q.   You mean, if they were appointed for the

3    purpose of being window dressing?

4        A.   Right.   That they were token.

5        Q.   When you say the top floor, would you

6    explain to someone who has never been what that's --

7        A.   The top floor of the building, the

8    Livingston building.   That's where everyone was.

9    That's where the General sits and his assistants and

10   appointees and people that he appoints.   And they

11   changed it now.   I think they've moved some other

12   people up there.   At one time, when they were up

13   there and they had all empty offices because General

14   Foti didn't want anybody else on the top floor.   He

15   just wanted him and his group up there, so they left

16   a bunch of offices open.

17       Q.   Okay.   Now, this is located on Livingston

18   Avenue?

19       A.   Livingston building.

20       Q.   The Livingston building?   Could you

21   describe that building for us, please.

22       A.   It's a beautiful building.   One of the

23   buildings Mark Drennin (phonetic) built with all the

24   bond money and the casino money.

25       Q.   It's been built in what, over the last

1   fifteen years?

2      A.   Oh, yeah.

3      Q.   It's one of those new buildings?

4      A.   Yeah.

5      Q.   I see.  So those are big buildings, is that

6   right?

7      A.   They're nice buildings, yeah.

8      Q.   How many floors are there in that building?

9      A.   In the Livingston building?

10      Q.   Less than ten floors?

11      A.   I really don't know.  It may be ten.  Six,

12   seven, something like that.

13      Q.   Now, the top floor is the, is where the

14   Attorney --

15      A.   General and the chief administrative

16   offices are.  Yeah.  His deputies, chief

17   administrator.  You know.  I think they moved

18   personnel up there now and some other parts of the

19   Department up there.

20      Q.   When you said there weren't any blacks on

21   the top floor, what period of time were you

22   referring to?

23      A.   That was under General Foti.  At that time,

24   that I know of, that I can remember, there weren't

25   any in the Livingston building.  Now, there may have

1    been some over in the Capitol.

2        Q.   Altogether, you spent about how many years

3    working in administration for the Department of

4    Justice?

5        A.   Nine.

6        Q.   Almost ten years.  Are you retired now?

7        A.   Uh-huh.  Sure am.

8        Q.   What did you do before you came to the

9    Department of Justice?

10       A.   I was the registrar of voters for the State

11   of Louisiana.  And before that, I was secretary of

12   the Department of Labor.

13       Q.   So you have had a lot of experience in

14   government?

15       A.   I think so.

16       Q.   And a lot of experience administering in

17   government?

18       A.   I think so, uh-huh.

19       Q.   Miss Truly, could you tell me, based on

20   your own observations, did you see any disparity in

21   how women were treated as compared with men?  And

22   I'm talking again about attorneys.

23       A.   Well, you know, that's hard to say.

24   Because we had different Attorney Generals.  I saw

25   more disparity, I think, maybe with minorities than

1   I did with the women.

2       Q.   Okay.   Why don't you --

3       A.   Because they were trying to appoint women,

4   and they did appoint some women.

5       Q.   Well, then, how about minorities.   What

6   sort of disparities were you referring to just now?

7       A.   I think some of the black attorneys --

8   well, like in New Orleans, we were told they

9   couldn't find any black male attorneys to work in

10   New Orleans, that it was just, we just couldn't find

11   black male attorneys.   Black male attorneys did not

12   want to work in New Orleans because they could go to

13   other offices and get a lot more pay.   That just

14   seemed kind of strange to me.   Because young

15   attorneys come out of school usually want a job.

16       Q.   Yes.

17       A.   But there were no, there were very few

18   young black attorneys.

19       Q.   Who was saying things like, can't get black

20   male attorneys in New Orleans?

21       A.   That's what I heard from some people that

22   were trying to get these people appointed.   I can't

23   think of names right now.   Said we just can't find

24   them.

25       Q.   Did you have anything to do with either

1    setting or keeping track of pay levels?

2        A.    I did at first, but then that was removed.

3        Q.    What did you do when that was removed from

4    you?  How did your focus change?

5        A.    Well, it was just taken away.  Most of my

6    duties were taken away.  The only thing I was really

7    kind of left with was doing 5108, which is

8    indemnification of state workers.  What we call

9    5108.  That was probably one of the few duties I had

10   left.  And it wasn't just, okay, I'm going to take

11   this away from you and told about it.  It was just

12   removed.  Removed from me and, you know.

13       Q.    That's referring to Title 13, 5108?

14       A.    5108 is the -- I don't know what title.

15   Indemnification of state workers, where we have to

16   indemnify the state worker, we have to send them a

17   letter and they have to agree that they're being

18   sued.

19       Q.    I see.

20       A.    That was what was left.  All of a sudden, I

21   was not over case tracking any more.  I was not over

22   personnel any more.  I was over nothing.  And I

23   just -- and I was even told by some people in case

24   tracking, we don't have to listen to you, you are no

25   longer over us.  I was told by the person that is

1   our, that answers the phone in front, the

2   receptionist, that she really didn't have to listen

3   to me any more because I was not her boss any more.

4   You know, time to retire.

5        Q.    To what do you ascribe the sudden change?

6        A.    I ascribe the sudden change to the

7   director, who just didn't really like the way I was

8   administering things.

9        Q.    And who was that director?

10       A.    Rob Harroun.

11       Q.    What kinds of things didn't Mr. Harroun

12  like about what you were doing?

13       A.    Well, he just, you know, he just decided he

14  didn't like the way I was administering.

15       Q.    Was there any philosophical difference?

16  Any difference on specifics?

17       A.    I don't think so.  We had some

18  disagreements about overtime.  We had some

19  disagreements about buying equipment.  You know.  It

20  wasn't anything big or important, but just, you

21  know, instead of just confronting it, it was just

22  like, you just don't do it any more.

23       Q.    What was Mr. Harroun's -- could Mr. Harroun

24  take constructive criticism?

