SHARR SCOTT
9/23/2010

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JENNIFER MEDLEY     *   CIVIL ACTION
                    *   NO. 09-4570
VERSUS              *   CJB - DEK
                    *
LOUISIANA STATE     *   JUDGE CARL BARBIER
DEPARTMENT OF       *
JUSTICE             *   MAGISTRATE JUDGE
                    *   DANIEL E. KNOWLES,
                    *   III
*   *   *   *   *   *   *


        Deposition of SHARRY R. SCOTT,
403 Dorset Drive, Slidell, Louisiana
70001, taken in the law offices of
Shows, Cali, Berthelot & Walsh, LLP,
located at 628 St. Louis Street, Baton
Rouge, Louisiana 70802, commencing at
1:29 p.m., on Thursday, the 23rd day of
September, 2010.


APPEARANCES:


    LAW OFFICE OF DALE EDWARD WILLIAMS
    (By:  Dale Edward Williams, Esquire)
    212 Park Place
    Covington, Louisiana  70433
      (Attorneys for the Plaintiff)

```
                                                                 Page 2
 1    APPEARANCES (continued):

 2
          SHOWS, CALL BERTHELOT & WALSH,
 3        L.L.P.
          (By:  Amy L. McInnis, Esquire
 4              - and -
              Lindsay L. Lollar, Esquire)
 5        628 St. Louis Street
          Baton Rouge, Louisiana  70802
 6          (Attorneys for the Defendant)

 7

 8
      ALSO PRESENT:
 9

10        Rob Harroun

11        Jennifer Medley

12        Richard Ward, III

13

14

15    REPORTED BY:

16
          KATHY SHAW-GALLAGHER, CCR, RPR
17        Certified Court Reporter
          (No. 049519)
18        Curren-Landrieu, L.L.C.
          749 Aurora Avenue
19        Suite 4
          Metairie, Louisiana  70005
20        (504) 833-3330 (800) 487-3376

21

22

23

24

25
```

SHARR SCOTT
9/23/2010

1        E X A M I N A T I O N   I N D E X

2

3                                    PAGE

4
    EXAMINATION BY MR. WILLIAMS          5
5              RE-EXAMINATION           69

6
    EXAMINATION BY MS. McINNIS          60
7

8           *      *      *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHARR  SCOTT
9/23/2010

Page 4

```
 1          S T I P U L A T I O N

 2       It is stipulated and agreed by

 3   and among counsel for the parties

 4   hereto that the deposition of the

 5   aforementioned witness is hereby being

 6   taken under the Federal Rules of Civil

 7   Procedure, for all purposes, in

 8   accordance with law;

 9       That the formalities of reading and

10   signing are specifically not waived;

11       That the formalities of filing,

12   sealing, and certification are

13   specifically waived;

14       That all objections, save those

15   as to the form of the question and the

16   responsiveness of the answer, are

17   hereby reserved until such time as this

18   deposition, or any part thereof, may be

19   used or sought to be used in evidence.

20          *     *     *     *     *

21       KATHY SHAW-GALLAGHER, certified

22   Court Reporter, State of Louisiana,

23   officiated in administering the oath to

24   the witness.

25
```

SHARR SCOTT
9/23/2010

1            SHARRY R. SCOTT,

2    after having been duly sworn by the

3    above-mentioned Certified Court

4    Reporter, was examined and testified as

5    follows:

6    EXAMINATION BY MR. WILLIAMS:

7         Q.   Yes, ma'am.  Could you tell

8    us when you began working for the

9    Department of Justice, please?

10        A.   I began working for the

11   Department of Justice in May of 2004.

12   And I'm not certain if my exact hire

13   date is the date I started because I

14   had a trial that was held over from my

15   previous job.  I don't know if they

16   just left that in the computer, and I

17   didn't check it to see when it was, but

18   it was within a week or two of the

19   date, and I believe my start date was

20   May 24th, 2004.

21        Q.   When did you -- Well, where

22   did you graduate from law school?

23        A.   I graduated from Loyola Law

24   School in New Orleans.

25        Q.   And when was that?

SHARR SCOTT
9/23/2010

Page 6

1        A.    That was in 2000.

2        Q.    What was your legal

3   experience prior to coming to the

4   Department of Justice?

5        A.    My legal experience prior to

6   coming to the Department of Justice

7   was -- Unfortunately, I didn't bring my

8   resume' with me or an old copy of it,

9   but I did legal assistant work for

10  Lugenbuhl, Burke, Wheaton, Peck, Rankin

11  and Hubbard.  Through that, I ended up

12  working mostly with Mr. Hubbard, who

13  had a mass toxic tort case, and from

14  there, I did contract work through

15  Mr. Hubbard, who was the liaison

16  counsel with Christovich and Kearney

17  and Montgomery, Barnett, and I believe

18  I was there two to three years.  I

19  mean, the office should have a copy of

20  my resume' when I started out.  And

21  that was before I went to law school.

22            Post-law school -- I also

23  did some work for my father through

24  another contract attorney prior to

25  going to law school.  And --

SHARR SCOTT
9/23/2010

Page 7

1          Q.    What was the nature of that

2     work?

3          A.    Which work?

4          Q.    The work you did for your

5     father.

6          A.    Corporate.

7                And I clerked in law school

8     with the district attorney's office.  I

9     don't remember how long that was.  It

10    was either -- I believe it was the

11    summer after my first year.  And -- I'm

12    sorry.  Backing up.  Prior to law

13    school, I also did an internship with

14    Judge Wingerter in Criminal District

15    Court and I believe that was a

16    semester.  So what was a semester, four

17    to six months.  That was before law

18    school.

19                Then I did the clerkship

20    with the district attorney's office

21    with Orleans the summer of my first

22    year, so that would have been

23    approximately 1998.

24                And from there, after I

25    graduated and passed the Bar, I started

SHARR SCOTT
9/23/2010

Page 8

```
 1   with the district attorney's office in
 2   New Orleans, and I was there just shy
 3   of three years before I left and came
 4   to the attorney general's office.
 5        Q.   You had done a number of
 6   different things in the law?
 7        A.   Yes.
 8        Q.   When you started working for
 9   the attorney general's office, was it
10   in the New Orleans office?
11        A.   Yes, it was.
12        Q.   At that point, did you meet
13   Jennifer Medley?
14        A.   Yes.  I don't think I knew
15   Jennifer before starting at the
16   attorney general's office.
17        Q.   In the course of a week, how
18   often would you see or interact with
19   Jennifer Medley?
20        A.   You mean when I first met
21   her?
22        Q.   Well, I mean typically over
23   a period of time, did you work in close
24   proximity?  I mean, could you see each
25   other in the office?  Did you run into
```

SHARR SCOTT
9/23/2010

Page 9

1   each other in the office?

2       A.   Well, we -- Yes.

3       Q.   Where did you sit in

4   relation to Jennifer?

5       A.   Well, when she first

6   started, which I think I preceded her

7   by a month or two, we roughly started

8   around the same time, I would say.  I

9   was physically in the office before she

10  was.  I was at one end of the hall and

11  she was at the other, as best I recall,

12  and our office was pretty much a

13  straight line with like two offices on

14  one end and I was in the little -- I

15  guess, the little small part of the L.

16      Q.   Did you get to know

17  Ms. Medley in the course of working in

18  the same office?

19      A.   Absolutely.  And we shared a

20  secretary at the time.

21      Q.   What was the name of that

22  secretary?

23      A.   Dion.  It was Blakeman when

24  she started and it's -- I believe it's

25  Coleman, C-O-L-E-M-A-N, now.

SHARR SCOTT
9/23/2010

Page 10

1        Q.   Now, you're still working
2   with the Department of Justice; is that
3   right?
4        A.   Yes, sir.
5        Q.   Anybody talk to you about
6   this case?
7        A.   Yes, sir.
8        Q.   Anybody tell you what to say
9   or not to say?
10       A.   No, sir.
11       Q.   Did you ever have issues
12  with the Department of Justice about
13  how they were paying women as compared
14  to men?
15       A.   I had issues with pay in the
16  office.  I don't specifically recall
17  ever telling, it would be Steve Babbin,
18  the men as opposed to women per se.  I
19  did and have had issues with the pay in
20  the office, yes, sir.
21       Q.   What kind of issues do you
22  mean?
23       A.   Well, pay increases or merit
24  raises or whatever they want to call
25  them have gone out and, in my opinion,

SHARR SCOTT
9/23/2010

Page 11

1  to people who have done less work in

2  the office than I have.

