STEPHEN F. BABBIN
9/23/2010

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JENNIFER MEDLEY    *   CIVIL ACTION
                   *   NO. 09-4570
VERSUS             *   CJB - DEK
                   *
LOUISIANA STATE    *   JUDGE CARL BARBIER
DEPARTMENT OF      *
JUSTICE            *   MAGISTRATE JUDGE
                   *   DANIEL E. KNOWLES,
                   *   III
*  *  *  *  * * *


        Deposition of STEPHEN F.
BABBIN, 2216 Danny Park, Metairie,
Louisiana 70001, taken in the law
offices of Shows, Cali, Berthelot &
Walsh, LLP, located at 628 St. Louis
Street, Baton Rouge, Louisiana 70802,
commencing at 11:24 a.m., on Thursday,
the 23rd day of September, 2010.


APPEARANCES:

    LAW OFFICE OF DALE EDWARD WILLIAMS
    (By:  Dale Edward Williams, Esquire)
    212 Park Place
    Covington, Louisiana  70433
       (Attorneys for the Plaintiff)

STEPHEN F. BABBIN
9/23/2010

Page 2

```
 1    APPEARANCES (continued):

 2
         SHOWS, CALL BERTHELOT & WALSH,
 3       L.L.P.
         (By:  Amy L. McInnis, Esquire
 4              - and -
            Lindsay L. Lollar, Esquire)
 5       628 St. Louis Street
         Baton Rouge, Louisiana  70802
 6         (Attorneys for the Defendant,
            Douglas Marine Service, Inc.)
 7

 8

 9    ALSO PRESENT:

10
         Rob Harroun
11
         Jennifer Medley
12

13
      REPORTED BY:
14
         KATHY SHAW-GALLAGHER, CCR, RPR
15       Certified Court Reporter
         (No. 049519)
16       Curren-Landrieu, L.L.C.
17       749 Aurora Avenue
         Suite 4
18       Metairie, Louisiana  70005
         (504) 833-3330 (800) 487-3376
19

20

21

22

23

24

25
```

STEPHEN F. BABBIN
9/23/2010

Page 3

1        E X A M I N A T I O N   I N D E X

2

3                                          PAGE

4
     EXAMINATION BY MR. WILLIAMS                5
5

6

7            *       *       *       *       *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STEPHEN F. BABBIN
9/23/2010

```
 1          S T I P U L A T I O N

 2      It is stipulated and agreed by

 3  and among counsel for the parties

 4  hereto that the deposition of the

 5  aforementioned witness is hereby being

 6  taken under the Federal Rules of Civil

 7  Procedure, for all purposes, in

 8  accordance with law;

 9      That the formalities of reading,

10  signing, filing, sealing, and

11  certification are specifically waived;

12      That all objections, save those

13  as to the form of the question and the

14  responsiveness of the answer, are

15  hereby reserved until such time as this

16  deposition, or any part thereof, may be

17  used or sought to be used in evidence.

18          *     *     *     *     *

19      KATHY SHAW-GALLAGHER, certified

20  Court Reporter, State of Louisiana,

21  officiated in administering the oath to

22  the witness.

23

24

25
```

STEPHEN F. BABBIN
9/23/2010

 1          STEPHEN F. BABBIN,
 2   after having been duly sworn by the
 3   above-mentioned Certified Court
 4   Reporter, was examined and testified as
 5   follows:
 6   EXAMINATION BY MR. WILLIAMS:
 7          Q.   Mr. Babbin, you are, in
 8   fact, Mr. Steve Babbin?
 9          A.   I am.
10          Q.   How long have you been
11   employed by the Department of Justice?
12          A.   Since April of 1995.
13          Q.   And what did you do before
14   then?
15          A.   Well, if you want me to go
16   like from -- go from law school
17   forward --
18          Q.   That would be an excellent
19   idea.  Thank you.
20          A.   When I first got out of law
21   school, I worked for the Fifth Circuit
22   Court of Appeals as a staff attorney.
23   I left there and went with Oster &
24   Wegener, which was a law firm that did
25   a lot of real estate work, but I did

STEPHEN F. BABBIN
9/23/2010

Page 6

1    their litigation for them.  I was there

2    for 15 years.  Then I left there and I

3    went in with Johnny Lee for maybe a

4    year or so.  Then I went on my own for

5    a year and then I went to the attorney

6    general's office.

7          Q.   Who was attorney general

8    when you came on?

9          A.   Richard Iyoub.

10          Q.   What did you do for

11    Mr. Iyoub when you signed on?

12          A.   When I first signed on, I

13    was doing medical malpractice work.

14    But that didn't last long.  That was

15    because there was a need at that time

16    for an experienced attorney.  In fact,

17    they had one big case that was coming

18    up that I did, but shortly after that,

19    I started doing road hazard work,

20    general liability.  I did some worker's

21    comp.  I did a little bit of

22    everything.

23          Q.   At some point, did you

24    become the deputy or assistant office

25    manager for the New Orleans office?

STEPHEN F. BABBIN
9/23/2010

1      A.    Yeah.   When Allen Danielson

2   was the office chief, he needed some

3   help, I guess, with administrative

4   duties and it was almost an unofficial

5   title, but it was assistant office

6   chief.   And if you ask me when that

7   was, I really don't remember.

8      Q.    Was there anything like a

9   job description for an assistant office

10  chief?

11     A.    No.

12     Q.    Just something you simply

13  started doing?

14     A.    Right.   Exactly.   I started

15  doing some administrative work, so they

16  said, "Well, let's give you a title."

