1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4   JENNIFER M. MEDLEY           CIVIL ACTION

                                 NO. 09-4570

5       VERSUS                    SECTION J

                                 JUDGE BARBIER

6   STATE OF LOUISIANA,         DIVISION 3

    DEPARTMENT OF JUSTICE       MAGISTRATE KNOWLES

7

8

9

10

11                       ORIGINAL

12

13

14

15        The deposition of SHA CARTER, taken in the

16   above-entitled cause, before Jan DiCicco, a

17   Certified Court Reporter, given at the Law Offices

18   of Shows, Cali, Berthelot & Walsh, LLP, 628

19   St. Louis Street, Baton Rouge, Louisiana, 70802, on

20   the 16th day of April, 2010.

21

22

23

24

25

```
 1   APPEARANCES:

 2   REPRESENTING JENNIFER M. MEDLEY:

 3           LAW OFFICES OF DALE EDWARD WILLIAMS
             BY:  DALE E. WILLIAMS, ESQ.
 4           212 Park Place
             Covington, Louisiana  70433
 5
     REPRESENTING STATE OF LOUISIANA, DEPARTMENT OF
 6   JUSTICE:

 7           SHOWS, CALI, BERTHELOT & WALSH, LLP
             BY:  E. WADE SHOWS, ESQ.
 8           628 St. Louis Street
             Baton Rouge, Louisiana  70802
 9
     ALSO PRESENT:
10
             ROBERT E. HARROUN, III
11           JENNIFER M. MEDLEY

12   REPORTED BY:

13           JAN DICICCO
             CERTIFIED COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

APPEARANCES.................................. 2

INDEX....................................... 3

STIPULATION................................. 4

REPORTER'S CERTIFICATE..................... 35

WITNESS'S CERTIFICATE...................... 36


EXAMINATION

BY MR. WILLIAMS............................ 5


EXHIBITS

SC-1...................................... 30

STIPULATION

1

2          It is stipulated and agreed by and between

3     counsel for the parties hereto that this deposition

4     is hereby being taken pursuant to the Federal Rules

5     of Civil Procedure, for all purposes, in accordance

6     with law;

7          That the formalities, including those of

8     sealing, certification and filing, are specifically

9     waived;

10         That the formality of signing is

11    specifically not waived;

12         That all objections, save those as to the

13    form of the question and the responsiveness of the

14    answer, are hereby reserved until such time as this

15    deposition or any part thereof, may be used or

16    sought to be used in evidence.

17

18         JAN DICICCO, Certified Court Reporter,

19    officiated in administering the oath to the witness.

20

21                    SHA CARTER

22    State of Louisiana, Department of Justice, P. O. Box

23    94005, Baton Rouge, Louisiana, 70804-9005, after

24    having been first duly sworn by the court reporter,

25    did testify as follows:

1    BY MR. WILLIAMS:

2        Q.    Good afternoon, Miss Free.  I'm Dale

3    Williams.

4        A.    Miss Carter.

5        Q.    I'm sorry.  Sha Carter.

6        A.    That's okay.

7        Q.    Miss Carter, have you ever gone by any

8    other name than Sha Carter?

9        A.    Lisa, or Lisa deSha Carter is my name.

10       Q.    Do you happen to have a copy of your

11   driver's license with you?

12       A.    Huh-uh.  It would be in the car.

13       Q.    What name appears on your driver's license?

14       A.    It's either Sha Carter or Lisa Carter.

15       Q.    What is your personal address?

16       A.    511 Lasalle Street in Tallulah.

17       Q.    For the record, how far away is Tallulah

18   from Baton Rouge?

19       A.    Probably about a hundred seventy miles.

20       Q.    Do you still reside at 511 Lasalle Street

21   in Tallulah?

22       A.    Uh-huh.

23       Q.    Where do you work, ma'am?

24       A.    Work here at the Department of Justice in

25   Baton Rouge.

1      Q.   Do you have an office here at the
2   Department?
3      A.   Yes, sir.
4      Q.   When did you begin working for the
5   Department of Justice?
6      A.   January 14th, 2008.
7      Q.   Do you attend to your duties at your office
8   every day at the Department of Justice?
9      A.   Pretty much.  Pretty much go throughout the
10   state if we have to.
11      Q.   Do you commute a hundred seventy miles back
12   and forth from work?
13      A.   A day?  No, sir.
14      Q.   How is that possible?
15      A.   I have an apartment here.
16      Q.   What is the address of the apartment?
17      A.   I'm not sure what the address is.  It's,
18   what is that, North Third Street, I think.
19   Chippewa.  I'm not sure what it's called.
20      Q.   I'm sorry.  You don't know where you live?
21      A.   Yeah, I know where I live.
