1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   JENNIFER M. MEDLEY              CIVIL ACTION
                                    NO. 09-4570
5       VERSUS                      SECTION J
                                    JUDGE BARBIER
6   STATE OF LOUISIANA,             DIVISION 3
    DEPARTMENT OF JUSTICE           MAGISTRATE KNOWLES
7

8

9

10

11

12                    ORIGINAL

13

14

15          The deposition of RENEE FONTENOT FREE, taken

16   in the above-entitled cause, before Jan DiCicco, a

17   Certified Court Reporter, given at the Law Offices

18   of Shows, Cali, Berthelot & Walsh, LLP, 628

19   St. Louis Street, Baton Rouge, Louisiana, 70802, on

20   the 16th day of April, 2010.

21

22

23

24

25

1   APPEARANCES:

2   REPRESENTING JENNIFER M. MEDLEY:

3           LAW OFFICES OF DALE EDWARD WILLIAMS
            BY:  DALE E. WILLIAMS, ESQ.
4           212 Park Place
            Covington, Louisiana  70433
5
    REPRESENTING STATE OF LOUISIANA, DEPARTMENT OF
6   JUSTICE:

7           SHOWS, CALI, BERTHELOT & WALSH, LLP
            BY:  E. DALE SHOWS, ESQ.
8           628 St. Louis Street
            Baton Rouge, Louisiana  70802
9
    ALSO PRESENT:
10
            ROBERT E. HARROUN, III
11          JENNIFER M. MEDLEY

12  REPORTED BY:

13          JAN DICICCO
            CERTIFIED COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3   APPEARANCES................................. 2