25            MS. McINNIS:

```
 1              I think we're going outside the scope
 2   on --
 3       Q.   I insist on asking that question.  If you
 4   can answer it.  Can you answer a question like
 5   that?  Did he --
 6       A.   I don't think he appreciated --
 7       Q.   Did he respond creatively to criticism?
 8       A.   I don't think so.
 9       Q.   What was the attitude that you observed in
10   the Department of Justice when people came up with
11   criticisms of the way things were being done?
12       A.   I don't think, I don't think you
13   criticized.  I don't think you went to meetings
14   upstairs and said anything.  I can remember some
15   people trying to make some suggestion and it was
16   just, you know, they were being -- they would be
17   ridiculed.  I just, I think criticism was not
18   something that you did.
19       Q.   Is vindictive too strong a word for the
20   attitude that you experienced in the Department of
21   Justice?
22       A.   I think it was petty.  I don't know how
23   vindictive, but it was petty.  There was some
24   meanness to it.
25       Q.   When you say meanness, somebody that
```

1    criticized either the Attorney General or one of the
2    chief administrators, would meanness comprehend
3    attempts to destroy the reputation of whoever it was
4    making the criticism?
5         A.    Well, I can't say that directly because I
6    really didn't have a lot to do with General
7    Caldwell.  We didn't have any kind of relationship.
8    I didn't know how he reacted.  Sinquefield was, I
9    don't think he ever got angry or mad.  I don't know,
10   you know, that didn't seem like his personality.  He
11   just kind of blew everything off.  I mean, if you
12   went up there and complained about something, he
13   just, you know, he just kind of blew that off.  So I
14   don't think those two had anything to do with it.
15        Q.    Did you ever have any experience with, I
16   think you did, legislative concerns about the way
17   the office operated?
18        A.    No.  I had heard some.  You know, I had
19   heard the stories about people going over there and,
20   I think it was Representative Peterson asked some
21   questions, and it was, was not good for the person
22   that they were talking about.
23        Q.    And who was that person that they were
24   talking about?
25        A.    I think it was Feist, Pauline Feist, that

1  Karen Peterson had said something about someone with
2  a disability wanting a parking space, and I think
3  they reacted to, that was Pauline, you know, I don't
4  know that they named her, but everyone knew she
5  wanted a parking space, and I think later she was
6  terminated.  I think I got that story straight.  I
7  mean, that's what I heard.
8      Q.   Well, describe for me what you were just
9  referring to in terms of they didn't like that.
10 They talked about it.
11     A.   Well, they didn't like Karen Peterson.
12 They didn't like a representative talking about --
13 and that probably happens at all departments.  They
14 don't like for a representative to say something
15 about their Department and that they're not doing,
16 you know, doing what is correct.  So it's just a
17 reaction they had.
18     Q.   And when you say they, was there any
19 specific --
20     A.   I imagine it was the people that they, you
21 know, that the committee was asking questions to.
22 And I'm not sure --
23     Q.   This is with General Caldwell, is that
24 right?
25     A.   Yeah.  But I can't really speak to it

1   because the story just went around the Department.

2   And it was like, oh, did you hear that, you know,

3   the General went to the committee and this happened

4   and then I heard later that she had been

5   terminated.  That may have been after I retired.  I

6   can't remember.

7       Q.   So this was something that you were not

8   trying to find out about.  This is something you

9   simply heard in ordinary conversation?

10      A.   Yeah.  I didn't, you know, I didn't even

11  know probably they were meeting.  I was not told

12  when the legislature was meeting with our, you know,

13  with our people.

14      Q.   Did you hear that Miss Carter Peterson had

15  also asked the Attorney General to provide data on

16  pay for women and minorities?

17      A.   I don't remember if I heard that at that

18  time.  I may have heard that later.

19      Q.   Do you know anything about that?

20      A.   No, I really don't.

21      Q.   Was there ever a time that you took

22  concerns about operations to management, so to

23  speak?

24      A.   I did one time.  I wrote a letter to

25  management.  I had had a problem with the case

1  tracking Department, one of the people in the case

2  tracking Department.  And it really wasn't a

3  problem.  And I'm going to try and get this

4  straight.  This person, every time I went in in the

5  morning, there were cases and I couldn't figure out

6  why the cases were coming in early in the morning

7  because we closed like at 5:00 o'clock.  So somebody

8  had to be staying there and getting, you know, maybe

9  one, two cases coming in in the morning with the

10  case tracking.  And I don't know if you want me to

11  explain case tracking.

12      Q.   I'd like to know what you're referring to

13  actually.

14      A.   It's part of our, part of litigation, where

15  you have people that risk management sends over

16  cases to case tracking.  Then they put it in their

17  computer and they put all the information in their

18  computer.  That's about, you know, they have to put

19  in the information.

20           When they get the case, they send it to

21  the director.  He assigns the attorney that's going

22  to take it.  So this had never happened before.  So

23  I just happened to walk in to the director of case

24  tracking and I asked her, I said, why are these

25  cases coming in?  She said, one of the people there,

1   one of the people staying and getting these cases

2   late.

3               I said late?  I said, well, does risk

4   management work that late?  Why would we have to pay

5   somebody overtime to stay, and I don't understand

6   why.  And she said, well, Gayle, I don't really

7   know.  She said I'll call over at case tracking.

8   She said I'll ask them.  I said, okay.  It's no big

9   deal.

10              I went back to my office and evidently she

11  called case tracking.  The woman at case tracking

12  called me.  She said there's no reason for anybody

13  to stay and do that.  Ridiculous for you all to be

14  giving overtime for somebody to stay.  I said,

15  look -- her name was Ann Wax.  I said, look, I don't

16  want to get into that.  I said, for one thing, if

17  that's what the director wants and they're doing it,

18  that's fine.  I'm going to do what the boss wants.

19  I said, I was just kind of asking about it, wanting

20  to know about it.  And I said it's no big deal to

21  me.  Well, she hung up.

22              Well, Rob Harroun, next time I walked down

23  there, he jumped on me about calling risk management

24  and telling them that this person was doing overtime

25  and, you know, and I said, I did not do that.  They

1    called me.  I did not call them.  And he was furious

2    about it.  He yelled at me about it.  And I just,

3    you know, I just left.

4        Q.    When you say yelled, what do you mean?

5        A.    He raised his voice very high and said high

6    no business calling at risk management and

7    complaining about this person doing overtime.

8        Q.    Well, why --

9        A.    And I thought, you know, at that time I was

10   an administrator.  If somebody has overtime and

11   that's, I should find out why they're getting

12   overtime.  You know, we're paying people tax money,

13   and if they're not needed for overtime, and at the

14   time money was tight.  So anyway, I wrote a letter

15   upstairs --

16       Q.    What was the basis that you understood him

17   to object?  It sounds to me like --

18       A.    I guess because he just didn't want anybody

19   to do anything, especially me.