3       Q.   Do any of those people who

4  have done less work, in your opinion,

5  than you have happen to be female?

6       A.   Do any --

7       Q.   Of those people who have

8  done less work than you, any of those

9  people happen to be female?

10      A.   Yes, sir.

11      Q.   Okay.  Can you give me an

12  example of a woman who gets paid more

13  and does less work?

14      A.   Kelly Badeaux-Phillips.

15      Q.   Are there also men who, in

16  your opinion, get paid more for doing

17  less?

18      A.   Yes, sir.

19      Q.   Are there more men than

20  women in that category?

21      A.   I don't know.  I didn't go

22  through the New Orleans list and list

23  men on one side and women on the other

24  side.  Basically I never did like an

25  across-the-board thing.  It came to my

SHARR SCOTT
9/23/2010

Page 12

1    attention that certain people got money

2    that everyone else didn't get and those

3    are the people that I'm mainly

4    referring to.

5         Q.   And what your testimony is,

6    you don't have an opinion as to whether

7    those are handed out on the basis of

8    gender or race?

9         A.   No, I do not.

10        Q.   Are any of the people

11   getting paid more for doing less

12   African-American?

13        A.   After what?

14        Q.   African-American?

15        A.   Paid more for doing less,

16   yes.

17        Q.   Who is that?

18        A.   Well, the specific people

19   that I am referring to, so we can -- we

20   don't have to beat around the bush, are

21   when I discovered that merit raises or

22   increases or adjustments or I don't

23   know what the answer is because no

24   one's ever been able to tell me, those

25   people would be John -- that would be

SHARR SCOTT
9/23/2010

Page 13

1    John Sudderth, Kelly Badeaux-Phillips,

2    Phyllis Glaizer, and Carmella, I

3    believe her last name is Parker.

4         Q.   Carmella Parker?

5         A.   Yes.  Obviously John is

6    male; Kelly is female; Phyllis is

7    female; and Carmella is female; and out

8    of those three, Carmella is the only

9    African-American in the group that I am

10   aware of.

11        Q.   Well, how is pay decided

12   there as far as you know?

13        A.   I don't know.

14        Q.   Is there anybody who you

15   have asked about how it's figured out?

16        A.   Yes, I have.

17        Q.   What have you been told?

18        A.   I've really been told two

19   different things by two different

20   people.

21        Q.   Let's start with one thing

22   by one person.

23        A.   Start with the first one?

24   Well, I originally asked for a -- an

25   increase in pay in December of 2008.

SHARR SCOTT
9/23/2010

Page 14

1   And in December of 2008, I made a
2   verbal request to Steve because it came
3   to my attention about these people and
4   I believe that was just before the
5   holidays.  And I went in his office and
6   I basically said, you know, "Apparently
7   I didn't get a raise because I'm too
8   dumb to ask for it so I'm here to ask
9   for it."
10          And he laughed and I
11  laughed, and he said, "Well, you know,
12  I don't know if you're reading the
13  newspapers, but money is tight.  I
14  don't think anything is going to
15  happen."  And he told me to submit, I
16  guess, written reasons or whatever why
17  I felt that I deserved an increase in
18  pay.
19          And I took the holidays to
20  put that together.  And I think I
21  submitted it in January, early January,
22  whenever we came back from, I guess,
23  the New Year's.  I submitted that to
24  Steve Babbin.  Steve said he would
25  submit it to Rob.  That would be Rob

SHARR SCOTT
9/23/2010

1    Harroun that's here today.

2         Q.    This was a fairly detailed

3    justification for your pay raise?

4         A.    I believe it was three or

5    four pages.

6         Q.    And in that, did you list

7    your accomplishments?

8         A.    Yes, sir.

9         Q.    That's in terms of trial

10   practice?

11        A.    I don't remember exactly how

12   I delineated it at the time.  I think I

13   did trials that I had handled and

14   obviously the results of those trials.

15   I can't -- I can't remember if I had

16   done any appellate work or I had any

17   responses back on any appellate work

18   that I had done, but obviously the

19   office has it.  I remember I did Kudos.

20   Kudos are on our Website.  I had

21   received kudos for my first year

22   basically assisting in a mediation

23   seminar and also preparing a -- I think

24   an introduction speech for a judge that

25   was speaking at our CLE.  I probably

SHARR SCOTT
9/23/2010

Page 16

1    put settlements in there, cases

2    settled.  I think I put my volume of

3    cases, you know, the total volume of

4    cases that I handled.  I have offered

5    under both former Attorney General

6    Charles Foti -- I think it is

7    Charles -- Mr. Foti and Mr. Caldwell

8    volunteered to do criminal work,

9    although it's never been sought from

10   me.  And as best I can remember, that's

11   what I put in.

12        Q.   And what response, if any,

13   did you get from that submission?

14        A.   As best that I recall, I did

15   not receive a response.  And I asked

16   Steve Babbin about it once or twice and

17   his response was that he had not heard

18   from Rob Harroun.  And I think maybe

19   after the second time I asked him, he

20   seemed agitated, so I asked him if I

21   could speak directly with Rob.

22        Q.   And what was the response?

23        A.   "Sure.  Go for it."

24        Q.   What happened?

25        A.   I believe I sent Mr. Harroun

SHARR SCOTT
9/23/2010

Page 17

1    an e-mail.  And I took his response as

2    curt and I responded back to him that,

3    you know, it wasn't my intention to

4    badger anyone.  It's just that several

5    months had passed and I hadn't heard

6    anything good, bad, or indifferent.

7    You know, I hadn't heard anything.  And

8    he responded back and said they

9    wouldn't know anything, if I remember

10   correctly, until the fiscal year, which

11   would be July.  I think I had asked him

12   that so I wouldn't aggravate him in the

13   meantime if he's not going to know

14   anything.

15           Then after July, frankly, I

16   got busy and didn't have time to follow

17   up and no one followed up with me until

18   December 18th of 2009.

19       Q.   And then what happened?

20       A.   Rob Harroun called me.  And

21   the reason I remember the date is I'm

22   quite certain it's the date of our

23   Christmas party that we had, and he

24   told me that we had had some --

25   obviously some office changes,

SHARR SCOTT
9/23/2010

Page 18

```
 1   different people were coming, either
 2   director, deputy, and Paul Deal was no
 3   longer with our office.  Steve Babbin
 4   was our office chief, and that they had
 5   taken care of management.  And --
 6        Q.   I'm sorry.  When you say
 7   "taken care of management," what sense
 8   did you mean that?
 9        A.   Well, I didn't mean it.
10   It's what he --
11        Q.   What sense did you
12   understand?
13        A.   My sense that I understood
14   was I believe his name is Trey
15   Phillips.  I only met him once.  He's a
16   director of something.  Steve Babbin
17   obviously went from assistant office
18   chief to office chef so obviously his
19   responsibilities, I would have
20   imagined, increased and that they were
21   going to take care of management, and
22   in our office, the only person I'm
23   aware of that is management is Steve
24   Babbin.  So I presumed he was talking
25   about Steve and other people in Baton
```

SHARR SCOTT
9/23/2010

Page 19

1    Rouge.  And one of those being, I

2    believe, was Trey Phillips, I think,

3    was around that time, he was promoted

4    to -- I don't follow all of that so I

5    really don't remember.

6         Q.   When Mr. Buddy Caldwell

7    became attorney general, did he ever

8    visit the New Orleans office?

9         A.   Yes, sir, he has.  I believe

10   he's visited twice.

11        Q.   Did he say anything about an

12   open-door policy in the course of that

13   visit?

14        A.   Yes, sir, he did.

15        Q.   What did he say about it?

16        A.   I believe basically that he

17   had an open door.  He was accessible,

18   that anyone, you know, could contact

19   him.

20        Q.   Did you ever attempt --

21        A.   Sort of.  He kind of gave a

22   speech to our little division in the

23   office.  Well, excuse me, the entire

24   office, the New Orleans office.

25        Q.   And that comment about the

SHARR SCOTT
9/23/2010

Page 20

1   open door occurred in the context of

2   that speech?

3        A.   Yes, sir.

4        Q.   In connection with that

5   announced policy of open door, did you

6   ever attempt to meet with Mr. Caldwell?