17     Q.    When you were hired by the

18  attorney general back in April of 1995,

19  who hired you?

20     A.    I interviewed with Cliff

21  Bingham the summer before that and he

22  is the one who actually hired me in

23  April.

24     Q.    You interviewed the summer

25  before that in 1994?

STEPHEN F. BABBIN
9/23/2010

Page 8

1      A.   Yes.  Yes.  I think the

2  office in New Orleans did not open

3  until, I think, January of 1995.

4      Q.   So you came at the point

5  where the New Orleans office opened?

6      A.   Shortly after it opened.  It

7  opened in January and I came in April.

8      Q.   Now, Mr. Cliff Bingham, is

9  he still with the office?

10     A.   No.  No.  He left some time

11  ago.

12     Q.   I never met Mr. Bingham.

13  Was he a white man?

14     A.   Yes.

15     Q.   At the time you took up your

16  duties in the New Orleans office, you

17  had been out practicing for --

18     A.   Nineteen years.

19     Q.   -- 19 years?

20          Can you tell me how the

21  figure on your compensation was arrived

22  at?

23     A.   No.  I don't know.  When I

24  interviewed with Cliff, he told me what

25  they could start me at and -- but he

STEPHEN F. BABBIN
9/23/2010

Page 9

1    didn't tell me -- I mean, I told him

2    the experience I had and what I had

3    been doing for the last 19 years, and

4    he told me they could start you at this

5    figure, but I never did know, you know,

6    exactly why.

7         Q.   Was there any negotiation or

8    was it simply, "This is what we can pay

9    you."  "Fine"?

10        A.   When he interviewed me in --

11   This is as I remember.  When he

12   interviewed me in the summer, he said,

13   "We could start you off at," I think it

14   was 50,000 was the figure.  And when he

15   called me back in April, he said,

16   "That's the figure."  So, no, there was

17   no negotiation.

18        Q.   All right.  As the assistant

19   office chief -- Let me back up.

20             I'm not sure I ever found

21   out when you took up those duties as --

22   Do you know yourself?

23        A.   No.  Allen Danielson was the

24   office chief at the time, so I would

25   say it was at some point before Charlie

STEPHEN F. BABBIN
9/23/2010

Page 10

1    Foti took over as attorney general.

2    Maybe the year before, something like

3    that.  It was like a --

4         Q.   It was after Katrina?

5         A.   No.  No.  No.  It was before

6    Katrina.

7         Q.   Before?

8         A.   Before Katrina.

9         Q.   2002?

10        A.   Yeah.  I mean, I'm really

11   guessing here.  Maybe 2000, 2001, 2002,

12   somewhere up in there.

13        Q.   Well, have you ever had

14   anything to do with recommending pay

15   raises for individuals that work at the

16   attorney general's office?

17        A.   Not -- Have I ever, like

18   even up to this date?

19        Q.   Yeah.

20        A.   Not directly.  Sometimes I

21   get a call from Baton Rouge and they

22   say, you know, "What about this

23   attorney?  We're thinking about giving

24   him a raise.  What do you think about

25   him?  What's their work performance

STEPHEN F. BABBIN
9/23/2010

Page 11

1    like, etc., etc.?"  And I'll put my --

2    I'll have some input.

3         Q.   And how long has that

4    practice been going on?

5         A.   Oh, probably back when -- I

6    would say probably when Foti took over.

7         Q.   Well, when you got these

8    calls, who would they be from?

9         A.   They would be either from

10   Rob or before that, from -- I'm trying

11   to think of who was -- who had Rob's

12   job before Rob.  They would be from one

13   of the deputy directors or somebody

14   like that.  It wouldn't be directly

15   from the attorney general or anything

16   like that.

17        Q.   Have you ever had a call

18   from the attorney general in person

19   concerning --

20        A.   No.  No.

21        Q.   And that would go for not

22   only salary recommendations but for

23   actual performance of the attorney?

24        A.   From the attorney general

25   directly?

STEPHEN F. BABBIN
9/23/2010

Page 12

```
 1        Q.   Yes.

 2        A.   No, I've never had a call

 3   like that.

 4        Q.   I take it you've met

 5   Ms. Jennifer Medley?

 6        A.   Oh, yeah.

 7        Q.   When was the first time you

 8   recall meeting Ms. Jennifer Medley?

 9        A.   She probably knows better

10   than I do.  I might have been in on the

11   interview with Jennifer and if it

12   was -- if she came -- I believe she

13   came in '04, so I probably met her

14   then.  So I did not know her before the

15   attorney general's office.

16        Q.   Do you remember if there

17   were other candidates interviewed at

18   the same time she was hired?

19        A.   In '04?  No.  No.  I

20   would -- No.

21        Q.   What is the hiring practice?

22   What can you tell us about the hiring

23   practice in the New Orleans office that

24   you're familiar with?

25        A.   You have X amount of spots
```

STEPHEN F. BABBIN
9/23/2010

Page 13

1    that are available for attorneys in the

2    New Orleans office.  We keep some

3    resume's on file.  If there is an

4    opening, then we look through the

5    resume's.  One of the attorneys in the

6    office might know somebody.  Somebody

7    from Baton Rouge might know somebody.

8    And they'll call up and say, "Hey, this

9    person might be a good fit."  And then

10   we'll go through an interviewing

11   process.  First of all, there's an

12   application process.  They fill out an

13   application.  There is a background

14   check that you have to go through and

15   then there's an interview process.  And

16   basically that's it.

17          Q.   Are these jobs required to

18   be advertised?