22      Q.   Could you tell me where you live.
23      A.   Yeah.  It's right off of Chippewa I believe
24   is the highway right there.  River Road, is that
25   River Road, Chippewa Street.

1      Q.   Is it at the intersection?

2      A.   No.  If you get off the interstate on 110

3  on Chippewa, you go right to the apartment.

4      Q.   Okay.

5      A.   The name of the apartment is River Palms

6  condominiums.  I'm just not sure of the address,

7  street address.

8      Q.   Okay.  You were hired by Attorney General

9  Buddy Caldwell?

10     A.   Yes, sir.

11     Q.   When is the first time you met

12  Mr. Caldwell?

13     A.   Probably in 1997.

14     Q.   What were the circumstances?

15     MR. SHOWS:

16          I'm going to object to any line of

17  questioning that deals with any personal issues,

18  unless it's somehow relevant to this particular

19  case.  I don't know how she met Buddy Caldwell

20  several years ago and under what circumstances has

21  anything to do with this particular case.  And so

22  it's not going to lead to any discoverable

23  information he, so I'm going to object it to.

24     MR. WILLIAMS:

25          Let me explain.  This has to do with

1   bias and it has to do with credibility, which are

2   always issues for the Court.  I intend to explore

3   that.

4           MR. SHOWS:

5               Uh-huh.  I'm going to instruct her not

6   to answer.

7           MR. WILLIAMS:

8               We are going to stop this deposition

9   and seek guidance from the Court.

10          MR. SHOWS:

11              Okay.  Is there anything else besides

12  how she first met Buddy Caldwell and under what

13  circumstances?  If you want to take the deposition,

14  ask her any questions about what she's done

15  concerning this particular issue with Jennifer

16  Medley, we're certainly open to that suggestion.

17          MR. WILLIAMS:

18              I want to ask this witness how much

19  Buddy Caldwell is paying her.

20          MR. SHOWS:

21              That's fine.  You can ask that.

22  BY MR. WILLIAMS:

23      Q.   Okay.  Let me just see how much we can ask

24  you, ma'am.  How much is Mr. Caldwell paying you to

25  work with the Attorney General's office?

1      A.    A hundred two thousand a year.

2      Q.    One hundred two?

3      A.    Uh-huh.

4      Q.    Are there any benefits associated with

5   that?

6      A.    I pay my own health insurance.  So no.

7      Q.    How about retirement?  Is that, are you on

8   the State retirement system?

9      A.    Yes.

10      Q.    Okay.  Before you came to work with

11   Mr. Caldwell, where were you working?

12      A.    Before I came to work for him?  I came to

13   work for Mr. Caldwell in 1997 at the District

14   Attorney's office in the Sixth Judicial District,

15   where he was DA for twenty-nine, thirty years.

16      Q.    Okay.  Which parish is that?

17      A.    It's Madison, Madison, East Carroll and

18   Tensas Parishes.

19      Q.    Did you ever work for any other parish

20   government before working for Mr. Caldwell?

21      A.    Parish, no.

22      Q.    Or any government unit at all.

23      A.    I'm thinking that probably in the 1970's

24   while I was going to college, I think I worked for

25   the Public Service Commission, maybe for a couple

1    months during the summer.

2        Q.   What are you paid to do for the Attorney

3    General?

4        A.   I am the special assistant, special

5    investigator to the Attorney General.

6        Q.   Okay.  And who do you report to?

7        A.   To the Attorney General.

8        Q.   You report directly to the Attorney

9    General?

10       A.   Yes, sir.

11       Q.   When is the first time you heard the name

12   Jennifer Medley mentioned?

13       A.   I'm not sure, but it was sometime in early

14   '09.

15       Q.   Okay.  And who mentioned her name to you?

16       A.   Attorney General Caldwell.

17       Q.   What did he say to you about --

18       A.   He asked me to get a copy, to look through

19   her emails to see if she had been meeting with Karen

20   Carter Peterson and discussing Attorney General

21   business.

22       Q.   Okay.  And why would that have been of

23   interest to the Attorney General?

24       A.   I don't know.

25       Q.   Did he express any problem with a member of

1    his staff talking to --

2        A.    I don't remember --

3        Q.    Excuse me.  Let me finish the question.

4    Did he express any sort of reservation or difficulty

5    with a member of his staff complaining to a member

6    of the Louisiana legislature?

7        A.    Not to me.  I didn't know anything about