 4   INDEX....................................... 3

 5   STIPULATION................................. 4

 6   REPORTER'S CERTIFICATE..................... 26

 7   WITNESS'S CERTIFICATE..................... 27

 8

 9   EXAMINATION

10   BY MR. WILLIAMS............................. 5

11

12   EXHIBITS

13   Disk....................................... 18

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              STIPULATION
2         It is stipulated and agreed by and between
3    counsel for the parties hereto that this deposition
4    is hereby being taken pursuant to the Federal Rules
5    of Civil Procedure, for all purposes, in accordance
6    with law;
7         That the formalities, including those of
8    sealing, certification and filing, are specifically
9    waived;
10        That the formality of signing is
11   specifically not waived;
12        That all objections, save those as to the
13   form of the question and the responsiveness of the
14   answer, are hereby reserved until such time as this
15   deposition or any part thereof, may be used or
16   sought to be used in evidence.
17
18        JAN DICICCO, Certified Court Reporter,
19   officiated in administering the oath to the witness.
20
21              RENEE FONTENOT FREE
22   State of Louisiana, Department of Justice, P. O. Box
23   94005, Baton Rouge, Louisiana, 70804-9005, after
24   having been first duly sworn by the court reporter,
25   did testify as follows:
```

1    BY MR. WILLIAMS:

2        Q.    Good morning, Miss Free.   I'm Dale

3    Williams.   I'm representing Miss Jennifer Medley in

4    a lawsuit she's brought against Louisiana Department

5    of Justice.   Are you employed by the Louisiana

6    Department of Justice?

7        A.    Yes, sir.

8        Q.    What is your job description there?

9        A.    I'm the director of administrative

10   services, so I'm responsible for payroll, MIS, the

11   budget, purchasing, accounting, all those types of

12   things.

13       Q.    How long have you been employed?

14       A.    Since January 15th of '08.

15       Q.    Did you come in with the administration of

16   the present Attorney General?

17       A.    Yes, sir.

18       Q.    Up to that point, what had been your work

19   background?

20       A.    August of 1990, I was hired by Billy Guste

21   to work in the collections section for the Attorney

22   General's office, and I worked in that capacity

23   until January of '04.   And at that point, I left and

24   I went to the Secretary of State's office, and I was

25   with the Secretary of State from '04 until I came

1    back in in '08.

2       Q.    And you came back to the Department of

3    Justice?

4       A.    Correct.

5       Q.    What was your job responsibilities then?

6       A.    At the Department of Justice or the

7    Secretary of State?

8       Q.    I assume you're referring to January of '08

9    when you came back.

10      A.    Yes.

11      Q.    Back in your present position.

12      A.    I came back as director of administrative

13   services, yes.

14      Q.    And who hired you as director of

15   administrative services?

16      A.    Buddy Caldwell.

17      Q.    Okay.  Were there other candidates as far

18   as you know?

19      A.    I have no idea.

20      Q.    Okay.  Were you interviewed for the job?

21      A.    I was approached before the election, would

22   I be interested in working with him if he was

23   successful.

24      Q.    When is the first time you met Mr. Buddy

25   Caldwell?

1      A.   I couldn't tell you what year.  I've known

2  him at least twelve years.

3      Q.   Okay.  When you first met him, were you

4  working for the Secretary of State?

5      A.   No.  I was working for the Attorney

6  General.

7      Q.   Okay.  And at that time you were --

8      A.   In the collections section.

9      Q.   Collections section.  How far did you get

10  in school, ma'am?

11      A.   I have a JD.  From Southern University.

12      Q.   Okay.  And what year was that?

13      A.   1988.

14      Q.   And where did you go to undergrad?

15      A.   McNeese in Lake Charles.

16      Q.   What did you major in?

17      A.   Social studies, education.

18      Q.   Did you ever do anything with that?  Did

19  you ever teach school or anything?

20      A.   No.  I didn't want to.

21      Q.   All right.  I wonder if you could give me

22  an idea of the kind of training you have received

23  since you have been employed by the State of