20       Q.    Was there a suspicion on your part that

21   there was some kind of politics or some sort of

22   improper conduct in somebody staying after business

23   hours to assign specific cases to specific

24   attorneys?

25       A.    No.  I don't think that was part of it.  I

1    think that this person was just staying and doing
2    the overtime and, of course, I'm going to say this,
3    that this person that was doing the overtime was the
4    girlfriend of Rob Harroun.  I don't know if she
5    still is.  But at the time she was Rob Harroun's
6    girlfriend.
7         Q.   Do you remember that woman's name?
8         A.   Tuyet Nguyen.  I went upstairs and talked
9    to Sinquefield about it.  I told him I didn't
10   appreciate being yelled at when I didn't call.  I
11   was accused of doing something that I did not do.
12   And I did not appreciate it.  And he also should be
13   aware that he is putting the Department, this is a
14   liability situation, if she ever gets mad at Rob,
15   she can turn around and get mad at Rob and tell
16   everybody, she can turn around and tell the people,
17   look, I am being sexually harassed.  So she is
18   putting the Department and Rob is putting the
19   Department in a very precarious situation.  That's
20   it.  Nothing ever happened.  Later on, months,
21   months, months later, they moved her.  Because I
22   think there were other complaints.
23        Q.   Was there any kind of policy about
24   workplace relationships?
25        A.   I don't think so, no.

1    Q.   Is this part of what you were referring to,

2    the absence of policy?

3    A.   Yeah.  No.  There was none of that.  As far

4    as having a workplace relationship, I have seen them

5    in all departments, and that did not bother me.

6    What bothered me was the fact that I was being

7    accused, and that I thought the situation, two

8    people working together was not a good idea.  In

9    another section, but not right together all the time

10   because other than, even the problem with me, there

11   were other problems, too, with other people in the

12   Department, with Tuyet.  And with risk management.

13   Q.   Did you ever think that you stood an

14   appreciable chance of getting fired by Mr. Rob

15   Harroun because of this situation?

16   A.   No.  I really didn't.  I was not

17   intimidated or worried about it.  I mean, if I would

18   have been there when all the cuts happened, that may

19   have happened, because the little clerk that was

20   there, she was, she had gotten fired.  Terri Grim.

21   And I don't know why Terri was -- she had been there

22   eighteen years, and they fired her.  I don't think

23   she had a very good relationship with Rob Harroun.

24   And I think, I don't think she had a very good

25   relationship with Tuyet, and I think some of that

1  may have played into it.  I don't know that.  I

2  can't tell you that.

3      Q.   Do you recall who the civil rights section

4  head was when you left?

5      A.   I can't think of her name.  I know who it

6  was.  I can see her face right in front of me.

7      Q.   What kind of experience did that person

8  have, if you know?

9      A.   I don't think she had a lot of experience.

10 She had worked over at Workers' Comp Corporation

11 before she came.  And then she was made head of

12 special projects or special -- special litigation.

13 She took Sonia Mallett's place.  Sonia Mallett

14 left.  She came from the outside.  She wasn't one of

15 the people that was in the Department.

16     Q.   Okay.  Was she an attorney?

17     A.   Oh, yeah.  Yeah.  She was an attorney.  And

18 there was a lot of problems there because there were

19 people in civil rights that would have liked to have

20 applied for that position, but like I said, there's

21 no structure.  You know, sometimes they opened it up

22 and let people apply.  Sometimes they didn't.  Just

23 depended.

24     Q.   Did the Attorney General's office ever

25 advertise available positions in, say, law journals

1    or in newspapers of record?

2        A.    I think -- no.  But one day after I left, I

3    saw them advertising for an attorney in, person I

4    can't remember, I saw civil rights advertising for

5    an attorney.  It was in the newspaper.  Because a

6    person that had been fired called me and laughed and

7    said she had applied for it.  And she had been in

8    civil rights.  And she had just been fired, and they

9    told, when they called everyone in, they said, we're

10   firing you because the budgeting problems.

11            Then they turned around and put this

12   advertisement in the paper right after they had

13   fired all these people, they put the advertisement

14   in the paper.  She said, I went ahead and applied

15   for it again.  So, you know, it was a budget

16   problem, but they were still hiring attorneys.

17       Q.    Do you have any idea why the old civil

18   rights section person had left?

19       A.    Michelle?

20       Q.    Yes.

21       A.    She just was not happy with civil rights.

22   She had a lot of problems with -- I'm not really

23   sure why she left.  But I know that she had

24   complained a couple of times that she was just not

25   happy there.  Very unhappy.

1    Q.   Was there ever any evidence of what you

2    might describe or someone might describe as good old

3    boy network or system in place in Attorney General's

4    office, where who you knew really seemed to matter

5    more than your performance?

6    A.   Oh, yeah.   I mean, that's because it's an

7    agency that is at will.   I mean, you don't have that

8    in civil service because you apply, you have to get

9    in the top, you know, ten grade groups and then, you

10   know, you're chosen.   There may be some politics to

11   that, but when you're at will, you can fire a person

12   and immediately put your friend in there.   So that's

13   just going to be the norm because it is not civil

14   service.   I mean, it's patronage.   The Attorney

15   General's office is patronage.

16   Q.   In the context of Louisiana, between the

17   years 2000 and you left in 2009?

18   A.   2009.

19   Q.   Nine?

20   A.   Uh-huh.

21   Q.   This patronage system or good old boy

22   system, as you might choose to call it, did that

23   system of friends and preferential treatment run

24   along gender and racial lines in what you observed?

25   A.   Well, I think because all the Attorney

1    Generals were male and all the Attorney Generals

2    were white, that's who their friends were.  I mean,

3    you know, that's who they knew unless they knew

4    somebody's daughter, you know.  Yeah.  It's

5    patronage.  Most of the people, and I'm not going to

6    say all of them, but most of the people know someone

7    that works at the Attorney General's office and, you

8    know.  I can't say that, you know, blanket because

9    that's, there are people that don't know anybody

10   that they have hired.

11        Q.    Now, Office of Risk Management is the

12   client, isn't it?