7        A.   Have I?

8        Q.   Yes.

9        A.   No, I have not.

10       Q.   Has Ms. Jennifer Medley ever

11  spoken to you about meeting with

12  Mr. Caldwell about her pay concerns?

13       A.   About her -- I'm sorry?

14       Q.   Her pay concerns.

15       A.   Had she ever discussed with

16  me her pay concerns?

17       Q.   And about talking with

18  Mr. Caldwell directly about it?

19       A.   Yes, sir, she did.

20       Q.   What do you remember about

21  that?

22       A.   I remember her saying

23  that -- and I'm not quoting her.

24  I'm -- I mean, this is a couple of

25  years ago.  I remember her saying that

SHARR SCOTT
9/23/2010

Page 21

1    she had, you know, asked for money and

2    asked to be considered and it was my

3    impression from what she said that she

4    felt like she was being ignored and she

5    had -- I know she had talked to Steve

6    about it.  I don't recall if she talked

7    to Rob Harroun about it or not, but

8    basically she was going up further in

9    the chain of command.

10        Q.   Did you compare notes with

11   Ms. Medley about the pay situation in

12   the office?

13        A.   What do you mean by "notes"?

14        Q.   Did you discuss the issue?

15        A.   Yes, we discussed the issue,

16   as did several people in the office,

17   many people in the office.

18        Q.   Who else other than you and

19   Ms. Medley do you remember discussing

20   these issues?

21        A.   Who have I discussed the

22   issues with?

23        Q.   Okay.

24        A.   I've discussed the issues

25   with Tom McGaw.  I've discussed the

SHARR SCOTT
9/23/2010

Page 22

1    issues with Becky Urrutia.  I've

2    discussed the issues with Lance Guest.

3    I obviously discussed it with Steve

4    Babbin, Rob Harroun.  I obviously

5    discussed it with Jennifer.  And I

6    would probably feel uncomfortable with

7    the word "discuss" with anyone else,

8    but, I mean, several people have made

9    comments and obviously passing remarks.

10   Kelly Badeaux-Phillips.  I mean, Chad

11   has made comments.  Andre Pitard has

12   made comments.  Thomas Brahney made

13   comments.  John Sudderth made comments.

14   I'm trying to go down the hall in my

15   head.  That's the best I can recall

16   right now.

17        Q.   Can you characterize these

18   comments as being primarily negative or

19   positive, or how would you characterize

20   them in general, if that's possible?

21        A.   I guess maybe some negative,

22   some positive.  I don't -- I don't

23   specifically -- I don't specifically

24   recall a whole bunch of conversations,

25   but I know that there's been talk about

SHARR SCOTT
9/23/2010

Page 23

1    it in the office.

2        Q.   Can you recall any specific

3    positive comments about the situation?

4        A.   Well, I mean, people do seem

5    to be happy when we got

6    across-the-board raises, frankly,

7    including me.  That would be positive.

8        Q.   Has anybody ever told you

9    that pay raises were decided on any

10   basis at all other than pure subjective

11   judgment on behalf of senior management

12   at the attorney general's office?

13       A.   I have never been told what

14   the basis of pay increases or raises

15   are based on, period.  So I have no

16   idea other than obviously looking at

17   Pacer.  No one has ever told me

18   anything.  No one has ever responded to

19   me.

20       Q.   Have you ever had occasion

21   to look at actual pay levels of

22   individuals employed at the Department

23   of Justice as attorneys?

24       A.   Yes, I have.

25       Q.   Did any patterns or

SHARR SCOTT
9/23/2010

Page 24

1  generalizations occur to you as you

2  reviewed that data?  Did you see any

3  patterns in it?

4        A.   Yes.  I saw John Sudderth

5  got two of them.

6        Q.   Two what?

7        A.   Pay increases.

8        Q.   Now, John Sudderth, what was

9  his job?

10        A.   He's an assistant attorney

11  general.

12        Q.   We just heard that he got

13  disciplined because of his actions in a

14  matter.  It's called the Burnich case.

15  Does that ring a bell with you?

16        A.   I am unaware of that.

17        Q.   Were you unaware that he got

18  disciplined?

19        A.   I was unaware that -- I'm

20  obviously familiar with the Burnich

21  matter.  No one from the Bar

22  Association, no one from our office

23  ever contacted me.  I'm the person that

24  made the complaint in our office about

25  him.

SHARR SCOTT
9/23/2010

Page 25

1       Q.    What merited a complaint in

2    your eyes?

3       A.    What merited a complaint in

4    my eyes?  I wrote the complaint on

5    paper.  You don't have the complaint?

6       Q.    No.

7       A.    My complaint was basically

8    that he took information out of my

9    office while I was in a trial on

10   another matter without my permission

11   and he used that information to get his

12   sister, who was -- I guess, would have

13   been a witness in the Burnich matter,

14   paid and he filed a lien for his sister

15   in that case.

16      Q.    And who ultimately paid that

17   lien?

18      A.    I don't know.

19      Q.    Well, did the State of

20   Louisiana have an adverse interest in

21   that case?

22      A.    In my opinion, yes, which is

23   why I reported it to Steve when he

24   seemed to be spinning out of control.

25      Q.    And who was spinning out of

SHARR SCOTT
9/23/2010

Page 26

1   control?

2        A.   Excuse me.  John.

3        Q.   Was anything done as a

4   result of your reporting that issue?

5        A.    Well, until you just told me

6   today, I had no idea.  I was told in

7   the office by Paul Deal -- We had a

8   meeting about the issue.  I spoke with

9   Steve several times about it, and I was

10  very upset about it, as is my

11  impression Becky was, and I don't -- We

12  had one or two verbal conversations

13  about it and he said -- he told me to

14  put it in writing, so I put it in

15  writing.

16          From that point, as best I

17  recall, some time passed and then there

18  was a meeting with Steve Babbin, Paul

19  Deal, John, Becky, and myself and we

20  sort of aired it out.  People were

21  yelling, including me.

22          And a few days after that,

23  we were called into Paul's office --

24  and the Burnich matter was in med mal,

25  which would have been, you know, under

SHARR SCOTT
9/23/2010

Page 27

1    the, I guess, informal -- I mean, he

2    was the office chief so he had -- my

3    impression of an office chief, he had

4    ultimate responsibility for the office.

5    And the only reason we reported it to

6    Steve is he wasn't there that day.

7              So we met in Paul's office

8    and Paul told us that he nor the office

9    was going to make a complaint against

10   Becky or myself.  And I should be very

11   clear, Becky was not part of the

12   complaint, even though they insisted

13   that she -- or excuse me.  Paul

14   insisted she be present for the

15   meetings.  And Paul basically said he

16   nor John would make a complaint against

17   Becky or myself and that John was going

18   to be suspended for two days without

19   pay and that nothing was to be written

20   down or said or anything disclosed

21   anywhere in the office.  That was done.

22   It was final and whatnot.  No one was

23   to contact Baton Rouge.

24         Q.   Did you say that no one was

25   to contact Baton Rouge?

SHARR SCOTT
9/23/2010

Page 28

1        A.    Well, I would assume that
2    those no ones would be me, myself, and
3    Becky.
4        Q.    Was Mr. Sudderth given a
5    raise after that discipline to your
6    knowledge?
7        A.    I cannot lie.  I have looked
8    at Pacer, but I would have to look at
9    the exhibit to -- As a matter of fact,
10   he -- I don't know when the -- Are you
11   talking about the office discipline or
12   what you just told me about?
13       Q.    Well, the office discipline.
14       A.    The office discipline would
15   have been -- We settled the Burnich
16   matter, seems to me, late April and
17   that would have been March or April of
18   2008 and then almost immediately, we
19   settled that.  I was helping Tom McGaw
20   with a trial and that's when it
21   occurred.  I would say that would have
22   been -- July of 2008 would have been
23   around the office, you know, us meeting
24   and all of that, I guess, the final
25   conclusion.  So -- And I am aware that

SHARR SCOTT
9/23/2010

Page 29

1    John got another pay increase in -- if
2    I remember correctly -- I didn't have a
3    lot of sleep last night, but if anybody
4    has the exhibit, I could tell you.  I
5    believe it was November 2009.  So
6    obviously he did.
7         Q.   Did you ever do any civil
8    rights work for the office?
9         A.   Yes and no.  I assisted
10   Susan Shuey on one matter.  And I think
11   Susan Shuey, when she came back from
12   the storm, relocated to the Baton Rouge
13   office as best I recall.  So this would
14   have been before the storm.  And I know
15   I helped her on something, but,
16   honestly, I can't remember what it was.
17   I don't think I enrolled in the case.
18   And Lance Guest had an employment
19   discrimination suit, which was -- which
20   also had a worker's comp suit and he
21   had the employment and I had the
22   worker's comp.  And I would say I
23   helped him and I would say he helped me
24   on that.  I did not enroll in the
25   federal suit, but, I mean, just

SHARR SCOTT
9/23/2010

Page 30

1    interoffice -- you know, interoffice

2    helping one another.