19          A.   No.

20          Q.   How is the initial salary

21   determined to the best of your

22   knowledge?

23          A.   To the best of my knowledge,

24   they go by experience, the length of

25   time you've been an attorney, what

STEPHEN F. BABBIN
9/23/2010

Page 14

1    particular type of specialty that you

2    have, if any.  Things of that nature.

3    And to be perfectly honest, it also

4    goes by budgetary constraints because,

5    as you know, and everybody knows,

6    sometimes the state has money and

7    sometimes it doesn't.

8         Q.   Is there a piece of paper

9    that you can look at that gives you a

10   summary of these things and tells you

11   how to weight them?

12        A.   If there is, I don't look at

13   them.  That's done out of Baton Rouge.

14        Q.   And the starting figure, is

15   that negotiated locally in the New

16   Orleans office or does that come out

17   of --

18        A.   No.  That comes from Baton

19   Rouge.

20        Q.   Have you had any occasion to

21   observe Ms. Jennifer Medley try cases

22   in court?

23        A.   I went with Jennifer on one

24   trial that we had seated the jury on

25   and the case was settled before --

STEPHEN F. BABBIN
9/23/2010

Page 15

1   There might have been one witness.  I

2   don't remember if one witness was

3   called or two witnesses, but it was

4   settled early on.  And I think that's

5   the only time I ever was in court with

6   her to help her.  Now, I might have

7   observed her once or twice doing

8   motions, but that was the only trial

9   that I remember anyway.

10       Q.   What opinion, if any, did

11   you form about Ms. Medley's abilities

12   in court?

13       A.   I thought she was, you know,

14   an average attorney, that she -- On

15   that particular case, we had stipulated

16   to liability, but I thought she did a

17   good job.  I helped her with seating

18   the jury and we seated a great jury.

19   So just from that observation, I

20   thought she did a good job.

21       Q.   The composition of the jury,

22   was that one of the factors that,

23   perhaps, led to the settlement in that

24   case?

25       A.   Oh, yeah.  Absolutely.

STEPHEN F. BABBIN
9/23/2010

Page 16

```
 1        Q.   Did you have any occasion to
 2   review pleadings that Ms. Medley had
 3   made?
 4        A.   I had occasion to view some
 5   civil rights pleadings, yes.
 6        Q.   Same question, how did she
 7   do there?
 8        A.   Well, it was the consensus
 9   in the office that she was having some
10   problems with civil rights cases.
11        Q.   What problems did you see?
12        A.   I'm not a federal court
13   attorney, but what I saw and what her
14   immediate supervisor saw was there was
15   some problems with her understanding of
16   the motion practices in federal court.
17        Q.   Who was her civil rights
18   attorney supervisor?
19        A.   Michael Keller.
20        Q.   Is Michael still with the
21   office?
22        A.   Uh-huh (indicating
23   affirmatively).
24        Q.   Did those shortcomings ever
25   get memorialized in any kind of
```

STEPHEN F. BABBIN
9/23/2010

Page 17

1   evaluation of her work or any kind of a

2   memo?

3        A.   They did not get

4   memorialized, but there was a time when

5   we took the civil rights cases that she

6   had from her.

7        Q.   Was that at the request of

8   Ms. Medley?

9        A.   It was -- As I understood

10  it, it was a joint request from

11  Ms. Medley and Mr. Keller.

12       Q.   Do you ever remember

13  Ms. Medley asking for some of that work

14  back?

15       A.   Yes.

16       Q.   What do you remember about

17  that?

18       A.   She came in to see me and

19  asked if she could do -- if she could

20  have a civil rights case.

21       Q.   Do you remember when that

22  was?

23       A.   No.

24       Q.   How about in relation to

25  when she left?  Was it shortly before,

STEPHEN F. BABBIN
9/23/2010

Page 18

1    a long time before, or what?

2          A.   I'm guessing here, but I

3    think it was at least a year before she

4    left.  That's my guess.

5          Q.   All right.  Without knowing

6    for sure, but having a guess, because

7    I've been practicing in the civil

8    rights litigation for 20 years, you

9    pretty consistently have civil rights

10   cases --

11         A.   Yes.

12         Q.   -- in that office?

13         A.   We do.

14         Q.   How many attorneys -- At the

15   time that Ms. Medley was asking for

16   these cases back, how many attorneys

17   were working civil rights?

18         A.   I'm trying to remember when

19   that was.  Three, I believe.

20         Q.   And when Ms. Medley was

21   doing civil rights cases, would that

22   have made four?

23         A.   Yes.

24         Q.   So nobody came in in the

25   interim?

STEPHEN F. BABBIN
9/23/2010

Page 19

1        A.   Ms. Medley left in '09.  No,

2   I don't believe so.  We do have

3   somebody else doing them now, but I

4   think she came after Ms. Medley left.

5        Q.   Who is that individual?

6        A.   Tanya Irvin.

7   MS. MEDLEY:

8             She came before.

9   THE WITNESS:

10             She might have come before.

11   MR. WILLIAMS:

12             All right.  Thanks.

13   EXAMINATION BY MR. WILLIAMS:

14        Q.   Do you remember why

15   Ms. Medley left?  Did she ever talk --

16        A.   Why she left?

17        Q.   Yeah.  Did she ever talk

18   about that?

19        A.   I just looked at the letter

20   of resignation the other day.  She said

21   that she was going to work for -- I

22   don't know if she said Gauthier, but

23   she was going to work with a firm to

24   take other opportunities, and I assumed

25   it was for more money, but that's what

STEPHEN F. BABBIN
9/23/2010

Page 20

1   she said in her resignation letter.