8    it.

9        Q.    What was your understanding why he was

10   making this request?

11       A.    I don't know.  I mean, that's all I know.

12       Q.    What did he ask you to do?

13       A.    He asked me to look through her emails to

14   see if I could determine if she had been meeting

15   with Karen Carter Peterson on AG business or AG

16   time.

17       Q.    What is your background as an investigator?

18       A.    Criminal investigator for Mr. Caldwell from

19   1997 to 2008, handled all the murder cases, rape

20   cases, armed robbery cases.  I was a victim

21   assistance coordinator for him for those years.  Did

22   investigative duties probably throughout my whole

23   adult life in the work force, here and there, with

24   the law firms I've worked for, things like that.

25   But I put all the murder cases together and worked

1  them all up for trial.

2      Q.   Okay.  I want to know how many other

3  individuals you have looked through the emails for

4  the Attorney General.  Who are the others -- what

5  other employees has the Attorney General asked you

6  to review emails?

7      A.   I don't know if I can answer that question.

8      Q.   And why not, ma'am?

9      A.   Well, some of it is pending some criminal

10  prosecution, criminal investigation, so I don't know

11  if I can relay that to you.

12          MR. SHOWS:

13             Let me say, to the extent that there

14  is ongoing criminal investigation of any particular

15  individual, then I will assert the fact that that

16  criminal investigation is not subject to the

17  discovery request.  If there is not the subject of a

18  criminal investigation, then I'll tell the witness

19  to answer the question.

20  BY MR. WILLIAMS:

21      Q.   Let me make sure I made the question clear

22  to you, ma'am.  What I'm seeking is not necessarily

23  about criminal investigations.  What I'm seeking is

24  Attorney General Caldwell asking you to review

25  emails of attorneys employed by the Attorney

1   General's office.  And if that involves criminal,

2   active criminal investigation, then I would --

3          MR. SHOWS:

4              Let me -- I'm going to object to the

5   form of that question because it's a misleading

6   question in that her answer was not that she was

7   instructed to investigate emails.  Her instructions

8   were to investigate emails involving a particular

9   subject.  Is that what I understood her to say?

10  BY MR. WILLIAMS:

11     Q.  Well, my question, though, is I want to

12  know how many other people, other than this

13  individual seated to my left, who complained about

14  employment practices.  Now I want to know how many

15  other people, aside from this person that's been

16  complaining of employment practice, I want to know

17  about other people who's mail you went through.

18          MR. SHOWS:

19              What's the question?  I'm sorry.

20  BY MR. WILLIAMS:

21     Q.  The question is, I'd like the names of

22  other employees, other Attorney General employees

23  that you have reviewed emails for, at the direction

24  of the Attorney General.

25          MR. SHOWS:

1           Other than of a criminal nature.  If

2    there's a criminal investigation.

3    BY MR. WILLIAMS:

4        Q.   Well, if there's an active -- and even so,

5    if that information is being withheld, we would ask

6    that you provide that to your attorney and that he

7    would make a privilege log so that we can dispose of

8    this question in a proper way.

9        A.   And you're asking me about people that have

10   complained about employment issues.

11       Q.   Let me just back up.  Did you regard the

12   Attorney General's request with Miss Medley as a

13   criminal investigation?

14       A.   No.

15       Q.   Okay.  Well, in that sense --

16       A.   At the time of his request?

17       Q.   Yes.

18       A.   No.

19       Q.   Do you regard it as a criminal

20   investigation now?

21       A.   I can't make those determinations of law.

22   I would say there's some concerning issues.

23       Q.   Okay.  What are your concerns that Miss

24   Medley violated the law?

25       A.   She, from my memory of some of the emails

1    that I saw, and this is just from my memory of them,

2    she was meeting with another assistant AG, assistant

3    AG about a personal case that he had, and she was

4    going to speak to a judge to try to help him.

5        Q.   Okay.  And your source of information of

6    that is what?  Is who, rather.

7        A.   Her emails.  The emails back and forth

8    between those two.