24  Louisiana, and I guess I'm thinking in terms of

25  personnel management issues, such as equal

1    opportunity, harassment policies.

2              MR. SHOWS:

3                   I object to the form of the question.

4    It's about four different questions.  If you can

5    break them down.

6              MR. WILLIAMS:

7                   Yeah.  I'm kind of setting background

8    here, and I understand that was not the best

9    question.

10   BY MR. WILLIAMS:

11        Q.   Could you give me an idea of the kind of

12   training, if any, that you received in civil rights

13   administration, management, complaints, that sort of

14   thing.

15        A.   Probably no official training.  I have

16   attended some EEOC seminars.

17        Q.   Okay.

18        A.   But other than that, no.

19        Q.   When you say EEOC seminars, could you

20   describe those for me a little bit.

21        A.   To where the federal government puts on a

22   program to teach you about EEOC claims and what you

23   should and shouldn't do.

24        Q.   Can you remember which ones you attended?

25        A.   The last one I attended was in Lake

1    Charles.

2        Q.   Okay.

3        A.   Within the last two years.

4        Q.   And who, was it the local EEOC office?

5        A.   I think it was a group spread from Houston

6    through New Orleans, there were different speakers.

7        Q.   Okay.  And where was that held?

8        A.   Lake Charles.

9        Q.   Do you remember what venue?  Whether it was

10   in a government building or --

11       A.   It was at L'Auberge.

12       Q.   I'm sorry?

13       A.   L'Auberge du Lac.  It's a casino that has

14   facilities for meetings like that.

15       Q.   Okay.  Was that a one day seminar?

16       A.   Yes.

17       Q.   Okay.  Who attended that with you?

18       A.   Nobody from my office.  Just me.

19       Q.   And what office were you working in two

20   years ago that would have been --

21       A.   Same office I'm in now.

22       Q.   Okay.  Did they teach you about, did part

23   of that instruction cover the Equal Pay Act?

24       A.   I don't recall.

25       Q.   You don't recall?

1        A.    Huh-uh.

2        Q.    Did it cover Title 7?

3        A.    I don't remember.

4        Q.    Okay.  Other than that seminar two years

5   ago or so in Lake Charles, do you recall any other

6   specific instance of training you received in civil

7   rights administration?

8        A.    I don't recall.

9        Q.    Is there someone in your office that you

10   rely on for advice in that area?

11        A.    I consult with a couple of attorneys in

12   litigation section on occasion.

13        Q.    Okay.  Who are they?

14        A.    They would be David Sanders and Bridget

15   Denicola.

16        Q.    David Sanders.  And Bridget --

17        A.    Denicola.

18        Q.    What is their background generally in this

19   area?

20        A.    I couldn't tell you.  I don't know.

21        Q.    Okay.  Have you ever had discussions with

22   either Mr. Sanders or Miss Denicola on Miss Jennifer

23   Medley's issues?

24             MR. SHOWS:

25                  I'm going to object in that that's

1    attorney-client privilege, if she was consulting the

2    attorneys in connection with this litigation, at

3    least.

4    BY MR. WILLIAMS:

5        Q.   Well, I'm not -- let me just clarify the

6    question.  I don't seek to elicit any information

7    about what transpired between you or any attorney,

8    for that matter.  I just want to find out who you

9    did or didn't consult with.  I think I'm entitled to

10   know that.

11       A.   The only people I would have talked to

12   about anything like that would be Bridget and David.

13       Q.   Well, now, in this case, Miss Jennifer

14   Medley's case, did you consult with either

15   Mr. Sanders or Miss Denicola about Miss Medley?

16       A.   Probably so, but I wouldn't recall when it

17   was or what exactly we talked about, because it's

18   been a long time.

19       Q.   Okay.  Do you remember being present, I

20   believe it was with the Attorney General on or about

21   April 1st of 2008 at the State Capitol building and

22   you were asked, and you had some questions posed by

23   Senator Carter Peterson concerning pay issues.

24       A.   I don't think she asked me anything.  I

25   remember what day you're talking about.  But I don't