13        A.    Uh-huh.  Uh-huh.

14        Q.    What was the problem with you talking to

15   the client?

16        A.    I don't know.  Oh, you mean when Ann called

17   me and I -- I don't know.  I just think it hit the

18   wrong chord.  I really don't know why it got him so

19   upset.

20        Q.    What attempts, if any, did you observe the

21   Attorney General's office making to assess from the

22   client, from Office of Risk Management, the kind of

23   job the office was doing?  Was the Attorney General

24   paying attention to the Office of Risk Management --

25        A.    Oh, yeah.

1    Q.   -- in terms of feedback?

2    A.   Oh, absolutely.  As a matter of fact, a lot

3  of the attorneys thought it was a little too much,

4  that it was just, you know, no one would stand up

5  for litigation a lot of times when they thought the

6  director should stand up for litigation in some

7  conflicts.  And I would just hear about it.  I

8  wasn't involved in that because I'm not an attorney,

9  so I, you know, I wasn't involved in any kind of

10  attorney relationship.  But I did hear at times

11  that, you know, they should have stood up a little

12  bit more for the office when risk management called

13  and said, you know, you can't send your paralegal to

14  court.  And, you know, they got all upset about

15  things like that.

16    Q.   Based on what you saw, was it accepted by

17  the administration in the Attorney General's office

18  that if you want to know how an attorney is doing,

19  you ask the adjusters at the Office of Risk

20  Management that the attorneys are working for?

21    A.   Yeah.  A lot of that.  I mean, yeah.  I

22  think that probably risk management had a handle on

23  who was a good attorney and who maybe wasn't as

24  good.  But I think most of the attorneys were good

25  attorneys.  I really do.  They had million dollar

1  lawsuits and, you know.  Most of the attorneys up

2  there, I think, were hard working and did a good

3  job.

4      Q.   Now, was there any regular or systematic

5  attempt that you observed to get reports from Office

6  of Risk Management on individual attorneys

7  performance?

8      A.   I don't know that.  I know at one time we

9  had evaluations, and then I think it was under

10 General Foti, they stopped doing evaluations.  No

11 one was evaluated.

12     Q.   What kind of evaluations did General Foti

13 use?  Can you describe that system?

14     A.   I don't know the attorneys.  I just know in

15 administration, we evaluated case tracking,

16 evaluated clerical, all the people I was over at the

17 time when Foti came in.  During Ieyoub, actually, it

18 was a civil service directive.  Everybody, every

19 agency had evaluations.  Everyone.

20          And we even had, when I was over

21 Department of Elections, we had to go to trainings

22 to learn how to do these evaluations and make sure

23 we did them right.  And I came to the Attorney

24 General's office and they had the evaluations and

25 everyone did them.  And then for some unknown

1   reason, the evaluations went away.   Nobody was

2   evaluated any more.

3        Q.   When you were at the Department of Labor,

4   you did evaluations, is that right?

5        A.   We did evaluations, but then they had a big

6   state wide evaluation study, and they had, I think

7   it was Christelle Slaughter came in and worked with

8   civil service and they put together an evaluation,

9   the same evaluation for everybody in state

10  government.   Everybody in state government had the

11  same evaluation.   That's what they did under

12  Richard.   They used the civil service evaluation

13  system.

14       Q.   So this wasn't General Ieyoub's invention?

15       A.   No.

16       Q.   It's simply him adopting --

17       A.   Right.   And I don't know if civil service

18  said elected officials had the option not to use it

19  perhaps.   Because they do have the option not to do

20  some things under civil service.   But Ieyoub wanted

21  everybody evaluated.   And he wanted the civil

22  service evaluations.

23       Q.   So the form General Ieyoub used for

24  evaluations conformed to the civil service?

25       A.   Uh-huh.   And then that was just, all of a

1    sudden one year somebody said, are we doing

2    evaluations?  I said, I haven't got anything.  We

3    tried to find out.  Nobody said anything, and we

4    just, it just went away.

5        Q.    There was no memorandum that you

6    remember --

7        A.    No.

8        Q.    -- setting out reasons for --

9        A.    There may have been one to the director.  I

10   don't know.  I didn't get any of that.  It was just

11   eliminated.

12       Q.    You have administered, to my knowledge, two

13   very large and important agencies of the state

14   government.  What, if any, advantages does a system

15   of standard evaluations have?

16       A.    Oh, I think it does a lot.  Because you can

17   look at them when you're giving -- well, for one

18   thing, there's a paper trail.  If somebody is not

19   doing their work and you do not want to give them a

20   four percent increase, then you have this backup on

21   why you didn't give them, because they will probably

22   appeal that they didn't get.

23            Then you can take in the evaluations and

24   show them, look, these people are not improving, so

25   we're not going to give them the four percent.  Or

1   the ones that get the four percent, you have the
2   evaluations that they merit the four percent
3   increase that year. Because, you know, in civil
4   service, everybody gets a four percent every year.
5       Q.   How about for purposes of giving merit
6   raises. More than just standard raises.
7       A.   Well, that kind of came afterwards with
8   civil service. If there was exceptional, I think
9   they can give a little more. I'm not sure. Because
10  I wasn't in civil service any more. So, but, you
11  know, it was just across the board, in the Attorney
12  General's office, pretty much across the board
13  except if they felt like they wanted to give more to
14  certain people.
15      Q.   How about preventing abuses in payment?
16      A.   There really isn't any. I mean, I think
17  one person went, that I know, and complained because
18  she had been at the Attorney General's office for
19  years and some other people got more money than she
20  did, even though she had the seniority, but it never
21  amounted to anything.
22      Q.   Have you ever heard of an investigator in
23  the Attorney General's office being paid more than a
24  hundred thousand dollars a year?
25      A.   No. I don't think so.