3         Q.   Did you know that Jennifer

4    Medley was doing civil rights cases

5    from time to time?

6         A.   Yes, I'm aware of that.

7         Q.   Did you and Jennifer keep up

8    with each other in terms of your work?

9    Did you discuss your work with

10   Jennifer?

11        A.   Yes.  I would say yes.

12        Q.   And Jennifer would discuss

13   her work with you?

14        A.   Yes.  I would say

15   vice-versa.

16        Q.   Have you ever known

17   Ms. Jennifer Medley to lose any civil

18   rights case, even a single one?

19        A.   Not that I'm aware of.  I

20   don't know either way.

21        Q.   Do you remember her ever

22   saying that she lost a civil rights

23   case?

24        A.   No, I do not remember her

25   ever saying that she lost a civil

SHARR SCOTT
9/23/2010

Page 31

1    rights case.

2         Q.   Were you in the office when

3    Mr. Lance Guest had a very, very

4    unfortunate accident over Mardi Gras of

5    2009?

6         A.   Yes.

7         Q.   He was unable to return to

8    work for some time; is that correct?

9         A.   He was paralyzed.  It was

10   very horrible.

11        Q.   Do you remember or do you

12   have any knowledge of how his

13   workload -- Now, he was a full-time

14   attorney in the office; is that right?

15        A.   He was an assistant AG such

16   as Jennifer, myself, and everyone else

17   we've mentioned.

18        Q.   And he did, I think you

19   referred to, civil rights cases; is

20   that right?

21        A.   It is my understanding that

22   Lance did civil rights and he

23   particularly -- based on what he's told

24   me, mainly does employment, but, yes.

25   Instead of more the prisoner suits, I

SHARR SCOTT
9/23/2010

Page 32

 1  believe he does more employment, but,

 2  yes, sir, he does.

 3       Q.    When Mr. Lance Guest was

 4  unable to continue his work, are you

 5  aware of how his workload was

 6  distributed in the office?

 7       A.    I consider Lance to be a

 8  friend of mine and I volunteered to

 9  help on any of his cases.  And Lance

10  was also worried about whether or not

11  -- if it took him a long time to get

12  out of the hospital, whether or not he

13  would have a job being all the doom and

14  gloom economy and whatnot.

15            I can say this, that I was

16  never asked.  I volunteered if they

17  needed me to do anything, but I was

18  never asked to do anything.  I mean,

19  I'd brought Lance some things back and

20  forth to the hospital.  I went and saw

21  Lance probably about four times a week

22  until he got out of the hospital.  And

23  I helped him move.  I didn't help him

24  move.  Obviously he wasn't moving

25  himself, but I helped his girlfriend

SHARR SCOTT
9/23/2010

Page 33

 1   move their apartment and whatnot.

 2        Q.   Was Lance worried about his

 3   ongoing cases at that time?

 4        A.   Yes, he was.  Well, he was

 5   worried about one in particular.

 6        Q.   What do you remember about

 7   Jennifer Medley's complaints about the

 8   attorney general and the way her

 9   employment situation was being handled?

10        A.   I remember her feeling

11   frustrated that she couldn't get a

12   response from anyone for her request

13   for either a merit increase, pay

14   increase.  I don't remember her exact

15   verbiage.  I remember her feeling

16   ignored.

17             As you asked me earlier, did

18   she, you know, ever try to contact

19   Caldwell and whatnot, the attorney

20   general.  I believe she did.  I mean,

21   that's what she told me.  I don't

22   recall her showing me, you know, like

23   an e-mail or a letter she typed.  I

24   don't specifically recall that, but, I

25   mean, she told me.  I assume it's true.

SHARR SCOTT
9/23/2010

Page 34

1        Q.   Assume that she had written

2   something?

3        A.   No.  I assumed that what she

4   told me was true, that she had

5   attempted to contact them.

6             I do remember her feeling

7   that it was a -- either a race or a

8   gender issue.  I don't do civil rights.

9   I've never done civil rights other than

10  merely assisting two people on two

11  cases.  I'm going to guess that it's

12  Title 7, but I don't even know that.

13  I've never read the law.

14       Q.   Do you remember what the

15  context of the discussion was when she

16  mentioned to you what you just said

17  about race and gender?

18       A.   It's been awhile and we

19  probably had more than one

20  conversation, I would presume.  I

21  remember her at one point -- I don't

22  know if she asked, but I had worked at

23  Eddie Jordan's office.  I'm presuming

24  you've heard of that fiasco.  I worked

25  at Eddie Jordan's office when that

SHARR SCOTT
9/23/2010

Page 35

1    occurred.  Of course, he did not fire

2    any attorneys.  He only fired staff

3    people.  And I just seemed to, in

4    general, remember discussing that, but

5    I was never a witness.  I was never

6    contacted.  I certainly wasn't one of

7    the attorneys.  I didn't have anything

8    to do with the case, but I guess I

9    remember discussing that from an

10   employment aspect.  And I'm quite

11   certain that I mentioned that.

12        Q.    In your opinion and in your

13   own particular circumstances, did you

14   feel comfortable about bringing forward

15   complaints through the chain of command

16   at the Department of Justice?  In other

17   words, did you fear that there could be

18   repercussions?

19        A.    I fear there could be

20   repercussions from this deposition,

21   yes, sir.  Any time you make a

22   complaint, it's uncomfortable.

23        Q.    And I guess we all know that

24   every employer, every institution has

25   its own culture and its own way of

SHARR  SCOTT
9/23/2010

Page  36

1   doing things.  And as somebody looking

2   in from outside, I just wonder if you

3   could tell us about your perceptions of

4   what it's like with a complaint in the

5   attorney general's office, what

6   constraints, if any, you feel about

7   bringing those forward.

8         A.   Well, I've made several

9   complaints to Steve Babbin obviously.

10  I think I'm going on my sixth year at

11  the attorney general's office.  Pretty

12  much stopped complaining because it

13  doesn't really do any good.  It seems

14  that whatever you want, the opposite is

15  going to occur.  And it's frustrating.

16         So even though I was never a

17  fan of Paul's, I will say that Paul

18  did -- he did resolve one issue that I

19  had and he resolved it, in my opinion,

20  in a good manner and he did that.  But

21  as far as my -- I guess, my opinion

22  with making complaints with Steve is,

23  you know, he'll take the receptionist's

24  position over yours, the secretary's

25  position over yours, and he seems to

SHARR SCOTT
9/23/2010

Page 37

1    honestly be annoyed with them.

2         Q.   Annoyed with, what,

3    complaints or -- I wasn't sure what you

4    meant?

5         A.   Yes.  I think Steve is

6    generally annoyed with me.

7         Q.   Well, in the case of

8    Jennifer Medley, you're aware

9    approximately when she began making

10   complaints about the pay issue.  Was

11   that in 2008?  Would that be a fair

12   statement?

13        A.   I seem to think it was

14   before that.

15        Q.   Well, did you notice after

16   Jennifer began making complaints any

17   change in the way management in the New

18   Orleans office related to Jennifer or

19   whether Jennifer even had complaints

20   about the way she was treated after?

21        MS. McINNIS:

22             That's a compound question.

23        MR. WILLIAMS:

24             It is a compound question.

25        MS. McINNIS:

SHARR SCOTT
9/23/2010

Page 38

```
 1            If you could split that up

 2       just to make it more clear.

 3    MR. WILLIAMS:

 4            Okay.  Well, let's just --

 5    THE WITNESS:

 6            And can I say it's a little

 7       long and I'm a morning person

 8       with three hours sleep, so --

 9    MR. WILLIAMS:

10            And I apologize.

11 EXAMINATION BY MR. WILLIAMS:

12       Q.   Let's just start with did

13 you notice any changes in the way that

14 management in the New Orleans office

15 related to Jennifer Medley after she

16 started voicing these complaints?

17       A.   Unless there's -- there's

18 something specific that I'm not

19 recalling, I'm going to say no, but in

20 my opinion, Paul was horrible to her.

21       Q.   Did Mr. Paul Deal start

22 looking in on Jennifer Medley more

23 frequently after she began voicing

24 complaints?

25       A.   I want to say I do recall
```

SHARR SCOTT
9/23/2010

Page 39

1    him looking in on her.  I don't

2    remember how frequent it was, but I do

3    know that that happened.