2        Q.   Did she ever come to you and

3   talk about problems she was having in

4   the office?

5        A.   Problems she was having in

6   the office?

7        Q.   Yes.

8        A.   Oh, yeah.  I mean yes.

9        Q.   Tell us what you remember

10  about that.

11       A.   She wanted to do civil

12  rights cases and this was after she had

13  given them up.  She wanted to get those

14  back.  She had come to me about money,

15  that she didn't feel like she was

16  getting paid enough.  Most of it was

17  because she felt like the cost of

18  living in New Orleans had gone up,

19  especially since Katrina, and that that

20  wasn't being taken into consideration

21  by Baton Rouge.

22       Q.   Did she ever -- Whether she

23  was talking about civil rights cases or

24  not, did she ever tell you that one of

25  the problems she had with her pay rate

STEPHEN F. BABBIN
9/23/2010

Page 21

1  was that she thought that minorities

2  and women were being paid less?

3          A.   I don't remember her ever

4  saying that.  She said sometimes that

5  she thought it was unfair, but I don't

6  think she ever told me there was any

7  kind of discrimination.  I don't

8  remember having that conversation.

9          Q.   Did she ever come to you

10  with a request that she have a meeting

11  with the attorney general to air some

12  of her problems?

13          A.   I think she sent me a memo

14  to that request, which was sent up to

15  Baton Rouge.

16          Q.   What happened to that memo?

17  Did you ever get any feedback or

18  response from Baton Rouge?

19          A.   I don't know.  I don't know

20  if they contacted her or not.

21          Q.   Did they contact you?

22          A.   About meeting the attorney

23  general?  I don't remember being

24  contacted about that, no.

25          Q.   Or about any complaint that

STEPHEN F. BABBIN
9/23/2010

Page 22

1    you got from Ms. Medley?

2         A.   About the pay raise?

3         Q.   Or any complaint.

4         A.   No.  No.  The other

5    complaints were basically internal as

6    far as civil rights cases and that sort

7    of thing.  I wouldn't have gotten any

8    feedback, I don't think, on that.

9         Q.   Did you ever have any

10   discussions with anybody in Baton Rouge

11   in the attorney general's office about

12   Ms. Medley or about any issues

13   surrounding her?

14        A.   Yes.  I had spoken to

15   Micheal Penn at one point about

16   Ms. Medley's performance in the civil

17   rights cases.

18        Q.   Who is --

19        A.   Micheal Penn at the time was

20   the section chief in Baton Rouge.

21        Q.   What does she do now?

22        A.   She -- I'm not exactly sure

23   what she does.  She lives in Atlanta

24   and is a practicing attorney in

25   Atlanta, but I don't know the specifics

STEPHEN F. BABBIN
9/23/2010

Page 23

1   of her job.

2        Q.   Do you remember when you had

3   this discussion with Ms. Penn?

4        A.   This was during the time

5   when she was having some problems with

6   her civil rights cases.  That's when I

7   had occasion to talk to Ms. Penn.

8        Q.   And this was about a year

9   before she -- in 2008 sometime?

10       A.   Probably, yes, and it might

11  have been a little earlier than that.

12       Q.   Anybody else that you had

13  any words with in the attorney

14  general's office concerning Ms. Medley?

15       A.   No.  Most of the

16  conversations I had about Ms. Medley

17  were with people in the office.

18       Q.   Who else did you have a

19  conversation with in the office?

20       A.   Mainly Michael Keller and at

21  one point, Lance Guest, who was trying

22  to mentor her in civil rights cases.

23       Q.   Mr. Guest does civil rights

24  cases?

25       A.   Yes, he does.

STEPHEN F. BABBIN
9/23/2010

Page 24

```
 1        Q.   I understand Mr. Guest had a
 2   serious accident?
 3        A.   He did.
 4        Q.   And that was Mardi Gras what
 5   year?
 6        A.   That was Mardi Gras of '09.
 7        Q.   Was that before Ms. Medley
 8   left?
 9        A.   Right before Ms. Medley
10   left.
11        Q.   Now, Mr. Guest was out of
12   the office for some time after that
13   accident, I understand?
14        A.   Yes.  Yes.
15        Q.   How did his workload get
16   redistributed?
17        A.   Mostly through Michael and
18   Phyllis Glaizer picked it up and at
19   that time, I believe we had Tanya
20   Irving, who also took some of the load,
21   and I can't remember if we -- I think
22   that was it.  And we -- He was out of
23   the office for some time, but he --
24   Lance was already right on top of
25   things, so we could delay things for a
```

STEPHEN F. BABBIN
9/23/2010

Page 25

 1   while till he got back.

 2        Q.   Do you know if Ms. Medley

 3   was ever offered any of those cases

 4   while Mr. Guest was out?

 5        A.   No, she was not.

 6        Q.   Did Ms. Medley, in fact,

 7   ever cry in your office about

 8   situations she was facing at work?

 9        A.   She cried in my office, but

10   it was -- as I remember, it was about

11   personal issues that were going on in

12   her life at the time.

13        Q.   It wasn't about frustrations

14   she felt in the office?

15        A.   She told me that she cried

16   at home about frustration she had in

17   the office, but I don't believe she

18   cried in front of me, as I remember it,

19   anyway.

20        Q.   Did she ever discuss her

21   going to her doctor and getting

22   treatment for nervousness, that sort of

23   thing?