9        Q.   Okay.  And has this resulted in any

10   criminal prosecution?

11       A.   Not yet that I know of.

12       Q.   Okay.  This is being planned as far as you

13   know?

14       A.   I don't know if it's being planned.  It's a

15   concern.  I don't know -- I mean, I don't make those

16   determinations.  I'm just a fact finder.  I find

17   things.

18       Q.   When did you report this to the Attorney

19   General?

20       A.   It was sometime in, probably the -- I'm not

21   sure.  It was in the summer of '09.  Late summer of

22   '09 when I found them.

23       Q.   All right.  Back to my question about other

24   attorneys.  Give me the names of other attorneys

25   you've reviewed the emails of.

1          MR. SHOWS:

2               With the same limitation, objection --

3    BY MR. WILLIAMS:

4      Q.   For any reason whatsoever.

5          MR. SHOWS:

6               We will do a privilege log if

7    necessary, but I instruct her not to tell you of any

8    emails that may be of a criminal investigatory

9    nature.

10   BY MR. WILLIAMS:

11     Q.   Okay.  With that understanding and the

12   understanding that Miss Medley's was not a criminal

13   investigation, I'd ask you the same question.  What

14   other attorneys have you reviewed emails of?

15          MR. SHOWS:

16               Other than of a criminal nature, if

17   any, answer the question if you would.

18          THE WITNESS:

19               None.

20   BY MR. WILLIAMS:

21     Q.   Okay.  And you have worked with Attorney

22   General Caldwell, I guess from the day he was sworn

23   in as Attorney General, is that right?

24     A.   Here, I worked for him from 1997 till 2008

25   at the DA's level.

1      Q.   To your knowledge, has Mr. Caldwell ever

2  confronted the complaints of employees with respect

3  to discrimination on the basis of gender or race?

4      A.   I have no idea about employment issues.

5      Q.   Were you ever asked to investigate anyone

6  that had brought a complaint?

7      A.   Huh-uh.

8      Q.   No?

9      A.   No.

10     Q.   Okay.  Have you ever met with Miss Medley

11  prior to today?

12     A.   Never.

13     Q.   Okay.  Is there a job description for what

14  you do?  Have you ever seen a job description for

15  your duties?

16     A.   No, sir.

17     Q.   And you are not in the civil service, is

18  that correct?

19     A.   No.  I don't think there are any employees

20  at the Attorney General's office that are.

21     Q.   And you work at the pleasure, then, of the

22  Attorney General?

23     A.   Yes, sir.

24     Q.   He can fire you at any time?

25     A.   Yes, sir.  That's how it was at the DA's

1    level, too.

2         Q.    Prior to your being paid a hundred two

3    thousand dollars by Attorney General Caldwell in

4    January of 2008, what was your salary immediately

5    preceding January 14th, 2008?

6              MR. SHOWS:

7                   If it's at the District Attorney's

8    office, I'm not going to object because that would

9    be a public record -- are you asking her at the DA's

10   office?

11             MR. WILLIAMS:

12                  Well, I'm asking -- I don't care where

13   it is.

14             MR. SHOWS:

15                  If she's employed at some entity

16   that's not a public entity, then I don't see the

17   relevancy of it in terms of what she was making, and

18   I'm going to instruct her not to answer.  If she was

19   employed at the District Attorney's office up until

20   the time she went to the Attorney General's office,

21   then it is a public record and she can answer.

22             MR. WILLIAMS:

23                  Well, it's still evidence of bias, no

24   matter where she worked.  I assure you, I do these

25   cases all the time and I always get information

1    without exception.

2            MR. SHOWS:

3                    I understand your expertise.  If the

4    judge requires that she tell what she is making at a

5    private operation, then she will have to answer the

6    question.  But I just don't think it's relevant, nor

7    do I think it leads to any discoverable

8    information.  But it may be all academic.  If she

9    had only the job at the DA's office, then you can

10   answer the question.

11           MR. WILLIAMS:

12                   Well, I would respond by saying if her

13   previous private job is forty-five thousand dollars,

14   and she was certainly making a hundred two thousand,

15   I think it would go to bias.

16   BY MR. WILLIAMS:

17       Q.   Where did you work just prior to January

18   14th, 2008?