```
 1    --

 2         Q.    Do you remember Senator Peterson asking

 3    Mr. Caldwell questions in that general area?

 4         A.    Yes, she, it's on the record what she said.

 5         Q.    Okay.

 6         A.    But I don't remember.

 7         Q.    Okay.  You were sitting at the table --

 8         A.    Probably so.

 9         Q.    -- weren't you?  Do you remember a request

10    made by Senator Peterson for certain information

11    concerning pay?

12         A.    I don't remember.  I testify often, and my

13    staff and I, we testify in all kinds of things, so I

14    don't really remember.

15         Q.    All right.  My question, ma'am, is I'd like

16    to know whatever information you have concerning

17    followup on those information requests.  Do you have

18    any knowledge at all about that?

19         A.    I don't remember what was asked.  If you

20    want to know what was asked, you can pull it up in

21    the archives and see what was asked and what was

22    answered, but I couldn't tell you.

23         Q.    Okay.  I've looked at it.

24         A.    Okay.

25         Q.    Okay.  And would it refresh your
```

1  recollection to view it?

2      A.   I guess it would, but I don't know what --

3          MR. SHOWS:

4              If you got something to refresh her

5  recollection, she'll look at it.

6          MR. WILLIAMS:

7              Well, I could --

8          MS. MEDLEY:

9              I can pull it up.

10         MR. WILLIAMS:

11             Why don't we pull it up right now.  I

12 think that's probably what we're going to have to

13 do.  While she's doing that -- is it going to take a

14 while?

15         MS. MEDLEY:

16             Huh-uh.  Satellite card is pretty

17 quick.

18 BY MR. WILLIAMS:

19     Q.   Let me just ask a couple questions while --

20     A.   Sure.

21     Q.   Have you ever talked to anybody in, about

22 Miss Jennifer Medley's, about Miss Jennifer Medley,

23 period?

24     A.   No.  Not that I recall.  As a matter of

25 fact, when she walked in the room, I wouldn't have

1  recognized her because I didn't know what she looked

2  like.

3      Q.   Have you ever heard her name mentioned

4  before today?

5      A.   Well, yeah, because I got an EEOC claim.

6      Q.   Is that the first time you heard Miss

7  Jennifer Medley's name?

8      A.   No.  Seems like we did a letter once that I

9  sent to her attorney after, after the claim was

10  filed.  But since then --

11     Q.   Okay.  Before that letter that you received

12  from Miss Jennifer Medley's attorney, can you recall

13  ever hearing her name before?

14     A.   No.

15     Q.   Ever recall seeing it as the topic of a

16  memo or email or any kind of correspondence?

17     A.   No, because I really don't get involved in

18  specific individuals.  Most everything I do is

19  handled in masses, like I do everybody's, handle

20  everybody's leave, their payroll checks come, you

21  know, their payroll stuff comes to my office, but I

22  don't have a lot of personal contact with anybody.

23     Q.   Did you ever talk to Mr. Rob Harroun about

24  Miss Jennifer Medley?  Did he ever come to you with

25  anything?

1          MR. SHOWS:

2               At what point in time are we talking?

3          THE WITNESS:

4               It's so vague.  I'm sure I did talk to

5     him about it.

6     BY MR. WILLIAMS:

7          Q.   About this issue?

8          A.   I don't know what issue you're talking

9     about.

10         Q.   Miss Jennifer Medley's complaints about

11    unequal pay.

12         A.   I'm sure whenever he gave me the paperwork,

13    he said, this is what's been filed, but as far as

14    the substance of it, no, not really.  Like I said, I

15    don't get involved with the substance of these kinds

16    of things.  Most of the stuff I deal with is very

17    superficial when it comes to staff.

18         Q.   And what do you mean by superficial?

19         A.   Meaning I have five hundred people that I'm

20    responsible for, and I don't have time to get into

21    the nitty gritty about any one particular person.  I

22    don't see people in litigation.  I don't see people

23    in civil.  I defer to the directors of the

24    respective divisions to handle their personnel

25    stuff.

1    Q.    Okay.

2    A.    I mean, I can't know if any one person was

3    good or bad or otherwise because I don't have

4    contact with them.

5    Q.    Okay.  In that light, have you ever been

6    made aware of any study of salaries as it applies to

7    race and gender in the Louisiana Department of

8    Justice?

9    A.    I know at one time we were attempting to do

10   that, to look at it.  But I never got the results of

11   it.

12   Q.    I want to ask you questions about that.

13   When was that, ma'am?

14   A.    What's the date of the letter that I said

15   we were conducting it?

16   Q.    I'm asking you.

17   A.    I don't know.  I don't have any paperwork

18   with me.

19   Q.    Okay.  So your answer is you are unaware of

20   the date of any such study?

21   A.    That's right.  I'm unaware of the date.

22   Q.    Can you tell me whether it happened in

23   2007?  You wouldn't have been there, I guess.  2008.

24   A.    Would have to be between January 15th of

25   '08 and now.

1      Q.    And you can't --

2      A.    I don't remember, no.

3      Q.    Can't give me any -- you don't have the

4  slightest idea --

5      A.    Nope.

6      Q.    -- when that was?  Well, tell me about what

7  they were trying to do in the study.  I want to know

8  what you understand about it.

9      A.    They were supposed to be analyzing the pay

10  of attorneys to see if there were any inequities.

11      Q.    Okay.  And who was involved in that?

12      A.    I don't know.  You would have to ask Rob.

13      Q.    Rob?

14      A.    Rob Harroun.

15      Q.    What is your understanding of Mr. Harroun's

16  involvement in that?

17      A.    He's the director of litigation so, as I

18  stated before, he would be overseeing anything that

19  would be analyzed about his division.

20      Q.    Why would that be about his division if it

21  was about employees of Department of Justice and you

22  are the director of administrative services?

23      A.    I would think that at that time somebody

24  had complained about their salary.  Since I don't

25  remember what day I wrote the letter, I couldn't