1     Q.   If that investigator had received a raise
2   from, say, forty or fifty thousand to a hundred
3   thousand dollars a year in the space of, like, one
4   immediate jump, would that be something unusual in
5   your experience as a state administrator?
6     A.   I would think so.  Unless they were --
7   well, if they got, if they went from, like, civil
8   service job to an appointed position in civil
9   service.
10    Q.   No.
11    A.   You're just talking about doing the same
12  work.
13    Q.   Investigator, yes, ma'am.
14    A.   Doing the same job, same work.
15    Q.   Yes, ma'am.  No administrative
16  responsibilities at all.
17    A.   Oh, yeah, I think that would be
18  questionable.  To me.
19    Q.   From what you've told us, Miss Truly, it
20  sounds like working in an environment without norms,
21  without regular evaluation procedures could possibly
22  be a more stressful place to work than some place
23  with, more with regular structure.  Have you seen
24  any results of this when you were working there?
25    A.   I think it causes stress, because people

1  don't know if they're going to get a raise, when

2  they're going to get a raise.  They know that other

3  people are getting more than them.  And they

4  probably feel that they're deserving.  And they see

5  other people, you know, getting a higher raise than

6  they're getting, so I guess, I guess it may irritate

7  some of them.

8      Q.   Do you have any examples?  Anybody in your

9  specific knowledge have problems working in this

10  environment?

11     A.   Well, you mean name names.

12     Q.   Well, yeah.  If that's appropriate.

13     A.   About people working -- no.  It's just the

14  whole atmosphere, I think.  You know, when you go

15  upstairs to civil rights and they're just giving out

16  raises and you have somebody saying, well, you know,

17  we just looked at the list, as they used to call it,

18  the list, and we see where somebody got more.

19          But they're not going to complain about

20  it.  It's an at will department.  You worried about

21  your job all the time.  And you don't want anybody

22  to hear that you complained.  You don't want anybody

23  to know that you're, you know, talking about it.

24     Q.   Did you ever hear Attorney General Buddy

25  Caldwell's talk about an open door policy?

1    A.   Oh, yeah.  I think the first meeting he had
2  was an open door policy.
3    Q.   What did you understand he meant by that
4  when you first heard it?
5    A.   Well, I've been in government so long, I
6  didn't think too much about it, but a lot of people
7  thought they could just go upstairs if there was a
8  problem and they could talk to him about it.
9    Q.   Did this actually work out like, as
10  advertised?
11    A.   I don't really think so.  I had never heard
12  of anybody talking to General Caldwell.  They
13  usually talked to Sinquefield when there was a
14  problem.  He was deputy, right under.  And they went
15  up and talked to him.  Maybe some of them did.  I
16  can't speak for everyone.
17    Q.   I was going to ask you, were you in a
18  position to observe who got access and who didn't?
19    A.   No.
20    Q.   Let me have a brief word with my client,
21  ma'am.
22    A.   Okay.
23         (SHORT BREAK TAKEN.)
24  BY MR. WILLIAMS:
25    Q.   Miss Truly, how did you first meet Jennifer

1   Medley?

2       A.   Oh, actually, during Katrina.  She came --

3   they moved everybody up to the office, and I may

4   have met her before then, but I got to know her

5   during Katrina.

6       Q.   What were the circumstances -- we all know

7   about Katrina, but what were the circumstances?  Why

8   did you --

9       A.   She was in civil rights, and I was trying

10  to help the people that had been in Katrina, all the

11  people that were effected by Katrina that were all

12  over the state.

13      Q.   What were you doing for them?

14      A.   Whatever I could.  Calling them.  They were

15  crying.  People were trying to, you know, find out

16  if they still had their jobs.  It was just, I mean,

17  I was trying to call Red Cross to come in and talk

18  to them all, and we were trying to find places for

19  them to live.  Just whatever we could.  I mean, it

20  was just, you know, just such a crisis.

21      Q.   Did you ever come to learn about any

22  problems or complaints that Jennifer was having with

23  her employer?

24      A.   Yeah.  I had heard that she was upset about

25  her employment at the Department.

1    Q.   Did she tell you that herself?

2    A.   I'm trying to remember if she actually told

3   me herself.  During Katrina.  I know she was having

4   problems.  I know that, you know, I had

5   conversations with people.  I think I did talk to

6   Jennifer during that time.  But, you know, I didn't

7   know that she was upset about her pay.

8    Q.   What was she upset about?  Just best you

9   can remember.

10    A.   They were upset during Katrina because they

11   didn't feel like they were getting a lot of support

12   from General Foti and the people up on the top

13   floor.  And they really weren't.  They really

14   weren't getting a lot of support.  I guess he was so

15   involved with everything that was going on, the

16   Department people were his last concern or not much

17   of his concern.  But she was very, you know, she was

18   upset about some, you know, just not being taken

19   care of as an employee.

20    Q.   And as her complaints about pay went, did

21   she keep you informed or was she trying to do that?

22    A.   No.  I don't think so.  I can't remember

23   exactly when she started complaining about it.  But

24   I think she found out that some other attorneys were

25   making more than her.  And she had been there a lot

1  longer and felt, you know, felt like she should have

2  been included in more, in a pay raise.

3      Q.   Did you take any steps to investigate that

4  in any way or talk to anybody for her?

5      A.   Not really.  Because there were so many.  I

6  mean, you know, people complained.  They saw the

7  list that came out, and they'd see somebody that had

8  a lot less experience than them.  You know, if

9  they'd say something, but nobody, like I said, I

10  don't think there was a lot of complaints because,

11  and I don't know that and maybe Rob Harroun could

12  tell you more about whether there were more

13  complaints because they would go to him.  But there

14  were definitely people that were unhappy.

15      Q.   I think I have a name for you.  Patricia

16  Wilton.

17      A.   That's it.

18      Q.   This is the civil rights --

19      A.   Director.

20      Q.   Is that right?

21      A.   Uh-huh.  Uh-huh.

22      Q.   And she came from what background,

23  according to your knowledge?

24      A.   I think she was with the Workers' Comp

25  Corporation.

1    Q.    Louisiana --

2    A.    Louisiana Workers' Comp Corporation.  I

3   think she came from over there.  I'm not positive

4   about that, but I think that's what she told me.

5    Q.    And whose decision was it in the Department

6   to assign her to civil rights, as far as you know?

7    A.    I imagine it was Rob Harroun's.  I mean,

8   there were other people that would have liked to

9   have applied, but it wasn't open.  She was just

10   appointed to that position.

11    Q.    Who was David Sanders?

12    A.    David Sanders was the former head of civil

13   rights, and then he was put downstairs and made

14   special litigation, and she was, I think, under

15   him.  Maybe she was his assistant.  Yeah.

16    Q.    Do David Sanders and Patricia Wilton appear

17   to have a personal relationship?