4         Q.   Do you recall Ms. Jennifer

5    Medley requesting the return of civil

6    rights case assignments and not getting

7    civil rights case assignments?

8         A.   I guess my answer to that is

9    yes and no.  Yes, I'm aware that

10   Jennifer complained.  I'm aware through

11   Jennifer so I assume she did and I

12   assume that's true.  And -- I'm going

13   to take it back.  And I believe I'm

14   aware that she did not get any.  I

15   believe she might have gotten one just

16   before her departure, but not like she

17   had had before.

18        Q.   Did she ever explain to you

19   her interest in civil rights cases,

20   where it came from?

21        A.   If she did, I don't recall

22   at this time, but I do know that she

23   had a -- an interest in civil rights.

24   I know that she appeared to like it.

25        Q.   Do you remember an issue

SHARR SCOTT
9/23/2010

Page 40

1   with regard to who gets printers?

2        A.   Yes, I recall the printer

3   situation.

4        Q.   What was that?

5        A.   Paul Deal had sent out an

6   e-mail stating that he was going to be

7   able to get some printers.  The

8   printers -- Obviously he said he wasn't

9   going to be able to get enough for

10  everyone in the office, so if you

11  wanted one, to please make a request

12  for one.  I know that Jennifer made a

13  request for one.  I, myself, made a

14  request for one, as I'm sure did

15  several others.  And I know that

16  Jennifer did not get a printer and I

17  did not get a printer.

18       Q.   Do you know of anybody that

19  was making complaints about pay who got

20  a printer?

21       A.   I'm trying to recall who got

22  the printers besides one person.  It

23  seemed to me Paul gave most of them to

24  the med mal unit.  And I know that

25  Kelly whined about pay and I'm also

SHARR SCOTT
9/23/2010

Page 41

1    aware she received a pay increase.  I
2    just can't remember if that was before
3    or after the printer situation.
4         Q.   Now, Kelly is who?
5         A.   Kelly Badeaux-Phillips.
6         Q.   She got a printer?
7         A.   I'm trying to recall.  I
8    know that Becky got a printer.  I know
9    that Don Paul got a printer.  They're
10   both in med mal.  And I'm also aware
11   that Jane Phillibert, she's our
12   timekeeper, she got a printer, and I
13   can't remember if there were two more
14   or three more.  I've been in Andre's
15   office, and to tell you the truth, I
16   don't know.  I can't recall the other
17   two or three.
18        Q.   Had any of the people that
19   you did recall request a pay raise or
20   request at meetings with management
21   about pay raises?
22        A.   Is your question do I recall
23   anybody who asked for a printer, did
24   they ask for money?
25        Q.   Well, I mean, anybody that

SHARR SCOTT
9/23/2010

Page 42

1  got a printer, did they make an issue

2  of pay raise in the office?

3      A.   I don't recall everyone who

4  got one.  I can tell you this, that Don

5  Paul did not make an issue of money

6  because he wasn't even in the office

7  when he sent the e-mail out if you

8  wanted a request and I saw the exhibit

9  that I referred to from Pacer that they

10  have a start date of September '08 and

11  the request would have gone out in

12  October, but I'm quite certain he --

13  whether that was his hire date, but I

14  don't recall him being in the office

15  before that because, honestly, I

16  remember being annoyed by it myself.

17      Q.   Why did you need a printer?

18      A.   It makes life easier, much

19  easier.

20      Q.   Where were you located in

21  relation to the printer that you would

22  have had to use otherwise?

23      A.   At the -- For clarification,

24  at the time that the --

25      Q.   Yes.

SHARR SCOTT
9/23/2010

Page 43

```
 1        A.    -- the printer thing?

 2        Q.    Yes.

 3        A.    All right.  So that would be

 4   the new office.  I would say I would be

 5   down the -- and I'm ashamed to say I

 6   can't remember the name of the street.

 7   I think that's Lafayette, the river

 8   side -- the river side of the building.

 9   I think our corner, that cross street

10   is Lafayette, Lafayette Street.  I

11   would have to walk down Lafayette and

12   turn and the printer is right there by

13   Jane and Phyllis.

14        Q.    Like, what, a half a block?

15        A.    I don't know, but it is down

16   that entire side of the building.

17        Q.    The distance would have been

18   about the same for Jennifer?

19        A.    Jennifer's office in the new

20   building was right next to mine.

21        Q.    So it would have been about

22   the same for both of you?

23        A.    About the same, but her door

24   was one door away from mine so she had

25   been slightly further.
```

SHARR SCOTT
9/23/2010

Page 44

1          Q.    Are the computers networked

2     in such a way that if one of you had

3     received a printer, the other could

4     have used it for printing?

5          A.    Like if I had received a

6     printer, could Jennifer print from

7     mine?

8          Q.    Yes.

9          A.    My guess would be that that

10    can be done, but it is not done in the

11    office that I'm aware of.  Actually I'm

12    quite certain it can be done.

13         Q.    When you litigate, do you

14    work with an adjuster from the Office

15    of Risk Management?

16         A.    Yes, sir.

17         Q.    One of the things you do is

18    try to satisfy the requirements of this

19    individual at the Office of Risk

20    Management?

21         A.    Sometimes it's difficult,

22    but absolutely.  They are the client.

23         Q.    Do you ever get feedback

24    from these individuals?

25         A.    Yes.

SHARR SCOTT
9/23/2010

Page 45

1      Q.    What form does that feedback
2  take?
3      A.    Sometimes it's over the
4  telephone, sometimes it's via e-mail.
5      Q.    Do they fill out a form
6  sometimes?
7      A.    They fill out a form?
8      Q.    Uh-huh (indicating
9  affirmatively).
10      A.    I've never received a copy
11  of the form that ORM has filled out
12  about me.  I don't know.
13      Q.    Does this ever get back
14  through the attorney general's office?
15      A.    Does what ever get back?
16      Q.    The kind of job you're doing
17  for the client, to your knowledge?
18      A.    I have heard through office
19  rumor that they do, I guess, evaluate
20  us.  I have never seen anything in
21  writing.  I've never asked any of them.
22  I have never seen an ORM evaluation.  I
23  have heard that and I'm trying to
24  recall where I've heard that, but I
25  have heard that and I can only imagine

SHARR SCOTT
9/23/2010

Page 46

1   it would be true since they are the

2   client.  But no one in management has

3   ever told me, that I can recall, or

4   that I remember at this time.

5        Q.   You've been working for the

6   attorney general's office for how many

7   years now?

8        A.   I've been there five years.

9   I'm going on my sixth year there.

10       Q.   Are you somewhat familiar

11  with the governing structure of the

12  attorney general's office?  Have you

13  been to Baton Rouge?  Do you know --

14       A.   Yes, I have been to Baton

15  Rouge.

16       Q.   As you go up the chain of

17  command at the attorney general's

18  office, do you encounter more or less

19  women as a percentage of management the

20  higher you go?

21       A.   That, I don't know because,

22  frankly, I don't know half the people

23  in Baton Rouge.  If I had to name

24  people off the top of my head in Baton

25  Rouge, I can name Peter Giarrusso, he's

SHARR SCOTT
9/23/2010

Page 47

```
 1   general liability section chief; Ray --
 2   John Ray, worker's comp; Michael
 3   Zeldon, he is the road hazard chief;
 4   obviously Rob Harroun is the head of
 5   litigation; Trey Phillips, we met him
 6   last year at Christmas, he is something
 7   deputy of, I think, litigation;
 8   obviously Buddy Caldwell.
 9        Q.   So far these are white
10   males?
11        A.   John Sinquefield.
12             Yes, so far they're white
13   males.  I don't believe I named any
14   females.
15             And obviously I know Houston
16   Penn.  He's not white.  Julie -- I
17   don't know where Julie is now, but I
18   thought or it was my understanding that
19   she was the head of criminal, the
20   criminal division.  She would be a
21   white female.  And unless I'm
22   forgetting anyone -- Well, maybe I
23   don't have good office politics.  I
24   don't know anybody there.
25        Q.   And as you go up the chain
```

SHARR SCOTT
9/23/2010

Page 48

1   of command --

2       A.   And I don't know if I

3   mentioned Rob, but I obviously know

4   Rob.

5       Q.   And how about pay as you go

6   up the chain of command according to

7   your observations?