24        A.   Discuss it in the fact that

25   she told me she was going to a

STEPHEN F. BABBIN
9/23/2010

Page 26

1   therapist, but not the specifics of

2   what was going on in those therapy

3   sessions or -- What I was getting out

4   of it, there was a lot of stress from

5   Katrina.  There were problems at home.

6   So I took it that that was the reason

7   why she was going.  And, you know,

8   don't get me wrong.  There was some

9   problems in the office, too.  But all

10  of those combined.

11       Q.   Did Ms. Medley ever tell you

12  that she was having problems with

13  Mr. Paul Deal?

14       A.   She might have come in once

15  or twice and complained about Paul,

16  yeah.

17       Q.   Do you remember what she was

18  complaining about?

19       A.   I'm trying to -- As you're

20  asking this question, I'm trying to

21  think.  It seems to me one of the

22  problems was about a printer.  He had

23  gotten some printers and he didn't give

24  her one, so she was upset about that.

25  There might have been one or two other

STEPHEN F. BABBIN
9/23/2010

Page 27

1    things.

2         Q.   Did she ever say that Paul

3    kept looking into her cubicle, into her

4    work space checking on her more than

5    other people?

6         A.   You know, I can't -- She

7    might have.  I don't remember that, but

8    she might have.

9         Q.   Did you ever have any

10   discussions with Mr. Deal about

11   Ms. Medley?

12        A.   Yeah, we talked about

13   Jennifer.

14        Q.   What do you remember about

15   those discussions?

16        A.   We talked about her

17   performance as far as civil rights

18   cases were going, and I remember

19   discussing with him that she and Mike

20   had come in my office and we decided to

21   take the cases.  And he was the office

22   chief at the time, so I told him that's

23   what we felt like we should do and he

24   agreed.

25        Q.   And when did Ms. Medley

STEPHEN F. BABBIN
9/23/2010

Page 28

1    begin doing civil rights cases?

2         A.   As I remember it, right from

3    the get-go, I think.  Right when she

4    first got there.

5         Q.   And that would have been in

6    2004?

7         A.   Yes.

8         Q.   So Ms. Medley did civil

9    rights cases for about four years

10   before she gave them up?

11        A.   That's probably right.

12        Q.   In the space of those four

13   years, can you remember any specific

14   incidents where, you know, she had what

15   you would consider major complaints

16   about her performance in civil rights

17   cases?

18        A.   From?

19        Q.   From 2004 and 2008 when she

20   gave up those cases.

21        A.   I don't remember specific

22   dates.  I do remember Mike coming in

23   from time to time saying he didn't

24   think Jennifer was getting it.  I mean,

25   he was trying to teach her the civil

STEPHEN F. BABBIN
9/23/2010

Page 29

1    rights work.  She started doing civil

2    rights work when she got there, but, I

3    mean, she was very green.  So I don't

4    know when these complaints first

5    started, but they were ongoing.

6         Q.    In civil rights cases, do

7    attorneys working out of the New

8    Orleans office for the State of

9    Louisiana work in connection with

10   Office of Risk Management adjusters?

11        A.    Oh, absolutely.

12        Q.    What is the -- What's the

13   roll of the ORM adjuster in the

14   litigation process?

15        A.    Similar to in private

16   practice, the role of an adjuster for a

17   private insurance company.  They have X

18   amount of cases that they monitor.

19   They -- When you want to try to get

20   authority to settle a case, you got to

21   go through ORM.  So they adjust the

22   cases just like an adjuster in a

23   private insurance company would do.

24        Q.    So they are really a client

25   in a sense?

STEPHEN F. BABBIN
9/23/2010

Page 30

```
 1        A.   They are the client.  I
 2   mean, the taxpayers are the clients, of
 3   the state, but they are the client,
 4   yes.
 5        Q.   So would it be important to
 6   look at what ORM adjusters are saying
 7   about an attorney's performance in
 8   order to gauge the performance?
 9        A.   Yes.
10        Q.   Do you recall specifically
11   any ORM adjusters that had complaints
12   about Ms. Medley's performance in the
13   area of civil rights?
14        A.   No, but you have to
15   understand, the adjusters, the civil
16   rights adjusters would have told
17   Michael if there was some problem.
18   They probably wouldn't have told me.
19        Q.   At the conclusion of a case,
20   is it the custom for the ORM adjuster
21   to provide some kind of written
22   evaluation of the representation?
23        A.   That's my understanding.  We
24   don't see those, but that is my
25   understanding.
```

```
 1        Q.    What happens to those?

 2        A.    I don't know.

 3        Q.    Have you ever worked for an

 4   ORM adjuster?

 5        A.    I've worked with them.

 6        Q.    For them?  With them?

 7        A.    On many, many cases, yeah,

 8   but I never see the evaluations on me

 9   or anybody else.  We don't get those, I

10   don't know if they get them up in Baton

11   Rouge.  I just don't know.

12        Q.    If you asked for them, do

13   you think they'd give them to you?

14        A.    I can't answer that.  I

15   don't know.

16        Q.    Fair enough.  Fair enough.

17   All right.

18              Have you ever heard of the

19   phrase "estrogen alley" --

20        A.    Yes.

21        Q.    -- as applied to the New

22   Orleans office?

23        A.    Yes.

24        Q.    What was the context as it

25   applied maybe to Ms. Medley?
```

STEPHEN F. BABBIN
9/23/2010

Page 32

1       A.   Well, I don't know if it was

2   applied to Ms. Medley, but between Paul

3   Deal's office and my office in the New

4   Orleans office when Paul was there,

5   there was five or six female attorneys

6   in a row and one of the female

7   attorneys coined that phrase, that this

8   is like estrogen alley.