19       A.   For the District Attorney's office in the

20   6th Judicial District.

21       Q.   Okay.  What were you making at that job?

22       A.   I was making fifty thousand plus insurance

23   benefits, which I did not, was paid, which was about

24   four hundred dollars a month.

25       Q.   And you made, when you first started that

1   job for the District Attorney's office, what were

2   you making and when was that?

3        A.   I was working before that at Chemical

4   Leeman Tank Lines, and I'm not sure what I was

5   making.

6        Q.   Well, when you first started working for

7   the DA's office, were you making fifty thousand?

8        A.   No.

9        Q.   What did you begin at?

10       A.   Where?

11       Q.   DA's office.

12       A.   I began at, I think about, I think about

13  forty-two maybe, something like that.  I got one

14  raise the whole time I was there.

15       Q.   And what year did you begin?

16       A.   '97, 1997.

17       Q.   '97.  When were you making fifty?

18       A.   I think in about a year or two, I got one

19  raise because I did such a really good job on my

20  first murder case.  I got bumped up by the police

21  juries, because we work with police juries.

22       Q.   Mr. Caldwell indicated that Miss Medley had

23  filed an EEOC complaint, is that correct?

24       A.   I don't know about that.  I mean, the only,

25  the first knowledge I knew about an EEOC claim was

1     maybe a month ago when I was noticed I was coming

2     here.

3          Q.   Okay.  Did Mr. Caldwell mention anything

4     about that when he talked to you?

5          A.   No.

6          Q.   How long did you speak to Mr. Caldwell

7     concerning Jennifer Medley before you started going

8     through her emails?

9          A.   Oh, it was just a brief, this is what I

10    want you to do.  I mean, there was no this is what's

11    going on or --

12         Q.   Okay.

13         A.   His time is so limited, I mean.

14         Q.   Okay.  Well, what else, did you go through

15    her emails?

16         A.   Yes.

17         Q.   And what did you find?

18         A.   I found several things.  I mean, I read

19    emails.

20         Q.   Okay.  What were of interest to you?

21         A.   Interesting to me, you know, and

22    interesting to you probably aren't the same thing.

23    I found interesting that for a couple years she was,

24    on the AG time and computer, she was actively

25    pursuing other employment.  On AG time and AG

1   computer, she was forwarding emails of interoffice
2   work to outside people, friends, not associated with
3   cases.
4        Q.   Okay.  And what in particular?  Do you
5   remember?
6        A.   I don't remember the case, but it was an
7   email that she sent to a plaintiff attorney and she
8   forwarded it to a friend of hers and she noted
9   something about, this is how I make these lawyers
10  back the F blank blank up.  So I mean, what's
11  concerning to me about that is it's work that's done
12  in the law office, in the legal office and she's
13  pushing it out to her private individuals.
14       Q.   What work was being pushed out to private
15  individuals?
16       A.   If email is being pushed out.
17       Q.   What --
18       A.   It's an email of a conversation she's
19  having with an attorney on a case that she's working
20  for the office, and she pushes it out to somebody
21  else.  I mean, we are in a law office.  We don't do
22  that.
23       Q.   So you're saying that Miss Medley divulged
24  confidential information to an attorney outside the
25  law office?

1        A.    I would -- I think that all information --
2    I would say yes to that.  I mean, it's a
3    communication she has while working on a case, and
4    she's pushing it out to somebody else.
5        Q.    Well, what information?  The fact she's
6    working on a case?
7        A.    No, it's the comments.
8            MR. SHOWS:
9                Object to the form of the question.
10   It's argumentative.
11           MR. WILLIAMS:
12               I'm trying to find out exactly what it
13   is that's objectionable.  I want to find out
14   specific information.
15           MR. SHOWS:
16               I think she's answered it two times,
17   but if you need to answer it again --
18   BY MR. WILLIAMS:
19       Q.    Go ahead.
20       A.    Let me put it to you like this.  If I'm a
21   lawyer and you're a lawyer send me anything coming
22   out of your law office and I send it to somebody
23   else, it's a work product out of that office and
24   it's your client, it's information on a case that
25   you're working on and you push it out to somebody