```
1    tell you who was complaining at that time.
2              MR. WILLIAMS:
3                    Okay.  Let's watch that tape.  Put it
4    there so everybody can see it.
5              MR. SHOWS:
6                    I don't need to see it.
7              THE WITNESS:
8                    I don't either.
9              MS. MEDLEY:
10                   Yeah.  I'm just getting to that point,
11   so you don't have to watch all the other agencies.
12   Trying to skip ahead.  See, this looks like you.
13             MR. WILLIAMS:
14                   We can include this, on a disk.
15             MR. SHOWS:
16                   We can't continue with the other
17   questions while this --
18             MR. WILLIAMS:
19                   Really they all follow from this.
20             MS. MEDLEY:
21                   Got a ways to go.
22             MR. WILLIAMS:
23                   Can't you --
24             MS. MEDLEY:
25                   It's coming.
```

```
 1              (THE CD WAS WATCHED/LISTENED TO.)
 2    BY MR. WILLIAMS:
 3         Q.   Does that refresh your recollection, ma'am?
 4         A.   I remember that day, yeah.
 5         Q.   Okay.  What I want to ask you about is any
 6    knowledge you have of any investigation into the two
 7    EEOC complaints that the Attorney General referenced
 8    in that dialogue.
 9         A.   Like I said, I don't have first-hand
10    knowledge of any of the individuals, so I don't get
11    involved in that part of it.
12         Q.   Do you administer the policies and
13    procedures for employees of the Attorney General's
14    office?
15         A.   I think the last time the policies and
16    procedures were updated was 2000.
17         Q.   Okay.  Well, my question was, is part of
18    your responsibility to administer those policies and
19    procedures?
20         A.   I guess you could say that.
21         Q.   Okay.  It's part of your job to be familiar
22    with what they are?
23         A.   I guess I need to reference them if
24    something came up, yes.
25         Q.   What is the policy with respect to the
```

1    evaluation of attorneys working for the Attorney

2    General of the State of Louisiana?

3        A.    I don't know.

4        Q.    Okay.  Would it be reflected in the policy

5    manual?

6        A.    I couldn't tell you because I haven't

7    looked at it.  And then I don't know if the policies

8    -- we don't do, we don't do evaluations on a regular

9    basis of attorneys.

10       Q.    If the policy manual said that evaluations

11   shall be done once a year, and I'll give you that,

12   would you dispute that that is the policy?

13       A.    It may be the policy, but not the practice.

14       Q.    Okay.  Why wouldn't it be the practice?

15       A.    Because each Attorney General does things

16   the way they want to.

17       Q.    If I were to tell you that Miss Medley got

18   a policy and procedure manual, received it, was

19   issued to her by the Department of Justice, that

20   said that she was to be evaluated after six months,

21   and then at twelve month intervals after that, is it

22   your position that, even though she got that policy

23   and procedure manual, it may not have applied, that

24   language may not have applied?

25       A.    It depends on when she was hired and under

1   what administration.

2        Q.   Well, I mean --

3        A.   Under the current administration, we do not

4   do evaluations on attorneys on a regular basis.

5        Q.   What method is used to evaluate their

6   performance in terms of pay?

7        A.   In litigation, ORM does evaluations of

8   their attorneys, that represent them.

9        Q.   Would that be the claims adjusters?

10       A.   Yes, risk management.

11       Q.   Risk management?

12       A.   Uh-huh.

13       Q.   So if I were to try to figure out who is

14  doing a good job or bad job, best place to start,

15  according to what I'm understanding, is those

16  evaluations by the ORM claims people?

17       A.   Honestly, I've never seen one.  I don't

18  know what's contained in them.  I don't get those.

19  I don't have any involvement with those.  So I mean,

20  I guess maybe you should.  I don't know.

21       Q.   You mentioned evaluations may be the policy

22  but not the practice.  What is your understanding

23  about the practice of evaluating?

24       A.   I mean, I don't know what to say.  You

25  know, we don't, they're not done.

1    Q.   Okay.  That's --

2    A.   Not formally done.

3    Q.   If that's your understanding, that's a

4    perfectly good answer.  I would like to ask you

5    about what the Attorney General mentioned as being