18          MS. McINNIS:

19              I'm going to object to that, again, on

20   the basis it's just irrelevant and it exceeds the

21   scope.

22          MR. WILLIAMS:

23              It's not irrelevant at all.

24          MS. McINNIS:

25              Exceeds the scope of the pleadings.

```
 1            MR. WILLIAMS:

 2                 It doesn't.  It's exactly on point, as

 3      you well know, counselor.  It's exactly on point.

 4            MS. McINNIS:

 5                 I don't know what you're talking

 6      about.

 7            MR. WILLIAMS:

 8                 It's convenient that you don't, ma'am.

 9                 I'm instructing this witness to answer

10      that question, if you possibly can.

11            MS. McINNIS:

12                 I voice my objection again for the

13      record.

14      BY MR. WILLIAMS:

15         Q.  Go ahead, ma'am.

16         A.  It appeared.  It appeared.  I can't confirm

17      that, but it appeared.

18         Q.  Miss Patricia Wilton, other than the

19      relationship with Mr. David Sanders, appeared to

20      have no particular qualifications in the area of

21      civil rights, is that correct?

22         A.  I don't think she had a lot of civil rights

23      litigation.  She worked with David on, I think they

24      worked on some civil rights, you know, so she

25      probably worked with him in that area as his, when
```

1  she assisted him in that.

2      Q.   According to your understanding, one of the

3  duties incumbent upon the section chief for civil

4  rights would have been to evaluate the work of other

5  attorneys working in the area of civil rights, is

6  that correct?

7      A.   Right.

8      Q.   Do you remember an individual by the name

9  of Wayne Gaudin?

10     A.   Oh, yeah.

11     Q.   Did he work well in the system of

12  administration that you have been describing?

13     A.   Yes.  Yes.  You mean, was he a good

14  litigator and a good --

15     Q.   Yes.

16     A.   Yes.

17     Q.   Would you define the workplace stressful?

18     A.   I would think so.

19     Q.   What happened to Mr. Gaudin?

20     A.   He committed suicide.

21     Q.   Was it because of stresses at work, to your

22  knowledge?

23     A.   I imagine that played into part of it.  I

24  think he also had a history of manic depression.

25  And he was under stress at work.  I know he was

1    under a lot of stress at work during a certain time.

2        Q.   Could you tell me approximately when

3    Mr. Gaudin committed suicide?

4        A.   Two years ago maybe.  Maybe two years ago.

5        Q.   Was that when, did that happen when Miss

6    Medley was working there?

7        A.   Yeah.  She would have been there.

8        Q.   That's all the questions I have now.  Thank

9    you.

10   BY MS. McINNIS:

11       Q.   Miss Truly, I have some questions for you.

12       A.   Okay.

13       Q.   Miss Truly, I know that Mr. Williams had

14   asked you about some women voicing some complaints,

15   and I believe you said there were not a lot of

16   complaints.  But you did say that they felt like

17   that the raises were unfair.  Is unfair the same as

18   discriminatory, or do you think -- let me ask you

19   the question in a different way.  Do you think that

20   the perception that raises were unfair could have

21   been attributed to other factors that were not

22   necessarily discriminatory?

23       A.   Could be.  We are not just talking about

24   lawyers, are we?

25       Q.   Let's talk about lawyers.

1     A.   No.   Are we just talking about lawyers is

2   what I'm saying when you asked me that question.

3   You talking about --

4     Q.   I'm talking about whatever you guys were

5   talking about when you were referring to that

6   earlier.   What were you referring to?   Everyone or

7   limiting that to attorneys?

8     A.   I can't remember.

9     Q.   Okay.   Then let's go with everyone for

10   right now.

11     A.   Okay.

12     Q.   Do you think that some of the perception

13   that raises were unfair could have been attributed

14   to other factors that were not necessarily

15   discriminatory towards women?

16     A.   Yeah, I guess so.

17     Q.   Okay.   And would your answer be any

18   different if you were talking about, if you were

19   limiting that to just attorneys?

20     A.   I don't think so.   Not if we are talking

21   about women and about minorities at the same time.

22   There were some problems with some of the women that

23   were minorities that had, that felt they weren't

24   being treated fairly.   Now, treated, discriminated?

25   Any may have felt that.   I can't tell you how they

1    felt.

2        Q.   I understand.  Now, when we are talking

3    about attorneys, like we mentioned during the break,

4    I do not work for the Department, so I'm not real

5    sure how the structure is and I'm not sure how you

6    fit into that except what we discussed this

7    afternoon.  But can you tell me, your duties when

8    you were the chief administrative officer for

9    litigation, you said that you were over the clerical

10   stuff and not the attorneys.  Is that right?  Am I

11   correct?

12       A.   I did not supervise attorneys.

13       Q.   Okay.  So when you were talking about, when

14   you were talking about attorneys or everyone that

15   did include attorneys, what are you basing that

16   knowledge on?

17       A.   Just friendship with all the attorneys that

18   I knew and going out to lunch with them and talking

19   to them and conversations.

20       Q.   Okay.  Going back to another statement that

21   you made.  You said you didn't think that anyone

22   complained to Foti.  After that you said that you

23   think people were scared.  Did anyone say that to

24   you, they were scared to speak up?

25       A.   I don't know that they said they were

1   scared.  They were intimidated.  Yeah.  They were

2   intimidated.  General Foti had a very bad, he had a

3   reputation for having a very bad temper.  And he

4   would fly off the handle.  And I do think there were

5   people that were intimidated by that.

6       Q.   I thought you said earlier you didn't think

7   that they were intimidated.

8       A.   I said that earlier?

9       Q.   I think so.  I don't want to put words in

10  your mouth, but I thought that was your --

11      A.   If I have to correct it, I would say that

12  people were intimidated by the General.

13      Q.   And who would have expressed those

14  sentiments to you?

15      A.   Well, some of the attorneys.  Some of the,

16  just the people in the Department.

17      Q.   So no one in particular?

18      A.   Well, yeah.  No one in particular.  Just

19  from conversations.  I can say for a fact that I

20  would not have liked to have gone up there and

21  complained to him.

22      Q.   Did you feel intimidated?

23      A.   Probably a little bit.  Because he just had

24  a reputation, you could not ever tell him no.  You

25  could not go up there and complain.  He didn't like

1    complaints.  He didn't like no.  He didn't like

2    titles.  He just had a way of administering the

3    Department that was very different from what

4    everyone was used to.