8       A.   Obviously I have gotten the

9   list, but I don't recall.  I don't

10  recall.  I can't tell you what Rob

11  Harroun makes while I'm sitting here

12  right now.  I can tell you what Paul

13  Deal made.

14      Q.   How much?

15      A.   Paul made almost $97,000 a

16  year.

17      Q.   And as you go up the chain

18  of command, do you notice a correlation

19  between being white and male and

20  earning more money than non-white,

21  non-male lawyers?

22      A.   Well, the only problem is,

23  is I don't -- I mean, Houston Penn is

24  the only black male that I know.  I

25  don't know if there are others.  So if

SHARR SCOTT
9/23/2010

Page 49

1    there are, I don't know.  And the list

2    that I got did not have people's race

3    or gender on it.

4         Q.   In terms of promotions --

5         A.   It did have job titles, but,

6    frankly, I don't think I can compare

7    myself to Rob Harroun, so I don't

8    expect to get Rob Harroun's pay.  I

9    mean, I obviously looked at it, but I

10   don't specifically -- I don't

11   specifically recall.

12        Q.   In terms of promotions, the

13   promotions that you've seen and heard

14   about, are they going to white males

15   more frequently than non-white males or

16   females?

17        A.   Well, I know that they just

18   brought in some lady.  I don't recall

19   her name, but her picture was on there

20   and she was white.  But I don't know

21   what she is getting paid.  And this was

22   probably within the last month.  I know

23   Julie Cullen is a white female, but,

24   like I said, I've never looked at my

25   request as in I'm not management so I

SHARR SCOTT
9/23/2010

Page 50

1    never compared myself basically to

2    management.  And the easiest way I can

3    describe it is -- and, frankly, I can't

4    even remember her name, this is

5    terrible, but -- and I don't remember

6    her race and she was just in the

7    office.  Some -- A secretary was let go

8    recently and -- I would say within the

9    last month and everybody was calling

10   the lady the hatchet lady, and I

11   wouldn't have known her if -- I mean,

12   some people, if I see their faces, I

13   might recognize the name, but -- I

14   don't -- I don't know.  I do know that

15   Micheal Penn was -- I forgot that --

16   she was promoted to, I believe, civil

17   rights section chief while she was

18   employed at the office.

19        Q.   She was a civil rights --

20        A.   She has since gone, but she

21   was -- if my memory serves -- because I

22   remember she moved to Baton Rouge.  She

23   was in the New Orleans office and I

24   believe she was the civil -- she was

25   promoted to something.  I think she was

SHARR SCOTT
9/23/2010

Page 51

1    the civil rights section chief, and I

2    didn't do civil rights so I sort of

3    consider myself -- I have enough people

4    to remember.

5         Q.   Do you know why she left?

6         A.   Do I know why Micheal Penn

7    left?  No, I do not.

8         Q.   Do you know if she had any

9    complaints against the department?

10        A.   No, I do not.

11        Q.   Is she -- She's no longer

12   with the attorney general's office; is

13   that correct?

14        A.   She left the attorney

15   general's office.  As best I recall,

16   maybe she moved to Georgia somewhere.

17        MR. WILLIAMS:

18             Let me have a quick word

19        with my client, please.

20        THE WITNESS:

21             Sure.

22             (Whereupon a recess was

23        taken.)

24   EXAMINATION BY MR. WILLIAMS:

25        Q.   You mentioned in your

Page 52

1   earlier testimony that Mr. Paul Deal

2   treated my client, Jennifer Medley,

3   horribly or he was horrible to her?

4        A.   Awfully bad I believe I

5   said.

6        Q.   I'm sorry?

7        A.   Awfully.

8        Q.   Awfully.

9             Would you tell us a little

10  bit more what you mean by that?

11       A.   I don't remember him ever

12  saying a nice thing about her, ever.  I

13  do seem to recall him looking and

14  checking in to her office as well as

15  somebody else's.

16       Q.   Did you notice any change?

17  That is to say, was he -- was Mr. Deal

18  from the very first moment always

19  treating Jennifer in an awful manner?

20       A.   I don't think he liked her,

21  no.  And are there varying degrees of

22  awful?  Was he more awful to her?

23  Unless there are specific things that

24  you can recall my mind to, I thought he

25  treated her bad the entire time.  That

SHARR SCOTT
9/23/2010

Page 53

1   was my impression.  Paul was rude and

2   obnoxious and whoever decided to fire

3   him, kudos to him.  I disliked Paul

4   myself and, frankly, at one point, I

5   quit speaking to him.  So I dealt with

6   Steve for everything.  I didn't do med

7   mal.  I quit asking to go into the med

8   mall unit because, frankly, I thought

9   it would be the kiss of death for me if

10  I had to deal with him.  And I frankly

11  think he treated her worse than me.

12      Q.   When you started voicing

13  complaints about your pay, did this

14  make any differences to the treatment

15  you received from Paul Deal?

16      A.   Well, I never complained

17  about pay to Paul Deal and I never

18  asked for an increase or an adjustment

19  or anything to Paul Deal, never

20  submitted anything to Paul Deal

21  because, frankly, I thought it would go

22  into the trash can, if you want to know

23  my honest opinion, and that's why I

24  dealt with Steve.  And Steve told me I

25  had his permission, I guess, to jump

SHARR SCOTT
9/23/2010

Page 54

1    out of the chain of command to speak

2    with Rob.  So that's what I did.

3              I don't even know if Paul is

4    aware -- is or was aware.  I would

5    imagine or I would hope that Steve

6    would have made him aware out of

7    respect for his position.  I certainly

8    would never talk to Paul about money.

9    And I think if Paul could block me at

10   any chance, he would.  And, frankly, I

11   think he would do the same to Jennifer.

12   And I'm unaware of Paul checking on my

13   habits, but I was aware that he checked

14   on hers as well as other people.

15        Q.   As well as other people?

16        A.   Yes.

17        Q.   Do you happen to know any

18   particular names?

19        A.   Well, the only other person

20   I'm aware of, and I'm trying to

21   remember where she was in relation to

22   Jennifer, she was on -- she was right

23   there on our hall.  It went Steve,

24   Brahney, me, Jennifer, and maybe

25   Pauline, or there might have been

SHARR SCOTT
9/23/2010

Page 55

1   somebody next to Jennifer and then

2   Pauline, and I should know because

3   Becky moved into -- it is.  Pauline

4   must have been next to Jennifer because

5   I believe Becky moved into Pauline's

6   office when she left, if I'm not

7   mistaken.  And I know that he checked

8   on her because I heard him.  And Paul

9   was elderly, he was loud.  I mean, you

10  couldn't help but hear things.

11       MS. McINNIS:

12            Wait.  I just want to

13       clarify.  Who did you say he

14       checked on?

15       THE WITNESS:

16            Pauline Fiest, F-I-E-S-T.  I

17       know that he checked on her.

18  EXAMINATION BY MR. WILLIAMS:

19       Q.  Did Pauline ever make

20  complaints about pay?

21       A.  I don't know.  I was not

22  that close to Pauline.

23       Q.  She is African-American?

24       A.  Yes, she is.  I didn't talk

25  to Pauline that much.  I mean, I

SHARR SCOTT
9/23/2010

Page 56

1    believe her complaining in general.  I

2    don't know if I mentioned her earlier

3    in the laundry list, but I wouldn't say

4    that we had a discussion or not that I

5    recall, a discussion about pay.  But I

6    do know that he checked on her because

7    I heard him speaking to the secretary

8    about it because Pauline's secretary

9    sat next to what was Jennifer and my's

10   secretary.  There basically is a open

11   walkway sort of between them and they

12   would be like right across from one

13   another and Paul was loud.

14        Q.   What do you recall him

15   saying?

16        A.   Where were they?

17        Q.   That's what he said?

18        A.   At certain points, he was

19   looking for them.  He was looking in

20   their office for them.  I remember

21   that.

22             Nothing against the office,

23   but I disliked Paul so much, I would

24   love to be able to tell you the things

25   he said about her, but nothing is

SHARR SCOTT
9/23/2010

Page 57

1   coming to mind right now.  I just know

2   that he never had anything nice to say

3   about Jennifer.

4        Q.   Do you recall Paul ever

5   looking and asking the whereabouts of a

6   white male in the same way?

7        A.   Not that I personally heard.

8             You are talking about Paul;

9   right?