9       Q.   And did any male attorney in

10  the office ever use that term?  Do you

11  remember Paul Deal ever using that

12  term?

13      A.   He might have to me.  He

14  might have said, you know, "So and so

15  said this is estrogen alley."  Do I

16  remember him walking up and down the

17  halls calling it estrogen alley?  No,

18  but he might have said that to me.

19      Q.   Do you remember the

20  circumstances of Mr. Deal leaving the

21  employ of the attorney general's

22  office?

23      A.   What do you mean "the

24  circumstances"?  He --

25      Q.   Well, I mean, did you go

STEPHEN F. BABBIN
9/23/2010

Page 33

1    down and tell Mr. Paul Deal that he was

2    no longer employed?

3         A.   I did.

4         Q.   What reason did you give

5    Mr. Deal that he was being terminated?

6         A.   I did not give Mr. Deal a

7    reason at that point.  I just said that

8    "You're going to be terminated," and

9    "Let's drive up to" -- this was on a

10   Friday -- "Let's drive up to Baton

11   Rouge on Monday and go through the

12   process."

13        Q.   What is your understanding

14   about the reasons Mr. Deal was

15   terminated?

16        A.   They don't -- They don't

17   always tell me the reason.  So I think

18   the main reason probably was that there

19   was a duplication of duties, that I was

20   basically doing the majority of the

21   administrative work, the day-to-day

22   administrative work, anyway, so I think

23   it was probably -- a cost-cutting

24   measure was probably what it was.

25        Q.   But you were not informed

STEPHEN F. BABBIN
9/23/2010

Page 34

1    either way; is that correct?

2         A.   No.

3         Q.   When is the last time you

4    spoke to Mr. Paul Deal?

5         A.   I speak to him from time to

6    time.  In fact, I probably went to

7    lunch with Paul maybe a month ago.

8         Q.   Did this litigation come up

9    as a topic of conversation?

10        A.   This litigation?

11        Q.   Yes, sir.

12        A.   No.

13        Q.   Was Mr. Deal employed at

14   that point when you had lunch with him?

15        A.   No.

16        Q.   Speaking of your own

17   experience with the Department of

18   Justice, have you ever received a pay

19   raise that was not an across-the-board

20   pay raise?

21        A.   Yes.

22        Q.   Do you remember

23   approximately how many times you

24   received such pay raises?

25        A.   I would say -- and this

STEPHEN F. BABBIN
9/23/2010

Page 35

1    is -- I'm guessing -- two or three.

2        Q.   And was there a change in

3    your duties when --

4        A.   Yes, when I took on the

5    additional duty, the administrative

6    work of assistance office chief, there

7    was a pay raise.  When I took on the

8    duties of office chief, there was a pay

9    raise, and maybe there was one other

10   one in there.

11       Q.   When this happened, was

12   there a discussion that took place in

13   Baton Rouge, or were you just informed

14   that this was going to happen?

15       A.   The way it probably went is

16   I remember having a conversation with

17   Allen when he wanted me to do the

18   administrative work and I said, "Is

19   this going to mean a pay raise?"  And

20   he told me, "Probably," and then he did

21   what he did with Baton Rouge and, then

22   I was informed I was getting a pay

23   raise.

24       Q.   Have you ever in the context

25   of being an office manager or assistant

STEPHEN F. BABBIN
9/23/2010

Page 36

1   office manager ever reviewed in any

2   systematic way the e-mails of other

3   attorneys working in the New Orleans

4   office?

5        A.  Have I?

6        Q.  Yes.

7        A.  Only in the context of if an

8   attorney was having trouble with an

9   adjuster or having some kind of

10  problems, they would bring in the

11  e-mails and say, "This is a problem,"

12  but not on my own.

13       Q.  Does the New Orleans office

14  employ any investigators?

15       A.  No.

16       Q.  Does the attorney general

17  employ any investigators --

18       A.  Yes.

19       Q.  -- as far as you know?

20       A.  Yes.

21       Q.  Do you know how many?

22       A.  I wouldn't have that

23  information, no.

24       Q.  Do you remember any

25  discussions about questions raised by

STEPHEN F. BABBIN
9/23/2010

Page 37

1   Senator Carter Peterson about pay

2   issues in the Department of Justice?

3       A.   No.  I -- No.  I know from

4   scuttlebutt what -- you know, what the

5   questions she was asking the general,

6   and actually I might have even seen a

7   video, I think somebody had the video,

8   but I don't have any -- I wasn't there.

9       Q.   Were you asked to provide

10  any information in the context of that

11  discussion that took place in the

12  Senate?

13      A.   Before he was questioned,

14  no.

15      Q.   Or after?

16      A.   The only thing I do

17  remember -- and I don't know if it was

18  from that questioning -- was the issue

19  of estrogen alley came up and I

20  remember talking to the general

21  directly about that.

22      Q.   What do you recall about

23  that conversation?

24      A.   He asked me about how it

25  originated and I told him the same

STEPHEN F. BABBIN
9/23/2010

Page 38

1    thing I told you earlier in this

2    questioning.

3         Q.   And how long was that

4    discussion?

5         A.   The general is a busy man.

6    Probably -- Maybe 10 minutes, 15

7    minutes.

8         Q.   Was it undertaken in the

9    context of Senator Carter Peterson's

10   question?

11        A.   I believe.  I believe that's

12   how it came to his attention.

13        Q.   Was there any discussion at

14   that point about reviewing the pay

15   practices within the department?