```
 1   else, out to the public, a friend, I don't think
 2   that's proper.  But that's not for me to make a
 3   determination of.  I just found it interesting.
 4        Q.   Was this information found in a pleading?
 5        A.   No.
 6        Q.   Well, what information is it that you're
 7   referring to?
 8        A.   I don't remember.  I can't remember.  I've
 9   looked at a lot of emails.  I just remember it was
10   an email that she, a case she was working on and she
11   was having a communication with the other side in
12   her email chain to this attorney, she then pushed
13   that out to an outside person.
14        Q.   Did you give a copy of this email to
15   anyone?
16        A.   No.
17        Q.   Was the Attorney General interested in
18   getting a copy of it?
19        A.   He's aware of it.
20        Q.   Did you give a copy of it to him --
21        A.   No.
22        Q.   -- or anyone else?
23        A.   No.
24        Q.   If I wanted to find a copy of this email,
25   where would I go to find it?
```

         A.    You would have to probably ask Mr. Shows.
I mean, I can't give it to you.
         Q.    Well, I would ask you this.  Could you
identify the date or the --
         A.    Not right now, no.
         Q.    Could you put your hands on the email?
         A.    Right now?
         Q.    No.  Ever.
         A.    Sure.
         Q.    Okay.  Could you provide it to the Attorney
General's lawyer?
         A.    Sure.
         Q.    Okay.  In fact, could you put your hands on
all of the emails that you found interesting?
         A.    Yes.
         Q.    And could you provide it to the Attorney
General's lawyer?
         A.    Yes.
         Q.    Were you ever asked to review Miss Medley's
emails prior to this instance that you're talking
about?
         A.    No, sir.
         Q.    And when Mr. Caldwell talked to you about
Miss Medley, he did that in response to the
questions that he had been asked by Senator Carter

1    Peterson?

2        A.    I don't know.

3        Q.    But he referred to that?

4        A.    Yeah.  He mentioned the name.

5        Q.    Did you ever talk to any third party, that

6    is an individual not employed by the Department of

7    Justice, about Miss Jennifer Sha?

8        A.    Jennifer Sha?

9        Q.    I mean Miss Medley.  I'm sorry.

10       A.    Not associated with the office?

11       Q.    Not employed by the office.

12       A.    I don't believe so.  Not to my memory that

13   I have.

14       Q.    Did you ever make a phone call to anyone

15   where you asked questions about attending a rodeo?

16       A.    Oh, Todd Labatut.

17       Q.    Who is Mr. Labatut?

18       A.    He, from what I remember Labatut, was maybe

19   director of prison enterprises with the State of, I

20   guess, Louisiana State penitentiary, or is that just

21   State of Louisiana?  Somehow affiliated.

22       Q.    Had you ever spoken to Mr. Labatut before?

23       A.    Not before that, no, sir.

24       Q.    How did you find out about Mr. Labatut?

25       A.    From one of her emails.

1      Q.    How did you -- did you go to visit
2  Mr. Labatut?
3      A.    No, sir.  I called him on the phone.
4      Q.    Did you use your cell phone or an office
5  phone to do that?
6      A.    Don't remember.  Really don't.  I was at my
7  desk, so I would assume it was my desk phone.
8      Q.    What did you say to Mr. Labatut when you
9  called him on the phone?
10     A.    I don't remember exactly, but it was, I
11 identified myself, of course, asked him, I think I
12 told him I had gotten some information that Miss
13 Medley had requested to come up and play golf and
14 maybe some rodeo tickets, and he confirmed that.
15 And I asked him if she had been up there, because I
16 think these emails were June or July of '09.  I
17 asked him, I said, had she been there, and he told
18 me no.
19          And I said, well, I said, just want you to