6    his open door policy.  Are you acquainted with any

7    instances where you are aware of people using the

8    open door policy and coming to the Attorney General

9    in person?

10   A.   I wouldn't be privy to it because I'm not

11   on the same side of the building, and I would have

12   to check with his secretary to see if, you know, and

13   I have way too much to do.  I just wouldn't,

14   wouldn't know first hand.

15   Q.   Okay.  Do you happen to know whether there

16   is any administrative procedure to keep track or

17   keep record of people who have used the open door

18   system?

19   A.   I wouldn't know.  Hadn't heard of anything.

20   Q.   Okay.  Is there any procedure you're aware

21   of that employees, specifically attorney employees

22   of the Attorney General, would use to get an

23   audience with the Attorney General?

24   A.   Like I said, I wouldn't know because I'm

25   not involved in any of that.  I'm on a different

1    side of the building and --

2        Q.    I believe you testified that you saw the

3    EEOC complaint that Miss Jennifer Medley had filed,

4    is that correct?

5        A.    I received a copy of it, yes.

6        Q.    Who did you discuss that EEOC complaint

7    with?

8        A.    I wouldn't remember.

9        Q.    Well, if you don't remember in this

10   instance, who would you usually have talked to about

11   such matters?

12       A.    I don't handle it as an attorney, and I

13   didn't have anything to do with the subject matter

14   of the case directly, so the attorneys, like Bridget

15   and David, would be the ones that would be looking

16   at that, not me.

17       Q.    Were you addressed, were you sent a copy of

18   the EEOC complaint?

19       A.    Yes.

20       Q.    And what did you do with it, if anything?

21       A.    I have a copy in my desk.  I don't really

22   do a lot with it.  I'm just not involved.

23       Q.    You keep a copy in your desk?

24       A.    Uh-huh.

25       Q.    Did you ever discuss any of the topics that

1   you just heard mentioned in the excerpt that we

2   listened to, did you ever discuss any of those

3   topics with Attorney General Buddy Caldwell?

4       A.   It's possible, but I don't specifically

5   remember any certain thing that we would have said

6   about it.

7       Q.   Was there any directions, did he tell you

8   to do anything as a result of that conversation that

9   you can recall?

10      A.   Not that I recall.

11      Q.   Are there any documents that, I think there

12  was a reference to a complete investigation

13  concerning the EEOC complaints.  Are you aware of

14  any complete investigation or any kind of

15  investigation ever having taken place?

16      A.   I wouldn't be privy to it, if there were.

17  So I don't know.

18      Q.   Were you ever asked to prepare a list of

19  employees, their salaries and their ethnicity and

20  gender?

21      A.   We don't have that information in our data

22  base about their ethnicity.  So I mean, I wouldn't

23  have been able to produce it.

24      Q.   Did you produce any information for the

25  Attorney General in response to Senator Peterson's

1     request?

2          A.     I don't recall.

3          Q.     Just a quick word with my client, ma'am.

4          A.     Sure.

5                 (SHORT BREAK TAKEN.)

6                 MR. WILLIAMS:

7                      Miss Free, we've asked you all the

8     questions we need to ask you and we appreciate you

9     being here this morning.

10                THE WITNESS:

11                     Okay.  Thank you.

12                (DEPOSITION CONCLUDED.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              REPORTER'S CERTIFICATE

 2

 3        I, JAN DICICCO, Certified Court Reporter, do

 4   hereby certify that the above-named witness, after

 5   having been first duly sworn by me to testify to the

 6   truth, did testify as herein above set forth;

 7        That the testimony was reported by me in

 8   shorthand and transcribed under my personal

 9   direction and supervision, and is a true and correct

10   transcript, to the best of my ability and

11   understanding;

12        That I am not of counsel, not related to

13   counsel or the parties hereto, and not in any way

14   interested in the outcome of this matter.

15

16

17

18        _____

19             JAN DICICCO

20        CERTIFIED COURT REPORTER

21

22

23

24

25
```

OFFICIAL SEAL
JAN DICICCO
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 85007
Certificate expires 12-31-10

WITNESS'S CERTIFICATE

I have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

(     ) No Corrections

(     ) Corrections Attached

_____

RENEE FONTENOT FREE