5        Q.    And this is Attorney General Foti?

6        A.    It's Foti, yeah.

7        Q.    Okay.  Let's go back to that overtime issue

8    just for one moment.  I just wanted to clarify.

9    When you said that it came to your attention that

10   there were some overtime hours being worked in case

11   tracking.  I want to ask you a couple questions

12   about that.

13       A.    Sure.

14       Q.    How many hours are we talking about?  Was

15   it a significant amount of hours?  Was it a

16   negligible amount of hours?

17       A.    Oh, it may have been one or two hours.  And

18   the way I knew about it was I was signing off on

19   overtime.  Tuyet would come in to me, she would ask

20   me to sign in the middle.  The way the structure

21   was, Tuyet would sign overtime, then I would sign

22   overtime.  Then Rob Harroun or whoever, one of the

23   deputies would sign overtime.

24       Q.    Yes, ma'am.

25       A.    She was getting Mr. Harroun to sign

1    overtime, she got him to sign, she would sign it and
2    she wanted me to sign in the middle.  I just did not
3    agree to that particular procedure.  Because it was
4    like she was telling me that I had to sign.  And I
5    just, you know, I didn't agree to that.  I said,
6    this is not the way we do overtime.  And I also told
7    her she should have one of the deputies sign.  But
8    after I did that and we had the blow up, all the
9    overtime was taken away from me.  I could no longer
10   sign overtime.
11        Q.   So it was the order in the, it was the
12   order in which the signatures actually affixed to
13   that document.  Is that right?
14        A.   That's more of the complaint I had, was the
15   way it was being done.
16        Q.   The sequence?
17        A.   Yes.
18        Q.   And not so much the overtime hours
19   themselves?
20        A.   I was just trying to find out about the
21   overtime hours, why we were doing this because
22   actually case tracking never had overtime unless
23   there was a special project they were working on.
24   So I asked about it, because it was out of the norm.
25        Q.   Right.  I understand.  Let me ask you

1  another question.  Talking about the case tracking.
2  And please inform me because I'm not very familiar
3  with the process.
4      A.    Sure.
5      Q.    Does case tracking want to get cases
6  assigned in the same day that they are received?  Is
7  that -- I mean, is there a time sensitive thing, I
8  guess.
9      A.    You could do it, you try to do it that
10  day.  But, you know, after 5:00 o'clock, there's
11  just, there's not a whole lot to do.  If you come in
12  the morning and do it, it's not going to cause, as I
13  felt like it would not cause a problem and you would
14  not have to give somebody overtime to do it.
15      Q.    You said it was maybe one or two hours.
16  Over the course of how long?
17      A.    I don't know.  Like I said, it was taken
18  away from me, after I, I didn't really complain.
19  After I asked about it.  Houston Pin (phonetic) came
20  in and told me he would be doing the overtime
21  because Rob Harroun said I had a problem with it.
22      Q.    All right.  Thank you for clarifying that.
23  You said that at one point you had felt accused.
24      A.    Uh-huh.
25      Q.    I was wondering if you could just tell me a

1    little bit more about what you remember about that.

2         A.   Well, he accused me of calling Ann Wax,

3    which I had not done.  Ann Wax was over at risk

4    management.  And he had accused me and said I had no

5    business calling Ann Wax.  I did not call Ann Wax.

6    Lo called Ann Wax.  That's the director of case

7    tracking.  She called Ann Wax.  Ann Wax called

8    back.

9         My secretary took the message, and when I

10   got it, I looked at it and I thought, what does Ann

11   Wax want with me because I really wasn't focusing on

12   the conversation with Lo.  Anyway, I wasn't

13   focusing, so I called her back and she wanted to

14   know what had happened and why we were doing

15   overtime, and she said as far as she was concerned,

16   people should not be doing overtime and that Tuyet

17   is causing a lot of problems.

18        I told her I didn't want to go into that,

19   that, you know, if this is what they wanted, you

20   know, I was going to do it.  And we ended the

21   conversation there.  I mean, I didn't go any

22   further.  But then when, I can't remember, I went

23   down, he called me down there or went down there,

24   and he started telling me I had no business calling

25   Ann Wax and talking to her.  And just accusing me of

1  calling her and just kind of overreacting to the

2  whole situation.  Well, I just walked out.

3      Q.   That kind of sounds like the whole thing

4  got blown out of proportion?

5      A.   Yes.

6      Q.   At least to an outsider.

7      A.   I didn't think it was blown out of

8  proportion because I'm not used to being talked to

9  that way by someone.

10     Q.   Miss Truly, I'm going to jump forward in

11 your testimony.  Mr. Williams had asked you about

12 hypothetical situation.  I think he said if there

13 was an investigator that was being paid more than a

14 hundred thousand dollars, a substantial jump in

15 salary for apparently no reason, what would you

16 think about that.  He asked you if you think it was

17 questionable.  I think you agreed.  Let me ask you

18 this.  When you were chief administrative officer --

19 I'm getting that correct, right?

20     A.   Uh-huh.

21     Q.   Were you over investigators?  Did you have

22 investigators under your supervision?

23     A.   No.  I would not know what they did.  I

24 don't know if you were talking about General

25 Caldwell's son.  No.  Okay.

1    Q.   So you would, would you have any idea what

2    investigators were being paid?

3    A.    No.  I really don't know.  But I know they

4    weren't being paid a hundred thousand dollars.

5    Q.   Like I said, I think Mr. Williams posed

6    that as a hypothetical, so we can only speculate.

7    A.    Okay.

8    Q.    Moving forward, I think after the break,

9    Mr. Williams had talked about occurrences after

10   Hurricane Katrina.  I believe you testified, correct

11   me if I'm wrong, that you said that Miss Medley was

12   upset that she was not being taken care of, and I

13   believe you also said that employees felt like they

14   weren't getting a lot of support from Foti.  Can you

15   talk about what you meant when you said that Miss

16   Medley was upset that she was not, she felt like she

17   wasn't being taken care of?