10        Q.   Yes, Paul Deal.

11        A.   Okay.

12        Q.   When Jennifer left, who sat

13   in her workspace next?

14        A.   I believe -- and I should

15   know this -- I believe on our wall,

16   which would be the Poydras wall, Steve

17   is obviously in the corner.  I know

18   that much.  Then it's Brahney.  Then

19   it's me.  Now it's Taylor Simon.  I

20   believe she was there when he was a law

21   clerk.  I believe Jennifer was there.

22   Taylor Simon.  Then it would have

23   been -- I'm 99 percent sure Becky moved

24   into Pauline's office.  Then it would

25   have been Pauline.  Then next to her, I

SHARR SCOTT
9/23/2010

Page 58

```
 1    think, is Kelly.  Next to her -- Was it
 2    or is it Don Paul?  I get a little
 3    fuzzy in the middle there, but I can
 4    tell you on that wall, I guess -- and I
 5    don't remember if Jennifer left in '08
 6    or '09.
 7         Q.   '09.
 8         A.   '09.  Stacey Lacompte was on
 9    that wall.  Don Paul took her place.
10         Q.   Who?
11         A.   Don Paul Landry.
12         Q.   That was the law clerk?
13         A.   No.  Taylor Simon was the
14    law clerk.
15         Q.   Do you know who took her
16    case load?
17         A.   I did not get any of
18    Jennifer's case load, and I'm aware of
19    people who got some of her cases.
20         Q.   Was anyone hired to replace
21    Jennifer when she left?
22         A.   Not any specific person that
23    I'm aware of.
24         Q.   The person sitting in her
25    desk was a law clerk?
```

SHARR SCOTT
9/23/2010

Page 59

```
 1        A.    Yes.   Taylor Simon was a law
 2  clerk with our office probably a year,
 3  two years.  Maybe two years.
 4        Q.    And this was a female?
 5        A.    Oh, I'm sorry.  No.  Taylor
 6  Simon is a male.
 7        Q.    And did Taylor pass the Bar?
 8        A.    Yes, he did.
 9        Q.    Do you know if Taylor at
10  that point had made any complaints
11  about his pay?
12        A.    I'm unaware of Taylor making
13  any complaints about his pay.  And I
14  know -- or I would rather say I know
15  that Taylor passed the Bar because I
16  took him -- Lance and I had taken him
17  out for a cocktail to congratulate him.
18        Q.    You mentioned you were a
19  little hesitant to come forward and
20  testify today.  What kind of things, if
21  anything, has you worried, I mean,
22  about speaking your mind today?
23        A.    Well, I'm not hesitant about
24  speaking my mind.  I mean, no one,
25  Jennifer nor the AG's office -- and I
```

SHARR SCOTT
9/23/2010

Page 60

```
 1   don't care who the AG is -- is worth a
 2   perjury charge to me.  But, yes, I,
 3   frankly, think nothing good can come
 4   from this for me and my career at the
 5   attorney general's office.
 6           MR. WILLIAMS:
 7                That's all I have for you.
 8           Thank you for being here.  I
 9           appreciate it.
10      MS. McINNIS:
11                I have a few questions for
12           you, Sharry.
13      THE WITNESS:
14                Okay.
15   EXAMINATION BY MS. McINNIS:
16           Q.   I just want to clarify a
17   couple of things.
18                When Mr. Williams was asking
19   you about the Department of Justice
20   employees that are higher up in the
21   chain of command, I think some of the
22   questions that he was asking you said,
23   you know, as you go up, are there more
24   or less females and are there more or
25   less African-American folks, and I
```

SHARR SCOTT
9/23/2010

Page 61

1    think that you had given us a list of a

2    lot of people.  Are there -- Those are

3    the people that you know of; correct?

4         A.   Those are the people that I

5    can say -- If Rob Harroun wasn't

6    sitting in the room right now, if

7    somebody said, "Is Rob a male or a

8    female," I could tell you Rob is a male

9    and I could tell you Rob is a white

10   male.  And I don't have to look at him

11   to say that because I've met him and I

12   have a picture of Rob in my head or

13   recall him.  I don't recall a lot of

14   people in the office.  And an easy

15   example is Neomie Savoy.  Didn't she

16   give her deposition today?

17        Q.   She sure did.

18        A.   And I did read her

19   affidavit.  I don't know if she's black

20   or white.  I probably met her, but I do

21   not know sitting here and do not want

22   to guess as to her race.

23        Q.   So are there other people

24   that you may -- besides the ones that

25   you named that are higher up in the

SHARR SCOTT
9/23/2010

Page 62

1    chain of command?

2          A.    Definitely.

3          Q.    So what you gave us was not

4    an inclusive list of people that you

5    consider high up in the chain of

6    command?

7          A.    To put it simply, from the

8    list that I got on -- in order to see

9    the pay, there's names.  And there's

10   either what I would interpret as staff

11   people, attorneys, and either staff

12   people with director, coordinator, I

13   mean, I'm trying to remember what

14   they -- what they -- all the little

15   things were.  You've got deputy

16   directors, directors, coordinators.  I

17   think there's a planner.  There's

18   secretaries.  There's assistant AGs.

19   And I'm just going to assume that a

20   deputy director would be management and

21   that an assistant AG is not such as

22   myself.  Is a coordinator higher than

23   an assistant AG?  I don't know.  There

24   were some staff positions that were

25   paid pretty damn well.  I might be

SHARR SCOTT
9/23/2010

Page 63

1    applying for one, you know.

2         Q.   So there's people in that

3    group that you didn't name off by name?

4         A.   There are people on the list

5    that I would assume are management

6    based on their title listed on the pay

7    information sheet that either I -- I

8    would assume Neomie Campbell, by

9    reading her thing, she's got to have

10   some director title or something

11   because she is the head of H.R.  So I'm

12   assuming she's management.

13        Q.   Okay.

14        A.   But I don't know her race as

15   she sits here and I'm -- Frankly, I

16   think I had met her, so I think I'm

17   comfortable with saying she is a

18   female, but I do not know her race.

19        Q.   Okay.  Thanks.

20             And I think right after

21   that, Mr. Williams had moved on and

22   talked about promotions and kind of the

23   same -- a similar line of questioning,

24   whether, you know, as you move up --

25   or, I'm sorry, whether promotions were

SHARR SCOTT
9/23/2010

Page 64

1  more for white folks or black folks or

2  males or females.  And I think you

3  talked about, you know, just a couple

4  -- maybe one or two examples, but just

5  generally speaking, are you aware of

6  all promotions?  Or, I mean, would you

7  be aware of everyone that's promoted

8  within the Department of Justice?

9       A.   Yes and no.

10       Q.   Okay.

11       A.   Yes, because I have

12  information, i.e., the pay list, and I

13  guess if I wanted to go through it

14  from -- I think the first one is '06 --

15  don't hold me to that -- and the last

16  one is the ones that I just got, which

17  I believe I got November, December, and

18  January of 2010.  I guess if I wanted

19  to, I could start with Person A and

20  write down their pay and make a chart

21  and obviously figure it out and

22  calculate --

23       Q.   Okay.  Just to clarify --

24       A.   -- a percentage basis.  But

25  have I done that?  I have not done that

SHARR SCOTT
9/23/2010

Page 65

1    for the entire Department of Justice.

2         Q.   Just to clarify, though, I'm

3    talking about promotions because I

4    think that --

5         A.   Oh, promotions?

6         Q.   Yeah.  So let me go back to

7    my question.

8         A.   Go ahead back.

9         Q.   Which would be, you had

10   discussed -- Mr. Williams had asked you

11   about promotions on the basis of gender

12   lines and race lines, and I think that

13   you had mentioned one or two examples

14   of promotions and then my question to

15   you, which I'm going to pose again to

16   you right now, is are you generally

17   aware of all promotions that occur

18   within the Department of Justice?

19        A.   All right.  Yes and no.

20        Q.   Okay.

21        A.   I believe they generally --

22   as a general rule, they send out

23   e-mails saying -- and I don't remember

24   who the white lady is.  She's some sort

25   of news media or whatever, release

SHARR SCOTT
9/23/2010

Page 66

1    person or something.

2         Q.   A public relations type?

3         A.   Yes.  Seemed to have that

4    sort of background.  I don't remember

5    her name.  I know she's white and she's

6    got blond hair because her picture was

7    on the thing.