16        A.   In that discussion, no.

17        Q.   Were you ever aware of a

18   study of salaries as it pertains to

19   race and gender in the department?

20        A.   No.

21        Q.   Have you had any discussions

22   with Mr. David Sanders about any

23   complaints that Ms. Medley has brought?

24        A.   In the context of this

25   lawsuit?

STEPHEN F. BABBIN
9/23/2010

Page 39

```
 1        Q.   Or even before then?

 2        A.   We've probably -- I think

 3   we've had discussions about this

 4   lawsuit, yeah, but before that -- I'm

 5   trying to remember because at one

 6   point, David Sanders was the civil

 7   rights section chief, but my memory is

 8   my discussions about Jennifer were

 9   mostly with Micheal Penn, not with

10   David Sanders.

11        Q.   Do you know if David Sanders

12   ever spent any time in the New Orleans

13   office?

14        A.   Working in the New Orleans

15   office?

16        Q.   Yeah.

17        A.   No.  Not that I know of, no.

18        Q.   Do you know if he ever had

19   any occasion to observe Ms. Medley's

20   work?

21        A.   I'm sure he had reviewed

22   some of her pleadings that she drafted.

23   Whether he observed her in court, I

24   don't know.

25        Q.   How about Ms. Bridget -- is
```

STEPHEN F. BABBIN
9/23/2010

Page 40

1    it Denicola?

2         A.    "Denicola."

3         Q.    Same question?

4         A.    I've had discussions with

5    her about the lawsuit and my answer

6    would be the same.  I'm sure she's --

7    she's reviewed and had reviewed

8    beforehand, before this lawsuit ever

9    came up, pleadings drafted by

10   Ms. Medley, but I don't know if she's

11   ever seen her in court or arguing

12   motions or anything of that nature.

13        Q.    Did you ever counsel the

14   woman that used the term "estrogen

15   alley"?

16        A.    Did I counsel her?

17        Q.    Yes.

18        A.    We found out where it came

19   from, but, no, I did not.  I didn't

20   counsel her.  Well, I mean, at that

21   point in time -- If counseling her, you

22   mean, "don't use it anymore," yeah, I

23   did that.

24        Q.    Do you remember the name of

25   the woman who used this term?

STEPHEN F. BABBIN
9/23/2010

Page 41

```
 1        A.    Yeah.  Kathi Logan.

 2        Q.    Did you ever supervise the

 3   work of Carmella Parker?

 4        A.    Yes.

 5        Q.    Did she ever come to you

 6   with concerns about pay issues?

 7        A.    I'm sure she came to me and

 8   requested that she make more money, but

 9   that was a general theme in the office.

10   When you work for the state, you're not

11   making the money that you do in a

12   private practice.  And so I would think

13   that probably everybody in the office

14   at one time or another has come to me

15   and asked me for a raise.

16        Q.    Did Ms. Parker ever come to

17   you with complaints more specifically

18   about women and minorities earning less

19   than comparable males or

20   non-minorities?

21        A.    She may have, but I don't

22   remember that conversation.  I remember

23   a conversation she needed more money

24   because of traveling to Baton Rouge and

25   for different reasons, but I don't
```

STEPHEN F. BABBIN
9/23/2010

Page 42

1    remember a conversation where she

2    thought it was race or gender related.

3        Q.   Have you ever -- Or put a

4    better way, have you ever become aware

5    of any complaints pertaining to

6    Ms. Medley with respect to discipline?

7        A.   Discipline?

8        Q.   Yes.

9        A.   You mean did I ever have to

10   discipline her?  Is that your question?

11   I don't know what you mean by

12   "complaints."

13       Q.   Well, okay.  Did you ever

14   see a document that may have ended up

15   in a file in Baton Rouge concerning a

16   disciplinary action as it pertained to

17   Ms. Medley?

18       A.   I'm trying to remember.  I

19   don't remember Jennifer ever being

20   reprimanded or anything of that nature.

21       Q.   How about verbally?  If we

22   just go outside the paperwork area,

23   verbal reprimands, anything come to

24   mind?

25       A.   There was one occasion when

STEPHEN F. BABBIN
9/23/2010

Page 43

1  she didn't want to do a worker's comp

2  case and I insisted that she do it.  So

3  if you consider that a reprimand, that

4  was a reprimand, but, you know, I don't

5  know what you mean by "reprimand."  I

6  mean, there was the occasion where we

7  took the civil rights cases away, if

8  that's a reprimand, but there was no --

9  I don't remember any kind of written

10  reprimand.

11      Q.   How about the same question

12  with regard to evaluations, performance

13  evaluations?  Ever see a written

14  performance evaluation on Ms. Medley?

15      A.   You know, when Charlie Foti

16  came in, they stopped doing performance

17  evaluations.  I believe -- and this is

18  awhile back -- I believe when Iyoub was

19  in, they did performance evaluations.

20  So she would have been -- She might

21  have had one right in the very

22  beginning and that would have been done

23  by the office chief.

24      Q.   Are you aware of anyone

25  receiving performance evaluations since

STEPHEN F. BABBIN
9/23/2010

Page 44

1    that time?

2           A.    Since Charlie Foti was --

3           Q.    Yes.

4           A.    No.

5           Q.    As an office chief, is it a

6    good idea or a bad idea or if you have

7    an opinion about giving attorneys

8    regular performance evaluations?

9           A.    I guess from a recordkeeping

10   viewpoint it might be a good idea, but

11   I'm constantly and the different

12   supervisors in the office are

13   constantly evaluating the attorneys,

14   you know, almost on a daily basis.  So

15   it's not written anywhere, but we're

16   trying to teach.  We're always trying

17   to say, "You have to do it this way.