20 know that the Attorney General's policy with us, I
21 mean, he doesn't like us going to places and getting
22 comps or people doing things for free for us, that
23 be sure if she does come up there, that she pays and
24 not comp anything for any employees, not just her,
25 but for any employees.  Buddy is really kind of

1    funny about that.

2           And I said, if you have a, you know, if

3    she has any questions, just tell her to call us or

4    anybody.  I mean, if anybody comes up there, we want

5    them to be treated like that.  We don't want free

6    business being handed out to our employees.  He said

7    he understood, and that was it.  I haven't spoken to

8    him since.  I had a hard time remembering what his

9    name was, but it's lab a you the, I believe.

10        Q.   Did you tell Mr. Labatut that Buddy would

11   not be happy if Miss Medley got any work from him?

12        A.   Work?  What do you mean, work?

13        Q.   Legal work.

14        A.   No.  Didn't even come to mind.  It was

15   about golf, rounds of golf and rodeo tickets.

16        Q.   Okay.  If Mr. Labatut were to say the

17   opposite, would Mr. Labatut be lying?

18        A.   Absolutely.

19        Q.   And you're giving this -- I want to make

20   sure I understand this.  Are you saying that you

21   don't remember saying that, or are you saying that

22   you didn't say that?

23        A.   Oh, I did not say that.  That wouldn't even

24   have entered my mind.  How would I know he could

25   give her work to begin with?

1    Q.   I'm not answering questions.

2    A.   She was our employee.  How would he be

3  giving her work?

4    Q.   Isn't it a fact when you called

5  Mr. Labatut, Miss Medley was not an employee of the

6  State of Louisiana?

7    A.   I wouldn't know.  I don't know when her

8  last day was.  I don't know what day I called him.

9  The emails were dated in June of '09.  I don't know

10  when I called him.

11    Q.   You're not an attorney, are you?

12    A.   No, sir.

13    Q.   How far did you get in school?

14    A.   High school, two years college.

15    Q.   Where did you go to college?

16    A.   LSU.

17    Q.   What did you study there?

18    A.   On a softball scholarship.  I was in, I

19  think my minor was English and I think my major was

20  criminal justice.  And then it changed.  I think at

21  some point I changed to general studies.

22    Q.   Have you had any training about legal

23  ethics, what the standards are for the conduct of

24  attorneys?

25    A.   I haven't had specific training, but I have

1    from time to time sat in some of the conferences,

2    some of those classes.  Not the entire classes, but

3    some of them.

4         Q.   To your understanding, are standards of

5    conduct supposed to apply equally to all attorneys

6    employed by the State of Louisiana?

7              MR. SHOWS:

8                   If you know the answer, answer.

9              THE WITNESS:

10                  I wouldn't -- I wouldn't know.  I

11   mean, I can make a guess, but I wouldn't know.

12   BY MR. WILLIAMS:

13        Q.   Are some standards applied to white male

14   attorneys that do not apply to white females?

15        A.   I would not know that.  That's, sounds

16   ridiculous to me, but.

17        Q.   Okay.  Have you ever been asked to

18   investigate -- let me show you a document.  I'm

19   going to identify this as SC-1.  I ask you to take a

20   look at this, ma'am.  And I don't think you've seen

21   it before.

22        A.   No, sir.

23        Q.   Maybe you have.  If you would look through

24   it.

25        A.   You want me to read it?

1 Q. Just glance through it.  I am going to ask

2 you to check page 1 and page 5 of the petition.

3 A. And 5?

4 Q. Page 5, yes, ma'am.

5 A. Okay.

6 Q. Is there anything improper to your

7 knowledge about -- do you know Mr. Paul Deal?

8 A. No, sir.

9 Q. I'll ask you to assume that he is the