18   A.    There wasn't places for people to stay.

19   The General wanted everybody to come in, like, the

20   next Monday after Katrina, and people were in San

21   Antonio, in Seattle, they were in New York.  Rob

22   Harroun came in and told me that I had to call them

23   and all and have them come in that day.  They didn't

24   have homes.  Their children were not in school.  It

25   was just a terrible crisis, and people really felt

1    like they were being pressured to come right back

2    after this terrible crisis had happened.

3            And as far as not being paid, no, they

4    really were not given a lot of support.  Nobody was

5    at the time looking for houses for them.  This came,

6    this came later but, you know, I think they would

7    have been happy, and I sent an email upstairs and I

8    said, would you have the General, after we got them

9    offices and, would you have the General just send

10   them an email and tell them, you know, he's sorry

11   for their situation and they're working to try to --

12   they would not say anything.  They would not do

13   anything, wouldn't say anything.  Wouldn't send

14   emails out.  Wouldn't meet with the people.  It was

15   just, you know, I think maybe they met with them one

16   time, one of the people upstairs.  I can't

17   remember.  It was just a total feeling of being

18   ignored.  Their problems being ignored.  Not them so

19   much as what was going on.

20      Q.   So correct me if I'm wrong, but I think

21   your comment that Miss Medley may have felt that or

22   expressed to you she was upset about not being taken

23   care of had to do with basic needs being met and

24   then having to transition back into work, kind of

25   the same thing that a lot of Katrina victims were

1   experiencing?

2        A.   Right.  We had people sleeping in the

3   Department.  Because they had no place to sleep and

4   they were scared not to come to work because they

5   felt like they may be fired if they didn't.  That

6   word was thrown around.

7        Q.   Give me one minute.

8             Miss Truly, Mr. Williams asked you about

9   good old boy network.  I'm not sure if it was your

10  word or his, but someone used the word patronage.

11       A.   Yeah.

12       Q.   And I'm just wondering, how do you know

13  Victor Bussie.

14       A.   He's a friend of mine.

15       Q.   Okay.  And what is his current employment?

16       A.   He's not employed.  He's ninety-two and

17  he's the former president of the AFL-CIO.

18       Q.   Okay.  And who is Fran Lasalle?

19       A.   Fran, I guess he's an assistant to

20  Caldwell.  Or did he retire again?  I don't know.

21       Q.   Okay.

22       A.   He was an assistant to Caldwell when I was

23  there.

24       Q.   Okay.  And to your knowledge, had

25  Mr. Bussie and Mr. Lasalle ever have any

1     conversations regarding your position or your

2     employment with the Department of Justice?

3       A.   I don't know.   I don't know that they ever

4     did.   I don't know.

5       Q.   Would it surprise you if Mr. Bussie made

6     occasional phone calls to Mr. Lasalle regarding your

7     employment?

8       A.   No.   That wouldn't surprise me at all.

9     He's always been a supporter of mine.

10       Q.   Okay.   I don't have any other questions.

11     BY MR. WILLIAMS:

12       Q.   Just a couple of redirect.   You responded

13     that Attorney General Foti didn't like titles.

14       A.   No.   He didn't like titles.

15       Q.   What did you mean by that?

16       A.   Well, there was somebody downstairs that

17     did, she worked with risk management.   I'm sorry I

18     can't think of her name.   Anyway, she wanted to

19     have, risk management called her and asked her what

20     her title was so they could send her a letter and

21     put her title on it.   She called upstairs to ask

22     them what her title was under the new

23     administration.   And she got chewed out royally

24     saying the General didn't like titles and she just

25     didn't have a title.   So that's why I said he didn't

1    like titles.

2        Q.    All right.  You said in response to one of

3    counselor's questions you wanted to know whether she

4    was referring to General Caldwell's son.  I think

5    that was the question.

6            MS. McINNIS:

7                I don't think I asked that.  I think

8    you asked that.

9            MR. WILLIAMS:

10               I think the deponent said in response

11   to a hypothetical question, she asked about General

12   Caldwell's son.

13   BY MR. WILLIAMS:

14       Q.    Is General Caldwell's son, to your

15   knowledge, employed by the Department?

16       A.    Yes.

17       Q.    What does he do?

18       A.    I think he's a director now of

19   investigations.  I don't know a lot about what his

20   title is or what he does.

21       Q.    Do you know of an investigator by the name

22   of Sha Carter?

23       A.    I know who Sha Carter is.  I don't know

24   exactly what she does.

25       Q.    Did you know that she testified under oath

1    that she is making one hundred two thousand dollars

2    a year as an employee of the Department of Justice?

3    As an investigator?

4        A.    No.  I did not know that.

5        Q.    Does that surprise you?

6        A.    That seems -- she may have some other

7    duties.  She just investigates?

8              MS. McINNIS:

9              Are you testifying, Dale?  Are you

10   testifying?  If you are, we can put you under oath.

11   If you have a question, ask her, but don't testify.

12             THE WITNESS:

13             Okay.

14   BY MR. WILLIAMS:

15       Q.    In fact, this is not a hypothetical

16   question.  Miss Sha Carter stated she was making

17   fifty thousand dollars a year prior to coming to

18   work for the State of Louisiana, Department of

19   Justice.  And at the time she testified, which was

20   April 16th, 2010, she testified she was making a

21   hundred two thousand dollars.  Based on your

22   experience, is that a grossly excessive amount to

23   pay any investigator?

24       A.    I think it's questionable, but I think he

25   has the prerogative to do it.  He is the elected

1   official and he has that prerogative.  If, you know,

2   it's approved.

3        Q.    All right.  That's all I have.  Thank you

4   very much.

5              (DEPOSITION CONCLUDED.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, JAN DICICCO, Certified Court Reporter, do hereby certify that the above-named witness, after having been first duly sworn by me to testify to the truth, did testify as herein above set forth;

That the testimony was reported by me in shorthand and transcribed under my personal direction and supervision, and is a true and correct transcript, to the best of my ability and understanding;

That I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

_____

JAN DICICCO

CERTIFIED COURT REPORTER

1                    WITNESS'S CERTIFICATE

2

3          I have read or have had the foregoing

4     testimony read to me and hereby certify that it is a

5     true and correct transcription of my testimony, with

6     the exception of any attached corrections or

7     changes.

8

9

10

11          (          ) No Corrections

12

13          (          ) Corrections Attached

14

15

16

17

18

19     _____

20                    GAYLE TRULY

21

22

23

24

25