8         Q.   And she sent out e-mail?

9         A.   I don't think I'll be

10   dealing with the public relations

11   person, so, frankly, in my little

12   world, she's probably unimportant to

13   me.

14        Q.   Let me just see if I

15   understand correctly.  This lady in a

16   public relations type capacity sends

17   out e-mail announcements within the

18   department of promotions; is that

19   right?

20        A.   She -- I cannot recall if

21   this has been promoted within or was

22   like recently hired.  I'm recalling her

23   because she seems to be the most

24   recent, you know, thing, so I don't

25   recall.  I guess in fairness, I don't

SHARR SCOTT
9/23/2010

1   recall if she would be a promotion or a

2   new hire, but it is my perception that

3   over the years, like Trey Phillips,

4   whatever he's deputy of -- he has to be

5   litigation because at some point, there

6   was some discussion whether or not we

7   had to send RSAs to him or something

8   like that and he must deal with

9   litigation because he came to our

10  office for Christmas.  I haven't

11  personally had to deal with Trey, but I

12  believe he was promoted from within,

13  and it is my appreciation that the

14  office sends e-mails basically saying,

15  "Rob has been promoted from, you know,

16  director of litigation to, you know,

17  the first assistant to the AG."  I

18  would presume --

19       Q.   And that's a hypothetical;

20  right?

21       A.   Yes.  Yes.

22            I would presume that if that

23  occurred --

24       MR. HARROUN:

25            Yeah, I don't want that.

CURREN-LANDRIEU, LLC   504.833.3330   FAX 504.833.3355              800.487.3376
www.currenland.com

SHARR SCOTT
9/23/2010

 1        THE WITNESS:

 2             I would presume that if that

 3        occurred, that e-mail would go

 4        out.  Do I know, in fact, whether

 5        they send them out in all cases?

 6        Obviously I'm not -- I'm just a

 7        little fish.  I'm not privy to

 8        that information.

 9        MS. McINNIS:

10             Got it.  Okay.  Thanks.

11   EXAMINATION BY MS. McINNIS:

12        Q.   And you talked a little bit

13   about Paul Deal, and if you could just

14   clarify, do you remember when Paul left

15   the department?

16        A.   If Jennifer left in '09,

17   Paul left in '08.  And I know it was a

18   Friday and I think it was -- and it was

19   the same week that Pauline was fired

20   because she was fired on a Monday and

21   he was, rumor is fired or resigned, I

22   don't know which is the case, on

23   Friday.

24        MS. McINNIS:

25             Can we take a break just for

SHARR SCOTT
9/23/2010

Page 69

1        a moment?

2              (Whereupon a recess was

3        taken.)

4        MS. McINNIS:

5              I don't have any other

6        questions.

7        MR. WILLIAMS:

8              I have got one beyond the

9        scope, if you don't mind.  It's

10       just one question I forgot.

11       MS. McINNIS:

12             That's okay.  Go ahead.  I

13       reserve my right to clarify, but

14       go ahead.

15       MR. WILLIAMS:

16             Sure.

17  RE-EXAMINATION BY MR. WILLIAMS:

18       Q.   I just wanted to ask you if

19  you had been to a Christmas party where

20  Mr. Buddy Caldwell said anything about

21  women suing him, and -- Yeah, could you

22  just tell us about that?

23       A.   That was not a Christmas

24  party.

25       Q.   Okay.  What was it?

SHARR SCOTT
9/23/2010

1          A.    That was -- I should have

2    checked my calendar, but it seems to

3    remind me that it was the same day that

4    Rob Harroun had called me.  As a matter

5    of fact, he showed up about ten minutes

6    after Rob had called me.  I believe

7    that was December 18, 2009.  As best my

8    memory serves, the Christmas party did

9    not start, so it was still part of the

10   workday.

11         Q.    Oh, okay.

12         A.    And he came to our office

13   and he's only been there twice, and

14   when he came, everybody, you know, gets

15   in a conference room and -- I mean, he

16   gave us I guess I would call it a

17   speech --

18         Q.    Okay.

19         A.    -- to us all.  And his

20   speech was -- there must have been doom

21   and gloom in the paper or something and

22   he said no one was getting fired for

23   Christmas.  Everyone was going to keep

24   their jobs, you know.

25              He went on to his Drew Brees

SHARR SCOTT
9/23/2010

Page 71

1    speech.  "We all can't be a Drew Brees,

2    but if you are, we certainly hope to

3    get you money without having to make

4    you an assistant to the assistant

5    deputy director," or some other title,

6    which I actually thought was hopeful in

7    light of my conversation with Rob

8    Harroun, but obviously it did not

9    happen.  His Drew Brees speech.

10                And then at one point during

11   the conversation, he did mention that

12   he had been sued or the office had been

13   sued and he said he did not

14   discriminate against women.  He did not

15   discriminate against African-Americans.

16   And I don't remember specifically what

17   he said, but his -- the impression I

18   got or what I remember from it is that

19   he had been district attorney for X

20   number of years and that he hired black

21   females, black males, white females,

22   you know.  He had no gender, race,

23   creed, national origin, you know,

24   whatever discrimination and that he had

25   never lost a suit and he wasn't going

SHARR SCOTT
9/23/2010

Page 72

1   to lose any of these.

2       Q.   What was his state of mind

3   when he was making these remarks?

4       MS. McINNIS:

5           I don't think she can

6           testify to the attorney general's

7           state of mind.

8   EXAMINATION BY MR. WILLIAMS:

9       Q.   Well, you can certainly

10  testify as to what you saw his state of

11  mind, what you believe his state of

12  mind was in the ordinary course of

13  experience.  Was he angry, sarcastic,

14  hopeful, humorous?

15      A.   I would say he was mostly

16  humorous, with the exception of the --

17  Obviously it's unpleasant to be sued.

18  I wouldn't say -- He didn't turn red

19  faced or anything like that.  I mean,

20  it was point blank he basically said he

21  was not a racist or a sexist and that

22  he had never lost a suit and he wasn't

23  going to lose those.  That's what he

24  said.

25      Q.   Did he say anything about

SHARR SCOTT
9/23/2010

Page 73

 1   the perpetuation of discriminatory

 2   practices in the course of that speech?

 3        A.   I don't know exactly what

 4   you mean by that.

 5        Q.   Did he talk about the

 6   failure to address the concerns?

 7        A.   No.  Basically I gave you

 8   the highlights of what he said and I

 9   don't remember him talking about any

10   failure.

11        Q.   Did he talk about the

12   disparate impact of neglect in his

13   speech?

14        A.   The disparate impact of

15   neglect of what?

16        Q.   Neglect to complaints

17   concerning --

18        A.   No.  No, not that I recall.

19        Q.   -- unequal pay?

20        A.   No, not that I recall.

21        MR. WILLIAMS:

22             All right.  That's all I

23        had, and I certainly tender the

24        witness for any further

25        questions.

SHARR SCOTT
9/23/2010

Page 74

1        MS. McINNIS:

2             I don't have any questions.

3        MR. WILLIAMS:

4             Thank you very much for

5        being here.

6             (Whereupon the deposition

7        was concluded at 3:01 p.m.)

8        *      *      *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHARR SCOTT
9/23/2010

Page 75

8           WITNESS' CERTIFICATE

11          I have read or have had read
12 to me the foregoing transcript and find
13 same to be true and correct with the
14 exception of any changes or corrections
15 listed on the attached amendment sheet.

19     _____
       SHARRY R. SCOTT
20

SHARR SCOTT
9/23/2010

Page 76

1              REPORTER'S CERTIFICATE

2          I, Kathy Shaw-Gallagher CCR,

3    RPR, Certified Court Reporter, in and

4    for the State of Louisiana, as the

5    officer before whom this testimony was

6    taken, do hereby certify that SHARRY R.

7    SCOTT, after having been duly sworn by

8    me upon authority of R.S. 37:2554, did

9    testify as hereinabove set forth in the

10   foregoing 74 pages; that this testimony

11   was reported by me in stenotype

12   reporting method, was prepared and

13   transcribed by me or under my personal

14   direction and supervision, and is a

15   true and correct transcript to the best

16   of my ability and understanding; that I

17   am not related to counsel or to the

18   parties herein, nor am I otherwise

19   interested in the outcome of this

20   matter.

21

        _____
22      KATHY SHAW-GALLAGHER, CCR, RPR
        Certified Court Reporter
23      Curren-Landrieu, L.L.C.
        749 Aurora Avenue
24      Suite 4
        Metairie, Louisiana  70005
25