18   You have to do it that way."  So that

19   goes on on a daily basis.  Evaluations,

20   I don't know.  I find a lot of times

21   evaluations are -- To me, it's better

22   to teach and mentor somebody than once

23   a year to have a performance

24   evaluation.  Put it that way.

25          Q.    Are you aware of any

STEPHEN F. BABBIN
9/23/2010

Page 45

1    instruction that attorneys receive in

2    terms of civil rights or workplace law

3    that pertains to their performance in

4    the New Orleans office?

5        A.   You mean the attorneys in

6    the civil rights section?

7        Q.   Yeah.

8        A.   As pertains to what?  Say

9    that again.

10       Q.   Well, I think you've

11   indicated you're not a civil rights --

12       A.   Right.

13       Q.   -- litigator yourself.

14       A.   Right.

15       Q.   Have you ever been given any

16   kind of instructional material, asked

17   to attend a class, or, in fact, were

18   you ever given a class in, "This is the

19   Equal Pay Act.  This is the Civil

20   Rights Act as it pertains to women and

21   minorities," anything like that since

22   you've been employed by the attorney

23   general's office?

24       A.   Besides the policy and

25   procedure manual?

STEPHEN F. BABBIN
9/23/2010

Page 46

1       Q.   Yes.

2       A.   No.

3    MR. WILLIAMS:

4            Let me have a word with my

5    client.

6    THE WITNESS:

7            Sure.

8            (Whereupon a recess was

9    taken.)

10   EXAMINATION BY MR. WILLIAMS:

11       Q.   Just a couple more

12   questions, Mr. Babbin.

13       A.   That's what they all say.

14       Q.   I mean it.

15            Now, did any other female

16   attorney in the New Orleans office ever

17   come to you with complaints about the

18   way women were treated in the office,

19   that is, other than my client, other

20   than Carmella?

21       A.   The way women were treated?

22       Q.   Yeah.

23       A.   You mean pay?

24       Q.   Pay wise, any other way.

25       A.   Not that I remember

STEPHEN F. BABBIN
9/23/2010

Page 47

1    specifically, no.  I'm not saying it

2    didn't happen, but I just can't

3    remember a specific complaint from

4    anybody that women were being treated

5    unfairly, no.

6         Q.   All right.  Do you remember

7    Mr. John -- Mr. John Sudderth worked

8    for you?

9         A.   Yes.

10        Q.   And he's still there?

11        A.   Yes.

12        Q.   Has Mr. Sudderth ever

13   received a pay raise that was not an

14   across-the-board pay raise?

15        A.   I think he received one,

16   yes.

17        Q.   Do you remember Mr. Sudderth

18   ever being disciplined for his actions

19   in the Bernich case?

20        A.   Yes.

21        Q.   Where he filed a lien

22   presumably adverse to the state?

23        A.   Yes.  Yes.

24        Q.   What's your recollection

25   about the Bernich case?  Why was

STEPHEN F. BABBIN
9/23/2010

Page 48

1  Mr. Sudderth disciplined?

2      A.   There was some communication

3  he made -- Once again, I was not the

4  office chief then.  But there was some

5  communication that he made, and I can't

6  remember who it was with, about the

7  Bernich case.  It might have been his

8  sister maybe.  And it was something

9  that he shouldn't have done and that's

10  where the discipline came in.

11      Q.   Was this discipline

12  undertaken prior to his getting the

13  raise?

14      A.   I'm not sure.  I'm not sure.

15  I don't know.

16      Q.   Do you remember

17  approximately how much of a raise --

18  how much the raise was?

19      A.   I remember he got -- I hate

20  to speculate.  It seems to me it was a

21  $5,000 raise, but it might have been a

22  $3,000 bump.  I'm not sure.

23      Q.   Mr. Sudderth is a white

24  male; is that correct?

25      A.   Yes.

STEPHEN F. BABBIN
9/23/2010

Page 49

1      Q.   This issue was not ever

2   reported to the disciplinary board?

3      A.   No.

4      MR. WILLIAMS:

5          That's all the questions I

6      have for you, Mr. Babbin.  I

7      appreciate you being here.

8      THE WITNESS:

9          Okay.

10     MS. McINNIS:

11         We have none.

12         (Whereupon the deposition

13     was concluded at 12:18 p.m.)

14     *     *     *     *     *

15

16

17

18

19

20

21

22

23

24

25

STEPHEN F. BABBIN
9/23/2010

Page 50

1            REPORTER'S CERTIFICATE

2            I, Kathy Shaw-Gallagher CCR,

3    RPR, Certified Court Reporter, in and

4    for the State of Louisiana, as the

5    officer before whom this testimony was

6    taken, do hereby certify that STEPHEN

7    F. BABBIN, after having been duly sworn

8    by me upon authority of R.S. 37:2554,

9    did testify as hereinabove set forth in

10   the foregoing 49 pages; that this

11   testimony was reported by me in

12   stenotype reporting method, was

13   prepared and transcribed by me or under

14   my personal direction and supervision,

15   and is a true and correct transcript to

16   the best of my ability and

17   understanding; that I am not related to

18   counsel or to the parties herein, nor

19   am I otherwise interested in the

20   outcome of this matter.

21

        _____
22      KATHY SHAW-GALLAGHER, CCR, RPR
        Certified Court Reporter
23      Curren-Landrieu, L.L.C.
        749 Aurora Avenue
24      Suite 4
        Metairie, Louisiana  70005
25