10 office chief in New Orleans office of Attorney

11 General's office.  He's office chief, assistant

12 Attorney General.  To your way of thinking, is there

13 anything improper about Mr. Paul Deal filing a

14 personal lawsuit as assistant Attorney General and

15 office chief?

16  MR. SHOWS:

17   She's not a lawyer.  She can't opine

18 on that, but subject to the objection.

19  THE WITNESS:

20   I wouldn't know.

21 BY MR. WILLIAMS:

22 Q. Wouldn't know?

23 A. Wouldn't know.

24 Q. Have you ever been asked to investigate

25 this?

1      A.   No, I've never seen anything like that.

2      Q.   Do you have a record of the calls that you

3  make from your desk, ma'am?

4      A.   I don't.

5      Q.   Do you know if such a record exists?

6      A.   I don't know if one exists.  I mean, I've

7  never seen one.

8      Q.   Do you ever have to, in the course of your

9  investigations, document phone calls?

10     A.   Huh-uh.

11     Q.   When you called Mr. Labatut, did you record

12 the call?

13     A.   No.

14     Q.   Were you aware that Mr. Labatut was

15 recording the call?

16     A.   Huh-uh.

17     Q.   I think that's about it.  Let me talk to my

18 client.

19     A.   Sure.

20          (SHORT BREAK TAKEN.)

21 BY MR. WILLIAMS:

22     Q.   A question I meant to ask you, have you

23 been licensed as an investigator by any authority?

24     A.   No, sir.

25     Q.   And what training do you have as an

1    investigator?

2        A.    Went to Vernon Gebre's (phonetic) homicide

3    school.

4        Q.    Where is that?

5        A.    It's not where.  Vernon would come around

6    with Dr. Henry Lee and they would come around and do

7    some schools.  We attended one in New Orleans, it

8    was probably in '98 or so.  But I mean, most of it

9    is just on the job working for thirty something

10   years.

11       Q.    Is your cell phone number, or do you have a

12   cell phone number, which is 318 341-7642?

13       A.    Yes.

14       Q.    Okay.  If Mr. Labatut returned your phone

15   call, I mean, he did return your phone call?

16       A.    I don't remember if I got him or he had to

17   call me back.  I'm not sure.

18       Q.    Are you sure that you called him on your

19   office phone?

20       A.    No.

21       Q.    Or could you have called on your cell

22   phone?

23       A.    No.  I said I didn't know.  I could have

24   called on the office phone and left cell phone on

25   return.

1      Q.    Is that an AT&T cell phone?

2      A.    Uh-huh.

3      Q.    Is that AT&T cell phone provided to you by

4    the State of Louisiana?

5      A.    No.

6      Q.    It's your personal cell phone?

7      A.    Uh-huh.

8      Q.    All right.  That's all the questions I have

9    for you.  Thank you very much.

10     A.    Thank you.

11          (DEPOSITION CONCLUDED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

    I, JAN DICICCO, Certified Court Reporter, do hereby certify that the above-named witness, after having been first duly sworn by me to testify to the truth, did testify as herein above set forth;

    That the testimony was reported by me in shorthand and transcribed under my personal direction and supervision, and is a true and correct transcript, to the best of my ability and understanding;

    That I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.


_____

JAN DICICCO

CERTIFIED COURT REPORTER

OFFICIAL SEAL
JAN DICICCO
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 81507
Certificate expires 12-31-10

```
1                    WITNESS'S CERTIFICATE
2

3          I have read or have had the foregoing
4    testimony read to me and hereby certify that it is a
5    true and correct transcription of my testimony, with
6    the exception of any attached corrections or
7    changes.
8
9
10
11            (       ) No Corrections
12
13            (       ) Corrections Attached
14
15
16
17
18
19            _____
20                 SHA CARTER
21
22
23
24
25
```